# 12-2605-cr

## United States Court of Appeals

*for the*

## Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GHULAM MESBAHUDDIN a/k/a Rumi,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 1 of 2 (Pages A-1 to A-275)

JOHN L. RUSSO, ESQ.
MICHAEL D. HORN, ESQ.
LAW OFFICES OF JOHN L. RUSSO
*Attorneys for Defendant-Appellant*
31-19 Newtown Avenue, Suite 500
Astoria, New York 11102
(718) 777-7717

MICHAEL P. CANTY, ESQ.
UNITED STATES ATTORNEY'S OFFICE,
  EASTERN DISTRICT OF NEW YORK
*Attorney for Appellee*
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

i

# TABLE OF CONTENTS

**Page**

Docket Entries ................................................. A-1

Transcript of Trial before the Honorable Nicholas
    G. Garaufis, dated August 29, 2011 ...................... A-10

Transcript of Trial before the Honorable Nicholas
    G. Garaufis, dated August 30, 2011 ...................... A-82

Transcript of Trial before the Honorable Nicholas
    G. Garaufis, dated August 31, 2011 ...................... A-276

Government Exhibit 1-Currency (Physical Exhibit) . A-454

Government Exhibit 2-Cookie Box (Physical
    Exhibit) ................................................. A-455

Government Exhibit 3-Passport Photograph ............ A-456

Government Exhibit 3A-Passport Photograph .......... A-457

Government Exhibit 3B-Thumbprints ...................... A-458

Government Exhibit 4-Passport Photograph ............ A-459

Government Exhibit 4A-Passport Photograph .......... A-460

Government Exhibit 4B- Thumbprints ..................... A-461

Government Exhibit 6-CD Recording of a
    Telephone Call ......................................... A-462

Government Exhibit 6A-Transcript of CD
    Recording of a Telephone Call ............................ A-463

Government Exhibit 7-CD Recording of a
    Telephone Call ......................................... A-465

Government Exhibit 7A-Transcript of CD
    Recording of a Telephone Call ............................ A-466

ii

| | Page |
|---|---|
| Government Exhibit 8-CD of a Conversation ........... | A-482 |
| Government Exhibit 8A-Translation of Conversation ............................................ | A-483 |
| Government Exhibit 3500-Sm-4-Cooperation Agreement................................................ | A-487 |
| Government Exhibit 9A-Stipulation, dated August 29, 2011 ...................................... | A-496 |
| Government Exhibit 10-Telephone Call between Maynard and Defendant ........................ | A-498 |
| Government Exhibit 11-Meeting between Maynard and Defendant ............................ | A-499 |
| Government Exhibit 12-Meeting between Maynard and Defendant ............................ | A-500 |
| Government Exhibit 14-Items recovered when Defendant was arrested........................... | A-501 |
| Government Exhibit 15-Items recovered when Defendant was arrested........................... | A-502 |
| Notice of Appeal, dated June 15, 2012 ..................... | A-503 |

A-1

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

CLOSED,APPEAL,MJSELECT-RLM

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:10-cr-00726-NGG-1

Case title: USA v. Mesbahuddin
Magistrate judge case number: 1:10-mj-00549-RML

Date Filed: 09/23/2010
Date Terminated: 06/25/2012

Assigned to: Judge Nicholas G. Garaufis

**Defendant (1)**

**Ghulam Mesbahuddin**
*TERMINATED: 06/25/2012*
*also known as*
Rumi
*TERMINATED: 06/25/2012*

represented by **John L. Russo**
Law Offices of John L. Russo
31-01 Broadway
4th Floor
Astoria, NY 11106
718-777-1777
Fax: 718-777-2737
Email: johnlawny@msn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jan Alison Rostal**
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1207
Fax: (718) 855-0760
Email: Jan_Rostal@fd.org
*TERMINATED: 05/24/2010*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Michael D. Horn**
Michael D. Horn
118-21 Queens Blvd
Suite 606
Forest Hills, NY 11375
718-261-9273
Fax: 718-261-9302
Email: mdhornesq@aol.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Susan Gail Kellman**
Susan G. Kellman
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
Fax: 718-783-8226
Email: kellmanesq@aol.com
*TERMINATED: 08/25/2011*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| FRAUD WITH IDENTIFICATION DOCUMENTS (1) | Dismissed on Motion of the United States |
| Conspiracy to Transfer False Identification Documents (1s) | Dismissed on Motion of the United States |
| Conspiracy to Transfer False Identification Documents (1ss) | Receives 27 months imprisonment on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each other; 3 years supervised release on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each; $200 special assessment |
| Bribery Conspiracy (2s) | Dismissed on Motion of the United States |
| Bribery Conspiracy (2ss) | Receives 27 months imprisonment on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each other; 3 years supervised release on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each; $200 special assessment |

**Highest Offense Level (Opening)**
Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

A-3

None

| **Complaints** | **Disposition** |
|---|---|
| 18:1028A.F | |

**Plaintiff**

**USA**                                          represented by **Michael P Canty**
                                                                  United States Attorneys Office
                                                                  Eastern District of New York
                                                                  271 Cadman Plaza East
                                                                  Brooklyn, NY 11201
                                                                  718-254-6032
                                                                  Fax: 718-254-6076
                                                                  Email: michael.canty@usdoj.gov
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Todd Kaminsky**
                                                                  United States Attorneys Office
                                                                  271 Cadman Plaza East
                                                                  Brooklyn, NY 11201
                                                                  718-254-6367
                                                                  Fax: 718-254-6481
                                                                  Email: todd.kaminsky@usdoj.gov
                                                                  *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2010 | 1 | COMPLAINT as to Stan Gerald Maynard (1), Ghulam Mesbahuddin (2). (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 05/13/2010) |
| 05/12/2010 | 6 | Minute Entry for proceedings held before Magistrate Judge Robert M. Levy:Arraignment as to Ghulam Mesbahuddin (2) Count Complaint held on 5/12/2010. Attorney Appointment Hearing as to Ghulam Mesbahuddin held on 5/12/2010. Initial Appearance as to Ghulam Mesbahuddin held on 5/12/2010. AUSA Todd Kaminsky present. Dft. present with Federal Defender Jan Rostal. Bail set @ $20,000 with some conditions. Order of excludable delay entered. (Tape #3:57-4:22; 5:59-6:10.) (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 05/13/2010) |
| 05/12/2010 | 7 | ORDER Setting Conditions of Release as to Ghulam Mesbahuddin (2) $20,000. Ordered by Magistrate Judge Robert M. Levy on 5/12/2010. (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 05/13/2010) |
| 05/12/2010 | 8 | ORDER TO CONTINUE - Ends of Justice as to Ghulam Mesbahuddin Time excluded from 5/17/10 until 6/12/10. Ordered by Magistrate Judge Robert M. Levy on 5/12/2010. (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 05/13/2010) |

A-4

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

| 05/12/2010 | 9 | CJA 23 Financial Affidavit by Ghulam Mesbahuddin. (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 05/13/2010) |
| 05/24/2010 | 12 | NOTICE OF ATTORNEY APPEARANCE: John L. Russo appearing for Ghulam Mesbahuddin (Russo, John) [1:10-mj-00549-RML] (Entered: 05/24/2010) |
| 06/24/2010 | 14 | ORDER TO CONTINUE - Ends of Justice as to Ghulam Mesbahuddin Time excluded from 6/23/10 until 7/23/10. Ordered by Magistrate Judge Roanne L. Mann on 6/24/2010. (DiLorenzo, Krista) [1:10-mj-00549-RML] (Entered: 06/25/2010) |
| 07/30/2010 | 16 | Minute Entry for proceedings held before Magistrate Judge Cheryl L. Pollak:Docket Call as to Ghulam Mesbahuddin held on 7/30/2010. AUSA Todd Kaminsky present. Dft present w/ret counsel John Russo. Order of excludable delay entered. Time excluded from 7/30/10 until 8/30/10. (Log # 7/30/10 11:54-11:58.) (Chin, Felix) [1:10-mj-00549-RML] (Entered: 08/02/2010) |
| 07/30/2010 | 17 | ORDER TO CONTINUE - Ends of Justice as to Ghulam Mesbahuddin Time excluded from 7/30/10 until 8/30/10. Ordered by Magistrate Judge Cheryl L. Pollak on 7/30/10. (Chin, Felix) [1:10-mj-00549-RML] (Entered: 08/02/2010) |
| 08/23/2010 | 18 | Minute Entry for proceedings held before Magistrate Judge Andrew L. Carter, Jr:Docket Call as to Ghulam Mesbahuddin held on 8/23/2010. AUSA Todd Kaminsky present. Dft present w/ret counsel John Russo. Order of excludable delay entered. Time excluded from 8/23/10 until 9/23/10. (Log # 8/23/10 11:31-11:33.) (Chin, Felix) [1:10-mj-00549-RML] (Entered: 08/23/2010) |
| 08/23/2010 | 19 | ORDER TO CONTINUE - Ends of Justice as to Ghulam Mesbahuddin Time excluded from 8/23/10 until 9/23/10. Ordered by Magistrate Judge Andrew L. Carter, Jr on 8/23/2010. (Chin, Felix) [1:10-mj-00549-RML] (Entered: 08/23/2010) |
| 09/23/2010 | 20 | INDICTMENT as to Ghulam Mesbahuddin (1) count(s) 1. (Attachments: # 1 Criminal Information Sheet) (Lee, Tiffeny) (Entered: 09/24/2010) |
| 10/06/2010 | 21 | Minute Entry for proceedings held before Magistrate Judge Joan M. Azrack: Todd Kaminsky for the United States; John Russo for the defendant. Arraignment as to Ghulam Mesbahuddin (1) Count 1 held on 10/6/2010. Plea entered; Not Guilty on counts 1. OED entered Status Conference set for 10/28/2010 at 10:30 AM in Courtroom 4D South before Judge Nicholas G. Garaufis. (Tape #11:33-11:34) (Lee, Tiffeny) (Entered: 10/07/2010) |
| 10/06/2010 | 22 | ORDER of Excludable Delay as to Ghulam Mesbahuddin: Time excluded from 10/6/2010 until 10/28/2010. Ordered by Magistrate Judge Joan M. Azrack on 10/6/2010. (Lee, Tiffeny) (Entered: 10/07/2010) |
| 11/02/2010 | 25 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis:Status Conference as to Ghulam Mesbahuddin held on 11/2/2010, ( Status Conference set for 11/22/2010 10:00 AM in Courtroom 4D South before Judge Nicholas G. Garaufis.) Speedy Trial, XT, Start 11/2/10 - Stop 11/22/10. AUSA Todd Kaminsky; Defense Counsel, John Russo. (Court Reporter Allan Sherman.) (Piper, Francine) (Entered: 12/02/2010) |

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

| | | |
|---|---|---|
| 11/18/2010 | | MOTION to Continue *11/22/2010 Conference* by Ghulam Mesbahuddin. (Lee, Tiffeny) (Entered: 11/24/2010) |
| 11/24/2010 | 23 | ORDER granting [] Motion to Continue as to Ghulam Mesbahuddin (1). Ordered by Judge Nicholas G. Garaufis on 11/22/2010. (Lee, Tiffeny) (Entered: 11/24/2010) |
| 11/29/2010 | 24 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Defendant on bond appears with counsel John Russo. AUSA Kaminsky appears for the Government.Status Conference as to Ghulam Mesbahuddin held on 11/29/2010.JURY SELECTION AND TRIAL IS SCHEDULED FOR FEBRUARY 14, 2011. PARTIES CONSENT TO A MAGISTRATE JUDGE SELECTING THE JURY. Time excluded from 11/29/2010 until 2/14/2011. (Court Reporter Allen Sherman.) (Marziliano, August) (Entered: 11/30/2010) |
| 01/20/2011 | 26 | SUPERSEDING INDICTMENT (S-1) as to Ghulam Mesbahuddin (1) count(s) 1s, 2s. (Attachments: # 1 Criminal Information Sheet) (Lee, Tiffeny) (Entered: 01/21/2011) |
| 01/27/2011 | 27 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis:Arraignment as to Ghulam Mesbahuddin (1) Count 1s,2s held on 1/27/2011 and Bond Revocation Hearing held. Plea entered by Ghulam Mesbahuddin Not Guilty on all superseding counts. AUSA Todd Kaminsky; John Russo, Esq. present for deft. Deft shall remain out on bail at this time. However the defendant needs to present a more sufficient bail package at the next hearing. Hearing set for 2/3/2011 at 10:30 AM in Courtroom 4D South before Judge Nicholas G. Garaufis. (Court Reporter Victoria Butler.) (Fernandez, Erica) (Entered: 02/02/2011) |
| 02/03/2011 | 28 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis:Status Conference as to Ghulam Mesbahuddin held on 2/3/2011. Counsel for parties present. The Deft remains out on bail pursuant to a new order setting conditions of release and bond dated 2/3/11. Jury Selection and Jury Trial set for 6/6/2011 09:30 AM in Courtroom 4D South before Judge Nicholas G. Garaufis. Parties consent to a Magistrate Judge selecting the jury. Pretrial Conference set for 5/6/2011 at 12:30 PM in Courtroom 4D South before Judge Nicholas G. Garaufis. Speedy trial info entered start 2/3/11 and stop 6/6/11. (Court Reporter Fred Guerino.) (Fernandez, Erica) (Entered: 02/09/2011) |
| 02/03/2011 | 29 | ORDER Setting Conditions of Release and Bond as to Ghulam Mesbahuddin (1). Ordered by Judge Nicholas G. Garaufis on 2/3/2011. (Fernandez, Erica) (Entered: 02/09/2011) |
| 04/04/2011 | 30 | Letter *Notice of Appearance* as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 04/04/2011) |
| 04/04/2011 | | Attorney update in case as to Ghulam Mesbahuddin. Attorney Michael P Canty for USA added. (Lee, Tiffeny) (Entered: 04/05/2011) |
| 04/05/2011 | | Incorrect Entry Information: The event, "Notice of Attorney Appearance-USA," is the correct event to note appearance of attorney for the United States of America. Please use this event in the future for such filings. (Lee, Tiffeny) (Entered: 04/05/2011) |

A-6

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

| | | |
|---|---|---|
| 05/13/2011 | 31 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Status Conference as to Ghulam Mesbahuddin held on 5/13/2011. AUSA Tood Kaminsky and Michael Canty; John Russo for defendant. Jury selection and trial has been rescheduled from 6/6/11 to 8/29/11. Parties consent to a magistrate judge selecting the jury. (Court Reporter: Shelly Silverman.) (Chee, Alvin) (Entered: 05/18/2011) |
| 07/20/2011 | 32 | Letter *regarding plea withdrawal* as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 07/20/2011) |
| 08/08/2011 | 33 | First MOTION in Limine by USA as to Ghulam Mesbahuddin. (Canty, Michael) (Entered: 08/08/2011) |
| 08/08/2011 | 34 | ORDER as to Ghulam Mesbahuddin -- This case has been referred to me for purposes of selecting a trial jury, which I will do on **August 29, 2011, beginning promptly at 9:30 a.m. in courtroom 4D, South.** I direct counsel for each party to submit, no later than noon on August 26, 2011, any questions the party wishes me to ask of prospective jurors during *voir dire.* Only questions specifically addressing the issues to be tried should be submitted; routine questions are not necessary. I further direct each party to include within its submission a list of the names of all persons, entities, and locations that the party expects to be mentioned during the trial.. Ordered by Magistrate Judge James Orenstein on 8/8/2011. (Guy, Alicia) (Entered: 08/08/2011) |
| 08/09/2011 | | Judge update in case as to Ghulam Mesbahuddin. Magistrate Judge James Orenstein added. (Brown, Marc) (Entered: 08/09/2011) |
| 08/11/2011 | 35 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Michael Canty for the United States; John Russo for the defendant. Status Conference as to Ghulam Mesbahuddin held on 8/11/2011. Any defense opposition to the government's motion is due by 8/19/2011. Parties proposed jury charge is due by 5/26/2011. Jury Selection set for 8/29/2011 at 09:30 AM in Courtroom 11D South before Magistrate Judge James Orenstein. Jury Trial to follow on 8/29/2011 in Courtroom 4D South before Judge Nicholas G. Garaufis. A charge conference will be held at the end of the day on Monday, 8/29/2011. Time is excluded between today and 8/29/2011 under the Speedy Trial Act from the court's previous order on consent of the parties. (Court Reporter Michele Nardone) (Lee, Tiffeny) (Entered: 08/16/2011) |
| 08/18/2011 | 36 | Second MOTION in Limine by USA as to Ghulam Mesbahuddin. (Canty, Michael) (Entered: 08/18/2011) |
| 08/19/2011 | 39 | SUPERSEDING INDICTMENT(S-2) as to Ghulam Mesbahuddin (1) count(s) 1ss, 2ss. (Attachments: # 1 Criminal Information Sheet) (Lee, Tiffeny) (Entered: 08/25/2011) |
| 08/22/2011 | 37 | Proposed Jury Instructions by USA as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 08/22/2011) |
| 08/23/2011 | 38 | Letter *regarding Curcio issue* as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 08/23/2011) |

A-7

| 08/24/2011 | 46 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: The case was called and all the parties were present. John Russo and Michael Horn appeared for the defendant and Michael Canty for the government. The court appointed Susan Kellman to serve as cursio counsel for the defendant to deal with any potential conflicts. The hearing will continue on 8/25/11 at 4:00pm. ( Curcio Hearing set for 8/25/2011 04:00 PM in Courtroom 4D South before Judge Nicholas G. Garaufis.) (Court Reporter Marsha Diamond.) (Jackson, Andrew) (Entered: 08/26/2011) |
| 08/24/2011 | | Attorney update in case as to Ghulam Mesbahuddin. Attorney Susan Gail Kellman for Ghulam Mesbahuddin added as curcio counsel. (Lee, Tiffeny) (Entered: 08/30/2011) |
| 08/25/2011 | 51 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Michael Canty for the United States; John Russo/Michael Horn for the defendant. Curcio Hearing held on 8/25/2011. Special curcio counsel Susan Kellman informs the defendant of the various potential conflicts that may occur. Court advises the defendant of the potential conflicts that may occur during trial. Defendant waives potential conflict of interest. The Court finds that the defendant knowingly and intentionally waives any potential conflict with his attorney. The defendant also understands and agrees in the event that Mr. Russo takes the witness stand and testifies, he will no longer be able to represent him, and tat Mr.Russo's assistant, Mr. Horn, would represent him for the duration of the trial. Ms. Kellman's duties are completed in her capacity of curcio counsel. The defendant is arraigned on the second superseding indictment and enters a plea of Not Guilty on counts S-2. (Court Reporter Marsha Diamond) (Lee, Tiffeny) (Entered: 08/30/2011) |
| 08/26/2011 | 40 | Proposed Voir Dire by Ghulam Mesbahuddin (Russo, John) (Entered: 08/26/2011) |
| 08/26/2011 | 41 | Proposed Voir Dire by USA as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 08/26/2011) |
| 08/26/2011 | 42 | Proposed Jury Instructions by Ghulam Mesbahuddin (Russo, John) (Entered: 08/26/2011) |
| 08/26/2011 | 43 | Proposed Voir Dire by Ghulam Mesbahuddin (Russo, John) (Entered: 08/26/2011) |
| 08/26/2011 | 44 | WITNESS LIST by Ghulam Mesbahuddin (Russo, John) (Entered: 08/26/2011) |
| 08/26/2011 | 45 | WITNESS LIST by Ghulam Mesbahuddin (Russo, John) (Entered: 08/26/2011) |
| 08/26/2011 | 47 | ORDER granting Motions in Limine (Docket Entry ## 33, 36). Ordered by Judge Nicholas G. Garaufis on 8/26/2011. (Fishman, Benjamin) (Entered: 08/26/2011) |
| 08/26/2011 | 48 | NOTICE OF ATTORNEY APPEARANCE: Michael D. Horn appearing for Ghulam Mesbahuddin (Horn, Michael) (Entered: 08/26/2011) |
| 08/29/2011 | 49 | ORDER: the parties shall file submissions as per the attached order. Ordered by Judge Nicholas G. Garaufis on 8/29/2011. (Fishman, Benjamin) (Entered: 08/29/2011) |

A-8

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

| 08/29/2011 | 52 | Minute Entry for proceedings held before Magistrate Judge James Orenstein: Michael Canty, Sylvia Shwedder for the United States; John Russo, Michael Horn for the defendant. Jury Selection as to Ghulam Mesbahuddin held on 8/29/2011. (Court Reporter Charlene Heading) (Lee, Tiffeny) (Entered: 08/30/2011) |
|---|---|---|
| 08/29/2011 |  | Case as to Ghulam Mesbahuddin no longer referred to Magistrate Judge James Orenstein. (Lee, Tiffeny) (Entered: 08/30/2011) |
| 08/29/2011 | 53 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis:Jury Trial as to Ghulam Mesbahuddin held on 8/29/2011. The case was called and all the parties were present. Michael Canty and Sylvia Shweder for United States, and John Russo and Michael Horn appeared for the defendant. The jury was charged; Opening arguments. Witness called: Jeffery Goldberger. Government's exhibits received in evidence. ( Jury Trial set for 8/30/2011 11:00 AM in Courtroom 4D South before Judge Nicholas G. Garaufis.) (Court Reporter Shelly Silverman.) (Jackson, Andrew) (Entered: 09/02/2011) |
| 08/30/2011 | 50 | Proposed Jury Instructions by USA as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 08/30/2011) |
| 08/30/2011 | 54 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Jury Trial as to Ghulam Mesbahuddin held on 8/30/2011. The case was called and all the parties were present. Michael Canty and Sylvia Shweder for United States, and John Russo and Michael Horn appeared for the defendant. Witnesses called: Jeffery Goldberger continued his testimony. Dr. Dwijen Bhattacharjya was deemed an expert witness by the Court; Stan Maynard. Governments exhibits received in evidence. ( Jury Trial set for 8/31/2011 09:30 AM in Courtroom 4D South before Judge Nicholas G. Garaufis.) (Court Reporter Shelly Silverman.) (Jackson, Andrew) (Entered: 09/02/2011) |
| 08/31/2011 | 55 | ORDER of Sustenance as to Ghulam Mesbahuddin. Ordered by Judge Nicholas G. Garaufis on 8/31/2011. (Lee, Tiffeny) (Entered: 09/06/2011) |
| 08/31/2011 | 56 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Jury Trial as to Ghulam Mesbahuddin held on 8/31/2011.The case was called and all the parties were present. A.U.S.A. Michael Canty and Sylvia Shweder for the government. John Russo and Michael Horn appeared for the defendant. Witnesses called and testified; Closing arguments; Rebuttal; Charge of the Court; Marshal sworn; Jury Deliberations begin; Jury polled; Jury renders a guilty verdict; See verdict sheet.( Sentencing set for 11/18/2011 02:30 PM in Courtroom 4D South before Judge Nicholas G. Garaufis.) (Court Reporter Shelly Silverman.) (Jackson, Andrew) (Entered: 09/09/2011) |
| 08/31/2011 | 57 | JURY VERDICT as to Ghulam Mesbahuddin (1) Guilty on Count 1ss,2ss. (Lee, Tiffeny) (Entered: 09/12/2011) |
| 08/31/2011 | 58 | COURT EXHIBITS 1-6 as Ghulam Mesbahuddin. (Lee, Tiffeny) (Entered: 09/12/2011) |
| 06/13/2012 | 59 | SENTENCING MEMORANDUM by Ghulam Mesbahuddin (Russo, John) (Entered: 06/13/2012) |

A-9

Eastern District of New York - Live Database Version 5.1.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?503857326978085-L_1_0-1

| | | |
|---|---|---|
| 06/14/2012 | 60 | Letter *regarding sentencing* as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 06/14/2012) |
| 06/14/2012 | 61 | Letter *regarding sentencing* as to Ghulam Mesbahuddin (Canty, Michael) (Entered: 06/14/2012) |
| 06/15/2012 | 62 | Minute Entry for proceedings held before Judge Nicholas G. Garaufis: Sentencing as to Ghulam Mesbahuddin held on 6/15/2012. AUSA Michael Canty; John Russo for the defendant. The defendant is remanded to the custody of the U.S. Marshals for the EDNY. The judgment will be prepared and filed shortly. (Court Reporter: Michele Nardone) (Brucella, Michelle) (Entered: 06/20/2012) |
| 06/20/2012 | 63 | ORDER as to Ghulam Mesbahuddin: The defendant is remanded to the custody of the U.S. Marshals for the Eastern District of New York on Friday, June 15, 2012. Ordered by Judge Nicholas G. Garaufis on 6/15/2012. (Brucella, Michelle) (Entered: 06/20/2012) |
| 06/25/2012 | 64 [R] | Letter to the court from Dr. Parham Amini as to Ghulam Mesbahuddin. (Lee, Tiffany) (Entered: 06/25/2012) |
| 06/25/2012 | 65 | JUDGMENT as to Ghulam Mesbahuddin (1), Count(s) 1, 1s, 2s, Dismissed on Motion of the United States; Count(s) 1ss, 2ss Receives 27 months imprisonment on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each other; 3 years supervised release, with special conditions, on Counts 1 and 2 of the Superseding Indictment (S-2) which shall run concurrently to each; $200 special assessment. Ordered by Judge Nicholas G. Garaufis on 6/21/2012. (Lee, Tiffany) (Entered: 06/25/2012) |
| 06/25/2012 | 67 | NOTICE OF APPEAL by Ghulam Mesbahuddin re 65 Judgment. Filing fee $ 455 has not been paid. Service done electronically. (Manuel, Germaine) (Entered: 06/27/2012) |
| 06/27/2012 | | Electronic Index to Record on Appeal as to Ghulam Mesbahuddin sent to US Court of Appeals 67 Notice of Appeal - Final Judgment. Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Manuel, Germaine) Modified on 6/27/2012 (Manuel, Germaine). (Entered: 06/27/2012) |
| 06/27/2012 | | APPEAL FILING FEE DUE re 67 Notice of Appeal - Final Judgment. Please either come to the Clerk's Office or mail the filing fee in the amount of $455.00. (Manuel, Germaine) (Entered: 06/27/2012) |
| 07/19/2012 | 68 | First MOTION for Leave to Appeal In Forma Pauperis , MOTION to Amend/Correct by Ghulam Mesbahuddin. (Russo, John) (Entered: 07/19/2012) |
| 08/08/2012 | 69 | ENDORSED ORDER granting 68 Motion for Leave to Appeal In Forma Pauperis as to Ghulam Mesbahuddin (1). So Ordered by Judge Nicholas G. Garaufis on 8/8/2012. [Received for docketing on 8/13/12.] (Manuel, Germaine) (Entered: 08/13/2012) |

A-10

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - X
 3
    UNITED STATES OF AMERICA      :    CR-10-726
 4
        -against-                      U.S. Courthouse
 5                                :    Brooklyn, New York
    GHULAM MESBAHUDDIN,
 6
            DEFENDANT,             :
 7                                     August 29, 2011
    - - - - - - - - - - - - - - - X    9:30 o'clock a.m.
 8
                TRANSCRIPT OF TRIAL
 9          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
            UNITED STATES DISTRICT JUDGE and a jury.
10

11
    APPEARANCES:
12
    For the Government:      LORETTA LYNCH
13                           United States Attorney
                             271 Cadman Plaza East
14                           Brooklyn, New York  11201
                             BY:  MICHAEL CANTY
15                                SYLVIA SHWEDER
                             Assistants U.S. Attorney
16

17  For the Defendant:       JOHN RUSSO, ESQ.
                             MICHAEL HORN, ESQ.
18

19

20
    Court Reporter:          SHELDON SILVERMAN
21                           Official Court Reporter
                             225 Cadman Plaza East
22                           Brooklyn, New York 11201
                             (718) 613-2537
23

24

25  Proceedings recorded by mechanical stenography. Transcript
    Produced By Computer Aided Transcription.
```

SS      OCR      CM      CRR      CSR

A-11

2

1          (Appearances noted.)

2          THE COURT:   The defendant is present.  I'm informed

3     by the clerk's office that we have sufficient number of jurors

4     to go ahead with jury selection.  In a moment we'll get

5     started with that.  Judge Orenstein will be up and jury

6     selection will take place here in this courtroom.

7          With respect to the charge, we have a draft charge

8     that we'll put up on ECF.  There are some issues that still

9     have to be addressed by the parties for the charge, has to be

10    some language concerning the question of interstate commerce.

11    I'm not sure if it's covered.  You'll tell me and also with

12    respect to the recipient of the bribe working for an agency

13    that received federal money, I'm not sure if it's in the text

14    of the statute, but I don't think there's anything that

15    directs the jury that they have to find that fact, that that

16    was the intention of the conspiracy.

17         Why don't you take a look at that?

18         What we'll attempt to do is meet --  I suppose we'll

19    meet tomorrow afternoon at 5:00 o'clock, go over the charge

20    with whatever additional materials we add to the charge based

21    on your submissions this evening.

22         Are you ready to do opening statements?

23         MR. CANTY:   Yes, your Honor.

24         THE COURT:   Assuming the jury is selected by

25    lunchtime, after lunch we'll go ahead with opening statements.

SS      OCR      CM      CRR      CSR

A-12

3

1          Do you have any witnesses for today?

2          MR. CANTY:   Yes, I have witnesses available for

3    today.

4          THE COURT:   To the extent we can get the trial

5    going, we'll get the trial going.

6          I ordered up a certain number of jurors.  We have

7    what we need so we're going to go ahead and do it.

8          The next person you'll see is Judge Orenstein.

9          (Jury selection taken by Judge Orenstein.)

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SS     OCR     CM     CRR     CSR

A-13

4

1        THE CLERK:  Criminal cause for trial, United States

2   versus Ghulam Mesbahuddin.

3        (Appearances noted.)

4        THE COURT:    Good afternoon.  I understand the jury

5   has been selected along with four alternates and we're ready

6   to go.

7        I understand there's an application?

8        MR. RUSSO:    Judge, given the hour and the length of

9   the jury selection today, we were going to suggest and request

10  of the court that openings begin tomorrow morning, that the

11  balance of the afternoon could be spent with the court's

12  opening instructions and charging of the jury.  I've spoken to

13  the government on this.  They take no position in this

14  application.

15        In addition, Judge, tomorrow is a significant Muslim

16  holiday.  Mr. Mesbahuddin has requested that he be allowed to

17  attend the mosque tomorrow morning which would delay his

18  arrival here.

19        THE COURT:    Until when?

20        MR. RUSSO:    He assures me he could be here by 11:00

21  o'clock tomorrow morning but he's prepared to adhere to the

22  court's instructions in that regard.

23        MR. CANTY:    Your Honor, with respect to starting

24  today, the government is ready, prepared to go forward.  I did

25  not know about this delayed starting tomorrow.  I have

A-14

5

1    witnesses I lined up for tomorrow, don't want to push them

2    over until Wednesday.

3         We're ready to begin.  I would certainly defer to

4    the court if the court has an objection to starting this

5    afternoon but if the court has no objection, we're ready to

6    open, call witnesses.

7         THE COURT:  Are there any other holidays I don't

8    know about, any other religious holidays I haven 't been told

9    about?

10        MR. RUSSO:  No.  The holiday tomorrow is a

11   once-a-year holiday, told it's a significant Muslim holiday.

12   I'm not familiar with it, but it's akin to Christmas, I guess,

13   is the best way to describe it.  It's a holiday called Eid,

14   your Honor.

15        THE COURT:  I'm not going to interfere with

16   someone's religious observance.  We can start at 11:00 o'clock

17   tomorrow morning.

18        I want you all to be here --  I can't have a charge

19   conference without the defendant, but I'm not willing to lose

20   an hour and a half tomorrow and two hours this afternoon.  I

21   just can't do it.  We'll go ahead this afternoon.

22        Bring in the jury.

23        During the voir dire, what were the hours the jury

24   was told, Mr. Canty?

25        MR. CANTY:  I believe they were told we would start

SS    OCR    CM    CRR    CSR

A-15

```
 1    at 9:30.  I don't recall what time we were going until.

 2              MR. HORN:   Until 5:00 o'clock.

 3              THE COURT:   How long is your opening?

 4              MR. CANTY:   Five or six minutes.

 5              THE COURT:   Yours?

 6              MR. RUSSO:   5 to 10 minutes, Judge.

 7              (Jury enters courtroom).

 8              THE COURT:   The jury should remain standing.

 9              Everyone else may be seated.

10              At this time the jury will be sworn.  The deputy

11    clerk will swear you in.

12              (Jury sworn.)

13              THE COURT:   Please be seated.

14              Members of the jury, we're about to begin the trial

15    in a criminal case of United States versus Ghulam Mesbahuddin.

16    As the trial begins, I would like to help you understand these

17    proceedings by telling you a few things about the process and

18    what is expected of you during the trial.

19              I'm a United States Judge Nicholas G. Garaufis.

20    I'll be presiding over this trial.  At times I may refer to

21    myself as "the court."

22              During this trial, the only question you'll be

23    called upon to answer is whether the government has proven the

24    defendant guilty beyond a reasonable doubt of any and all

25    charges.  The trial will likely last approximately one week.
```

SS     OCR     CM     CRR     CSR

A-16

7

1          Opening statements will take place today, after

2     which testimony will begin.  Generally, the trial will take

3     place Monday through Friday from 9:30 until 5:00 p.m. except

4     for national and major religious holidays.

5          There will be a one hour break for lunch every day

6     at approximately at 1:00 p.m. and a short break each morning

7     and afternoon.  There may be some days trial begins late or

8     ends early due to unavoidable conflicts.

9          I would now like to reintroduce you to the parties.

10    The government is represented by Assistant United States

11    Attorneys Michael Canty.

12          MR. CANTY:   Good afternoon.

13          THE COURT:   And Sylvia Shweder.

14          MS. SHWEDER:    Good afternoon.

15          THE COURT:    They're joined at counsel table by FBI

16    Special Agent Ryan Stinson.

17          The defendant in this case is Ghulam Mesbahuddin.

18          THE DEFENDANT:  Good afternoon.

19          THE COURT:    Mr. Mesbahuddin's attorneys are John

20    Russo and Michael Horn.

21          MR. RUSSO:   Good afternoon.

22          MR. HORN:   Good afternoon.

23          THE COURT:   My courtroom deputy is Andrew Jackson.

24    You've met him and my law clerk assigned to this case is Ben

25    Fishman.

SS      OCR     CM     CRR     CSR

A-17

8

1         During the course of these proceedings, you will

2    hear me use a few terms that you may have not heard before.

3    I'll briefly explain some of those terms.  You will sometimes

4    hear me refer to counsel.  Counsel is another way of saying

5    lawyer or attorney.  The prosecution and the defendant are

6    also sometimes called the parties to the case.

7         From time to time one party may raise an objection

8    to evidence introduced by the other party.  When I sustain an

9    objection, this means I'm excluding the evidence from this

10   trial.  You may not consider excluded evidence.

11        When you hear me overrule an objection, it means I'm

12   permitting the evidence to be admitted.  When I say admitted

13   into evidence, or received into evidence, I mean this

14   particular statement or this particular exhibit is now part of

15   the trial evidence and you may consider it when making the

16   decisions you must make at the close of the case.

17        The terms burden of proof and sustaining the burden

18   of proof refer to the obligation of proving the case.  In this

19   trial, it is the government's obligation to produce proof

20   beyond a reasonable doubt of the charges in the indictment.

21        This is a criminal case commenced by the

22   United States, which I may sometimes refer to as the

23   prosecution or the government.  The charges in this case are

24   against Ghulam Mesbahuddin, who I may refer to as the

25   defendant.

SS      OCR      CM      CRR      CSR

A-18

1          The government began this case by obtaining an

2     indictment.  An indictment is an accusatory instrument that

3     formally commences a prosecution.  It is not evidence.  The

4     current indictment charges the defendant with crimes that

5     allegedly took place in 2009 and 2010.

6          There are two counts in the indictment.  I will now

7     describe them.  Count one, the government alleges between

8     August, 2009 and May, 2010, the defendant conspired to

9     transfer one or more false identification documents which

10    appeared to be issued by and under the authority of the

11    United States, knowing that those documents were produced

12    without lawful authority.  The documents in question in count

13    one are employment authorization documents and social security

14    cards.

15         Count two.  In count two, the government alleges

16    that between August, 2009 and May, 2010, the defendant

17    conspired to corruptly give, offer and agree to give things of

18    value, namely cash payments, to an agent of the California

19    Department of Motor Vehicles with the intent to influence and

20    reward that agent in connection with the issuance of a

21    fraudulent license.

22         This concludes the summary of the charged crimes.

23    Again, I remind you the indictment is simply a charge by the

24    government to begin a case and that it is not in any sense

25    evidence of the allegations or the statements it contains.

1          Ghulam Mesbahuddin, the defendant, has pleaded not

2    guilty to all the charges.  The government has the burden of

3    proving each of the elements of the crimes charged in the

4    indictment beyond a reasonable doubt.  As jurors, you must

5    determine at the close of the trial whether or not the

6    government has met this burden.

7          You must presume that the defendant is not guilty of

8    the crimes charged in the indictment.  You must maintain this

9    presumption throughout the trial and until you have reviewed

10   the evidence during your deliberations in accordance with the

11   law as I instruct you at the conclusion of the trial. Then and

12   only then will you be able to reach your decision as to

13   whether the prosecution has succeeded in proving the defendant

14   guilty as to any or all charges beyond a reasonable doubt.

15         I will now describe how the trial will proceed.

16   First, the parties have the opportunity to make opening

17   statements.  The government will make an opening statement at

18   the begin of the case.  The defense, if it chooses, may then

19   make an opening statement.  What is said in the opening

20   statements is not evidence.  The opening statement simply

21   serve as an introduction to the evidence that the parties

22   intend to produce or comment upon during the trial.

23         Second, after opening statements, the government

24   will introduce evidence that it believes supports the charges

25   contained in the indictment.

A-20

1           Third, after the government has presented its

2    evidence, the defense may present evidence, though it is not

3    obligated to do so.  The burden or obligation, as you will be

4    told many times during the course of this trial, is always on

5    the government to prove each and every element of the offenses

6    charged beyond a reasonable doubt.  The law never imposes on a

7    defendant in a criminal case the burden of calling any

8    witnesses, producing any exhibits, introducing any evidence or

9    making any arguments to the jury. A defendant is presumed to

10   be innocent of the charges against him.

11          Fourth, after all the evidence has been received, in

12   other words, after all the witnesses have testified and after

13   all the exhibits have been admitted, the parties will be given

14   the opportunity to present arguments to you in support of

15   their cases.  These are called closing arguments.  What is

16   said in a closing argument is not evidence, just as what is

17   said in an opening statement is not evidence.

18          Closing arguments are designed to present to you the

19   theories and conclusions of the parties as to what the

20   evidence has shown and what inferences may be drawn from the

21   evidence.

22          Fifth, after you have heard the closing arguments of

23   the parties, I will give you orally and in writing final

24   instructions concerning the law which you must apply to the

25   evidence received during the trial.  Those instructions will

A-21

1  be much more detailed than the ones I am giving you now.  You

2  will then retire to consider your verdict.  Your deliberations

3  are secret.  You will not be required to explain your verdict

4  to anyone.  Your verdict as to each charged count must be

5  unanimous, which means that all 12 of you must agree to it.

6      You must keep an open mind to both sides during this

7  trial.  You must not make up your mind about any of the

8  questions in this case until you have heard each piece of

9  evidence and all the law that you must apply to that evidence,

10  in other words, until you begin your deliberations.

11      Your purpose as jurors is to determine the facts.

12  Under our system of justice, you are the sole judges of the

13  facts.  It is extremely important that you perform your duty

14  of determining the facts diligently and conscientiously.  The

15  law, as given by the court in these and other instructions, is

16  the only law you are to consider.  It is your duty to accept

17  and follow the law as I give it to you, even if you may

18  disagree with it.

19      You are to determine the facts solely from the

20  evidence admitted in the case.  This evidence consists of

21  exhibits received and the testimony of witnesses.

22      Questions asked by the lawyers are not evidence.

23  The evidence consists of the witnesses' answers to the

24  questions, not the questions themselves.  As I said earlier,

25  statements and arguments of counsel are not evidence.

A-22

1  Counsel, however, may enter into agreements or stipulations

2  regarding facts that are not in dispute.  When they do so, you

3  may accept those facts as evidence.

4       I also may tell you I am taking judicial notice of

5  certain facts.  You may then accept those judicially-noted

6  facts as evidence.  It is always up to you, however, to decide

7  which facts are established by the evidence and which

8  inferences are to be drawn from the evidence.

9       The parties may sometimes present objections to some

10  of the testimony or exhibits.  It is the duty of a lawyer to

11  object to evidence that he or she believes may not properly be

12  received or admitted and you should not be prejudiced in any

13  way against a lawyer who makes objections or against the party

14  he or she represents.  An objection is the only proper method

15  for requesting a ruling from the court concerning evidence.

16       At times, I may sustain objections or direct you to

17  disregard certain testimony from the witness.  You must not

18  consider any evidence to which an objection has been sustained

19  for which I have instructed you to disregard.

20       Let me stress again that it is extremely important

21  that you follow my instruction that you not discuss this case

22  with anyone, not your family, friends or business associates

23  and not other jurors.

24       In addition, you must not read, listen to, watch or

25  access on the internet any accounts of this case nor research

SS     OCR     CM     CRR     CSR

14

1    or seek outside information about any aspect of this case.

2    Please do not communicate with anyone about the case on your

3    phone, through e-mail, text messaging or on Twitter to any

4    blog or web site, to any internet chat room or by way of any

5    social networking web sites, including Facebook and Linkedin.

6    You must not consider anything you may have read or heard

7    about the case outside of this courtroom, whether before or

8    during the trial or during your deliberations.

9         Do not attempt any independent research or

10   investigation about this case.  Do not visit any of the

11   locations identified during the course of testimony.  Your

12   decision in this case must be based solely and exclusively

13   upon the evidence received during this trial and not upon

14   anything else.

15        You may have already heard the terms direct evidence

16   and circumstantial evidence.  Direct evidence is generally the

17   testimony of a person who claims to have actual and direct

18   knowledge of a fact, for example, the testimony of an

19   eyewitness who claims to have seen an event.  If you went

20   outside and saw that it was raining, your observation would be

21   direct evidence of rain.  Circumstantial evidence, on the

22   other hand, is generally testimony about a chain of facts that

23   may lead to some kind of conclusion, for example, if you would

24   come to court on a sunny day, then after several hours in this

25   courtroom with the window shades drawn, you were to see two

A-24

15

1    people enter, one wearing a wet raincoat and the other shaking

2    a wet umbrella, you might infer from those circumstances,

3    without ever going outside or even looking out a window, that

4    it had rained while you were here in court.  This is

5    circumstantial evidence of rain.

6         In any event, the law makes no distinction between

7    direct evidence and circumstantial evidence.  In considering

8    the evidence in this trial, you should give it such weight or

9    importance as you think it deserves, whether it is called

10   direct or circumstantial evidence and make the deductions and

11   reach the conclusions to which your experience and common

12   sense lead you.

13        In attempting to determine the facts in this case,

14   you will be called upon to judge the credibility of witnesses

15   who testify in this trial.  In deciding whether or not to

16   believe what a witness has said, I suggest you consider the

17   intelligence of the witness, the ability of a witness to have

18   seen or heard what the witness said he or she saw or heard,

19   the ability of the witness to remember what happened, any

20   interest the witness might have in testifying or in how this

21   case is decided and whether the testimony is reasonable.  How

22   you choose to evaluate the witness' testimony as well as

23   evidence in the form of exhibits is left entirely up to your

24   discretion.  You're free to believe all, some or none of what

25   a witness says or an exhibit illustrates.  I will address this

SS     OCR     CM     CRR     CSR

16

1    subject again after you have heard all the evidence in the

2    trial.

3              No statement, ruling, remark or comment that I may

4    make during the course of the trial is intended to indicate my

5    opinion as to how you should decide the case or is intended to

6    influence you in any way in your determination of the facts.

7    At times I may ask questions of witnesses.  If I do, it is for

8    the purpose of inquiring into matters that I feel should be

9    inquired into and not to indicate in any way my opinion about

10   the facts or to indicate the weight I feel you should give to

11   the testimony of the witness so questioned.

12             I may also find it necessary to admonish or correct

13   the lawyers.  If I do, you should not allow that to prejudice

14   you toward the lawyer or toward the party the lawyer

15   represents.

16             At times during this trial it will be necessary for

17   me to confer privately with the lawyers and others about

18   various evidentiary and procedural issues.  In conducting

19   these conferences, both here at the bench and in my chambers,

20   it is not our intention to hide anything from you but simply

21   to determine how certain issues will be handled and how

22   questions of law will be resolved.  Please be patient with us

23   during any such delays.  We are only taking care to ensure

24   that the trial is being conducted fairly.

25             Because what is discussed at such side bar

SS      OCR      CM      CRR      CSR

A-26

1    conferences is not relevant to your deliberations, I may turn

2    on a white noise machine to ensure they are private and I'll

3    show you what I mean (demonstration.)  That's the white noise.

4    We'll be standing in the corner.  We may have a conference.

5    I'll turn on the white noise so you won't be able to hear

6    while we're having the private conference.

7            When you determine whether the defendant is guilty

8    or not guilty, you are not to concern yourself in any way with

9    the sentence the defendant might receive if you should find

10   him guilty.  Your function is solely to decide whether the

11   government has carried its burden of proving the charges to

12   you beyond a reasonable doubt.

13           The attorneys and the parties will not speak with

14   you because I've already instructed them that they must not.

15   In the unlikely event that you see one of the lawyers in the

16   hallway, for example, and he or she does not speak with you,

17   please be aware that that lawyer is not being rude but is

18   simply doing what I have ordered all the lawyers to do in this

19   case.  It is not appropriate for one side or the other in this

20   case to speak with any of you, no matter how innocent or

21   trivial the conversation might be.  If you see one of the

22   lawyers or any of the parties in the hallway, they will ignore

23   you and that's because I've instructed them to do so.

24           Until this case is submitted to you to begin your

25   deliberations, you must not discuss it with anyone at all, not

SS      OCR      CM      CRR      CSR

18

1    even with your fellow jurors.  After you begin deliberating,

2    you may discuss the case only with your fellow jurors and only

3    in the jury room when all 12 of you are sitting at the jury

4    table.

5           You may not discuss the case anywhere else or with

6    anyone else, including members of your family.  It is

7    important that you keep an open mind and not decide any issue

8    in the case until the entire case has been submitted to you

9    and you have received the final instructions of the court

10   regarding the law of that you must apply to the evidence.

11          Please keep in mind that the following key

12   principles are as follows as we begin this trial.  Your job is

13   to decide all the factual questions in this case such as who

14   should be believed and who should not be believed.  I will

15   decide all the legal questions in this case such as which

16   testimony or exhibits are received into evidence and which are

17   not received.  Please do not concern yourselves with the legal

18   questions.

19          Ghulam Mesbahuddin has pleaded not guilty and is

20   presumed to be innocent of the crimes charged.  As such, he is

21   not required to produce any evidence whatsoever.  By bringing

22   the indictment, moreover, the government has accepted the

23   responsibility of proving the guilt of the defendant on each

24   element of each charged crime to each of you unanimously and

25   beyond a reasonable doubt.

A-28

19

1          Finally, do not discuss this case with anyone and
2     keep an open mind regarding each issue until all the evidence
3     has been received.  At that time, I will give you the complete
4     and final instructions that you must use to guide you in
5     reaching your decisions.  Then and only then will you be fully
6     prepared to begin your deliberations and reach your verdict.
7          Do not permit any other person to discuss this case
8     in your presence and if anyone does so, despite your telling
9     him or her not to, report that fact as soon as you are able to
10    either my courtroom deputy or my law clerk.  You should not,
11    however, discuss with your fellow jurors either that fact or
12    any other fact that you feel is necessary to bring to the
13    attention of the court.
14         At times you will be required to wait in the jury
15    room while I'm required to hear and decide matters arising
16    from other cases not connected with this one.  These delays
17    are unavoidable.  I do everything that I can to keep these
18    interruptions to a minimum but can never avoid them entirely.
19    Please be patient.
20         There are a few other matters that I would like to
21    go over with you.  I permit jurors to take notes here in the
22    courtroom.  If you want to take notes, Mr. Jackson will
23    provide you with a note pad, yellow pad and a pen if you need
24    it or pencil.  When you take notes, if you take notes -- and
25    you're not required to -- those notes are for your personal

SS     OCR     CM     CRR     CSR

A-29

20

1    use only.  Each day at the end of the testimony, the notes

2    will be collected by Mr. Jackson, be kept in the jury room and

3    then you'll receive them back the next morning.

4            In addition, at the time that I give you the charge

5    as to the law, at the end of the trial, each of you will

6    receive a copy of the charge to refer to in the jury room.

7            In addition, each of you will receive a copy of the

8    verdict sheet to review in the jury room.  You will have

9    everything that you need in the jury room to conduct your

10   deliberations and you'll also have all the evidence that's

11   been admitted in the trial in the jury room and you will also

12   have the opportunity, if you need it, to receive copies of the

13   transcript of any particular testimony or part of the

14   testimony that you wish to review in the jury room.

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

*Judge's remarks to the Jury*                    21

1    THE COURT (Cont'd):  So you will have everything

2  that you need at the end of the trial in to conduct to your

3  deliberations.

4          In addition, let me just say that generally I don't

5  wear a robe in the courtroom because I am mor comfortable in a

6  business suit, there's no requirement I wear a robe and I am

7  telling you that now so you don't go inside and say this Judge

8  doesn't wear a robe,  what's the story?  The story is I don't

9  wear one except perhaps when I'm charging the jury at the end

10  of case.

11          In addition, I want you to know that tomorrow

12  morning we're going to start at 11 a.m. not at 9:30. So please

13  be on time at 11 a.m. for the trial.  We try very hard to keep

14  you advised of any changes in the schedule, so that you will

15  only be here when you need to be here, but it's very important

16  that you adhere to the schedule because that way we can move

17  this trial along, and with your cooperation we will be

18  efficient, we will do everything we can to minimize the time

19  that we have together, so that we won't waste any of your

20  time.

21          Let me also say to you, you have our heartfelt

22  thanks for being here today after the weekend that we've had

23  and being on time and following on your responsibilities as

24  good citizens to participate in the jury system.  This is very

25  important to everyone  --to the defendant, to the government,

A-31

1    to the Court, and I just want to tell each and everyone of you

2    that the Court really does appreciate the fact that you made a

3    special effort to be here this morning after the difficulty we

4    had, so I just point that out as well.

5              Now, I may give you further instructions along the

6    way, and if you have any questions individually, please bring

7    them up with Mr. Jackson and I will then bring them up with

8    the attorneys when you are not in the room and we will get

9    back to you, and that's where we will leave it.

10             Now, we will at this point begin with the opening

11   statements.  We will hear first from the government.

12             Mr. Canty, you may address the jury.

13             MR. CANTY: Mr. Russo, Mr. Horn, Your Honor, ladies

14   and gentlemen of the jury, good afternoon.

15             On May 11th, 2010 the defendant and another man sat

16   across from each other at a restaurant in Queens, New York.

17   The other man carefully slid across the table a girl scout

18   cookie box inside of it was $10,000 cash, passport photos,

19   fingerprints, and biographical call information. The defendant

20   planned to use that cash and that information to illegally

21   obtain government documents, including social, security cards,

22   authorization cards and driver's licenses.  As that package

23   was passed across the table  the whole thing was being

24   observed by agents with the Federal Bureau of Investigation,

25   and the whole conversation was being recorded.

1        You will learn that this meeting was the culmination

2   of over ten months of planning by the defendant

3   Ghulam Mesbahuddin and his friend Stan Maynard.

4        The defendant Ghulam Mesbahuddin would use his

5   contacts within those government offices that he could pay off

6   to get those genuine and authentic documents and Maynard's

7   role was the line up customers on the street.

8        In order to understand the relationship between

9   Ghulam Mesbahuddin and Stan Maynard we need to go back to

10   2008.  In 2008 Stan Maynard met the defendant Ghulam

11    Mesbahuddin.  They socialized together, they hung out

12   together, they shared meals together.  They were friends, and

13   through this friendship Ghulam Mesbahuddin proposed a scheme

14   to Stan Maynard.  He told Stan Maynard about the contacts that

15   he had with these government officers who could get these

16   genuine authentic documents  and they would be priceless with

17   the right people.

18        So the defendant asked Stan Maynard if he would be

19   willing to enter into this agreement with him.  You line up

20   the customers and I have the contacts and the officers, I'll

21   pay off the contacts and we will split the profits.  It was

22   the perfect plan.

23        This defendant gave Stan Maynard specific

24   instructions. He told him to specifically target those

25   individuals in the United States illegally, those individuals

A-33

1   to whom these documents would be priceless.

2         Along with the instructions on who to target start

3   the defendant told him exactly what he needed to give to his

4   contacts in order to make these authentic documents --

5   passport photos, fingerprints, biographical information and

6   most importantly, money.

7         You'll learn that on May 11th, 2010 Stan Maynard had

8   met with one of his customers. He had lined somebody up that

9   was willing to pay for these documents, an individual he

10  believed to be in the United States illegally. He had

11  collected that information -- the passport photo, the

12  biographical information, and the fingerprints -- and on that

13  day he thought he was getting a down payment of $10,000. What

14  Stan Maynard didn't know was that the customer he had lined up

15  was an informant for the FBI. The minute Stan Maynard took

16  that package he was arrested by the agents of the Federal

17  Bureau of Investigation and he was given the opportunity to

18  cooperate and Stan Maynard did that.

19        He placed a phone call to this defendant where they

20  discussed their conspiracy, where they discussed the ability

21  of this defendant to get documents, specifically licenses from

22  California.

23        Now, you're probably asking yourselves why

24  California.  Well, the evidence will show that on May 1st,

25  2010 there was an attempted bottoming in Times Square and

*Opening - Canty*                                        25

1   because of that attempted bombing the defendant's contacts in

2   New York felt that it was too hot to get these genuine

3   documents here in the New York Metropolitan Area, so the plan

4   had now shifted to California.

5           Not only did they speak on the phone about this

6   conspiracy, they agreed to meet.  The defendant wanted to take

7   possession of that information to get the ball rolling to get

8   the production of these documents started, and that couldn't

9   happen without money. So they met at that IHOP Restaurant, and

10  they talked, and they conversed about how this is just the

11  beginning, how this scheme was going to make them rich. And

12  when the defendant took possession of the money, photos

13  fingerprints, biographical information he was placed under

14  arrest by agents for the Federal Bureau of Investigation who

15  were sitting at the surrounding tables.

16          The defendant is charged here in this indictment

17  with two counts. The first count is the transfer of false

18  identification documents, and the reason why they're false is

19  because, you will learn, that they were not issued

20  legitimately.  Although the documents are genuine, they were

21  issued to individuals that were not entitled to them; and

22  secondly he is charged with bribery and conspiracy and that he

23  agreed with the Stan Maynard that they will pay off his

24  contacts within the California Department of Motor Vehicles to

25  produce those documents -- those California drivers' licenses.

*Opening - Canty*                                           26

1          Now, how are we going to prove that?  The Judge told
2    you the proof will come in the form of evidence -- physical
3    evidence, testimony and recordings. The physical evidence will
4    be the cooky box.  You'll see the cooky box, the $10,000 cash,
5    the biographical information, the thumbprints, all the
6    information that this defendant requested, so he could start
7    with the production of these genuine documents through his
8    contacts. It will also come in the form of testimony.  That
9    testimony will come from Stan Maynard.
10          Now you'll learn that Stan Maynard has pled guilty
11   in this case and agreed to cooperate with the government. He
12   has pled guilty to the charges for which he is guilty and he's
13   testifying with the hopes of getting a lesser sentence.
14          Now, you will see that his testimony, however, is
15   supported by the other independent evidence in this case.
16   Stan Maynard will give you an insider's account of this
17   conspiracy. He will tell you about the instructions he
18   received from this defendant.  He will tell you about their
19   relationship. He will tell you that the defendant told him
20   exactly what he needed, exactly who to target and exactly what
21   to get, and they talked about targeting people from different
22   regions of the world because they would be willing to pay top
23   dollar --  anywhere between $25,000 to $60,000 for these
24   documents.
25          You will also hear from agents from those different

A-36

*Opening - Canty*                                            27

1  offices:  The Social Security Administration, the Homeland

2  Security, and Representative from the California Department of

3  Motor Vehicles. They'll tell you who is entitled to these

4  documents. They'll all tell you the same thing, if you are in

5  the United States illegally you cannot get these documents.

6  You can't send somebody else to get them for you.  You have to

7  get them yourselves because they understand the value of these

8  documents.

9              And lastly, the evidence will consist of the

10  recordings. You will hear the recorded conversation between

11  the defendant and Stan Maynard on May 11th. You will hear

12  Stan Maynard call up the defendant and say I've got the money,

13  I have got the down payment for you. First question the

14  defendant asks is how much. He said I got $10,000.

15              Stan Maynard's already under arrest says:  But

16  listen, my contacts are concerned, are these going to be

17  genuine and authentic California licenses.

18              The defendant's response: Definitely.

19              And then he barks at Stan Maynard:  Don't talk so

20  clearly about this on the phone. You will hear that recording.

21  You will be able to listen to the defendant's own voice as he

22  talks about getting California licenses for individuals Mr.

23  Maynard had lined up here in the New York Metropolitan Area.

24              You are going to hear the recording from that IHOP,

25  how they bantered back and forth about how this is going to

A-37

*side-bar*                                                        28

1   make them money. You are going to hear about how the agents

2   saw the defendant take possession of that money, and on that

3   recording the defendant takes a phone call and on that phone

4   call he says get ahead of the DMV.

5           Ladies and gentlemen, that's the evidence.  That's

6   what you need to base your verdict on. The evidence will

7   consistent of testimony, physical evidence, and recordings,

8   and after you review all of that evidence I ask you to return

9   the only verdict that is consistent with that evidence and

10  that's consistent with justice, that this defendant is guilty

11  on the both counts of conspiracy as charged.

12          Thank you.

13          THE COURT: Mr. Russo.

14          MR. RUSSO: Can we have side-bar.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

A-38

*side-bar*                                                      29

1          THE COURT: Yes.

2          MR. RUSSO: I am going to ask the Court at this point

3   for the Court to dismiss Count Two, the bribery conspiracy.

4   The government has not made a prime facie case.  It hasn't

5   laid evidence for making a prima facie.  Indeed, referring to

6   the Court earlier today where it laid out the elements of that

7   bribery conspiracy, I think it was unable to glean from the

8   government's opening the essential element of prima facie of

9   that conspiracy.

10         MR. CANTY: Judge, I specifically opened on the fact

11  that the defendant was willing, the defendant had contacts,

12  agreed to pay within the California Department of Motor

13  Vehicles, the witness will testify they received $10,000 from

14  federal agencies within that calendar year.  Certainly, we

15  don't have to produce all proof during our opening statement

16  but relate out the charges for which we are going to present

17  evidence and we've done that.

18         THE COURT: Motion is denied.

19         (End of side-bar)

20

21

22

23

24

25

1           (The following took place in open court)

2           MR. RUSSO: Your Honor, good afternoon.  Good

3      afternoon, Mr. Canty, members of the government, ladies and

4      gentlemen, good afternoon, and again, just to echo the thanks

5      that have already been given to you from the Court and from

6      the government, we really do appreciate it.  Without people

7      willing to meet the call of service our system of justice

8      cannot proceed.  Thank you all, and I also want to thank you

9      all in advance for your promise to keep an open mind and to

10     hear the evidence, to reserve any opinions or judgment on the

11     facts until all the evidence is in, and most of all, to apply

12     the evidence and facts that come in against the rules of law.

13     His Honor will instruct you on at the end of this case. If you

14     do that, we have no doubt that you will come back with a

15     verdict of not guilty in this case.

16           Now, as you have been told, my name is John Russo

17     and I represent Ghulam Mesbahuddin who is sitting at counsel

18     table, along with high colleague Michael Horn.

19           Now, Ghulam  Mesbahuddin who, although charged with

20     a crime by the federal government, sits over there presumed

21     innocent as he shall be throughout this trial. He is innocent.

22     He is presumed innocent.  You must look at him as an innocent

23     man from now until the close of evidence in this case and

24     until you are instructed on the law by His Honor. That is our

25     law and that is part of the promise that you have made to us

1   here today.

2           Now, don't believe a thing Mr. Canty just told you.

3   Now, I say that with all respect to Mr. Canty and not to

4   suggest that he is as an individual a liar, because he is not.

5   I say that because you cannot decide how this case will end

6   simply by hearing the government's allegations. After all,

7   could you decide how a book ends by reading only the first few

8   pages.  Other than that, can you decide how good a movie is

9   going to be by just look at that the trailer they show you in

10  the previous views in the movie. Well, of course not. You have

11  to see the movie, in its entirety you you've got to read the

12  book in its entirety before you know how it's going to end.

13          Now, this case is about evidence and it's both

14  documents and testimony that you will hear from the witness

15  stand, and after all of the evidence is in and after you have

16  been instructed on the law, you may then begin to deliberate.

17          Now, the charges in the case are, one, conspiracy to

18  transfer false identification documents.  You are going to

19  find out that no such transfer of identification documents, in

20  this case drivers' licenses, ever took place, and you are

21  going to find out that no such conspiracy to do that was ever

22  entered into by Mr. Mesbahuddin.

23          Another charge, bribery, but there was no bribery

24  here, and most importantly, there was no conspiracy to bribe

25  anyone real or imagined.  What there is here, as you will

1    learn, is a pretty despicable human being by the name of Stan

2    Jerald Maynard upon whose shoulders the government has built

3    their entire case.

4           Well, let's see.  What you are going to learn as the

5    evidence comes in about Mr. Maynard. Well, he's a narcotics

6    user, he's a narcotics trafficker, a bank fraud conspirator, a

7    conspirator in a scheme to obtain fraudulent British

8    passports, and a bunch of other crimes which are too extensive

9    for me to take the time with now. Mr. Maynard is a career

10   criminal who features as part of his resume that he was once

11   sentenced to death in Thailand for narcotics trafficking. He's

12   been in and out of our federal prisons here at least twice, if

13   not three times.  He has a resume of shame which, again, will

14   be detailed throughout this trial, and that is the person

15   whose testimony, whose credibility, whose believability this

16   case arrests on.

17          In 2008, after being released from prison,

18   Mr. Maynard was befriended by Mr. Mesbahuddin. You are going

19   to learn that Mr. Maynard was living in the mosque that

20   Mr. Mesbahuddin practices his faith at. You are going to learn

21   that Mr. Maynard was found in an apartment to live in by a

22   friend of Mr. Mesbahuddin over in Jamaica, Queens.

23          Now, for reasons that you are going to learn during

24   the course of this trial, Mr. Maynard decided to become a

25   government agent to go out and find some crime, set some

 1   people up, including Mr. Mesbahuddin. He was on a mission to

 2   do this -- to find crimes, to find things for the government

 3   to prosecute. Why? Why would somebody do such a low thing?

 4   You will learn, and I am certain that the evidence will be

 5   clear, Mr. Maynard was made promises and has expectations of

 6   what the government is going to do for him as a reward for

 7   making up this crime with Ghulam Mesbahuddin.  Mr. Maynard, as

 8   you are going to conclude without a doubt in our mind, is a

 9   liar, he is a criminal, and he's completely unworthy of

10   belief, and that is the person upon which this government

11   wants you to brand that man a criminal.

12           This is the indictment (indicating).  There's a

13   charge, there's an allegation, it's three pieces of paper and

14   a back.   Without proof, without reliable trustworthy proof,

15   beyond a reasonable doubt, this indictment is little more than

16   three pieces of paper.

17           On May 11th, 2010 Ken Maynard got a bag of money

18   from the government after having convinced them that he

19   actually had a live conspiracy going on with

20   Ghulam Mesbahuddin, or Rumi as he's known to his friends.

21   They gave him this money, they wired him up, and they sent him

22   into an IHOP, international House of Pancakes.  He set up

23   Mr. Mesbahuddin and the only problem for Mr. Maynard and for

24   the government here was that Mr. Mesbahuddin was not involved

25   in any crime, Mr. Mesbahuddin did not have crime in his mind.

A-43

*Opening - Russo*                                          34

1   He was simply willing to connect Mr. Maynard with a friend who

2   knew a lawyer who could for a fee assist people in obtaining

3   work permits, drivers' licenses, legal documents.  We are not

4   talking about, and the evidence will not show that, we are not

5   talking about fake stuff, stealing your name, your identity,

6   your address. We are talking about getting genuine documents

7   issued by the government agencies.

8            And of course, the folks that need these documents,

9   the most, the customers for this type of service as you are

10  going to find out, are essentially new arrivals, new

11  immigrants, people who don't have all those documents. Who

12  need to get legalized, who need citizenship, who need asylum

13  and yes, some of you may find that at the end of this case

14  that the practice of lawyers, other people providing these

15  types of services and making money off people who are looking

16  for these documents, you may find it distasteful, but you will

17  not and cannot find it criminal, and that's what you are going

18  to learn from the evidence in this case, that Mr. Mesbahuddin

19  was simply not conspiring or committing any crime with the

20  criminal misdemeanor.

21           Now, no one asked Mr. Maynard to bring that money

22  you are going to hear so much about, and in fact, you are

23  going to learn that Mr. Mesbahuddin never even looked at the

24  girl scout cooky box or the envelope, or whatever it was that

25  the money came in. Never asked for it.  Didn't even know about

1   it. You are going to hear evidence, hear tapes.  They talk

2   about the surreptitious tapes. Sounds good but listen to what

3   they say; not where they came from. These are wired up

4   informant tapes. Listen to them as recordings, and see if it

5   sounds to you like a crime is being conspired by

6   Mr. Mesbahuddin. We think not.  We think what you are going to

7   hear is someone who, on at least two occasions, says if you

8   have someone who wants these services just get me the check.

9   When is the last time you heard a conspirator for an illegal

10  crime, illegal activity, asking someone to bring a check?  You

11  are going to hear on the tapes -- we ask you to listen to the

12  words not the source.  Listen to the tapes.  Mr. Mesbahuddin

13  says, sure. If you want to bring this money as a deposit, I'll

14  put it in my in my bank until if we have to send it to the

15  lawyer. I'll a put it in my bank. You see, that we submit to

16  you is evidence that will make clear this is not the

17  conspiratorial ramblings of a criminal.

18          Now, please pay close attention, not just to the

19  evidence that's about to come, but please pay close attention

20  to Judge Garaufis's instruction on the law that will follow at

21  the close of evidence in this case because evidence is

22  important. You are the judges of the facts.  As the Court has

23  instructed you today and told you today, only you judge what

24  the facts are in this case.

25          His Honor is the Judge of the law and he will tell

1    you what the law is and you have promised us to follow the law

2    and to follow the rules of law and to ask yourselves

3    essentially this question: On these facts and this law do I

4    have a crime, has the government proven on these facts and on

5    the law that His Honor has given us each and every element of

6    the crimes that they have charged Mr. Mesbahuddin. If

7    Your Honor answer is no, if you have a doubt that's

8    reasonable, you cannot convict Mr. Mesbahuddin. If you do

9    those two significant things, two things, an open mind, listen

10   with a critical ear to the testimony and the recordings and

11   the facts that are put forth and you apply the law to them,

12   you will return from the deliberations with a verdict of not

13   guilty. If you do those two things you will return with a

14   verdict of not guilty.

15            Thank you all, so very much.

16            THE COURT:  At this time the government may call its

17   first witness.

18            MR. CANTY:  Yes.  The United States calls Special

19   Agent Jeffrey Goldberger of the Federal Bureau of

20   Investigation.

21            (Continued on next page)

22

23

24

25

A-46

1   J E F F R E Y   A.   G O L D B E R G E R,

2                    having been duly sworn/affirmed, was examined

3   and testified as follows:

4              THE COURT:   State and spell your full name for the

5   record.

6              THE WITNESS:   Jeffrey A. Goldberger,

7   G O L D B E R G E R.

8              THE COURT:   You may inquire.

9   DIRECT EXAMINATION

10  BY MR. CANTY:

11  Q     Where do you work?

12  A     Federal Bureau of Investigation.

13  Q     What's your title?

14  A     Special Agent.

15  Q     How long have you been a special agent with the Federal

16  Bureau of Investigation?

17  A     Approximately five and a half years.

18  Q     Can you briefly describe for the jury the training you

19  received in order to become a special agent with the Federal

20  Bureau of Investigation?

21  A     At the FBI academy in Quantico, Virginia, I had training

22  in firearms, defensive tactics, first aid, legal training,

23  practical applications among other topics.

24  Q     What, if anything, did you do professionally prior to

25  becoming a special agent with the Federal Bureau of

Goldberger-direct-Canty                    38

1   Investigation?

2   A    I would say my last job was in the Navy, instructor

3   pilot, left with the rank of lieutenant commander.

4   Q    Are you still in the Navy?

5   A    Yes, part-time now as a reservist.

6   Q    I would like to direct your attention to approximately

7   May of 2010.  Did there come a time you became involved in an

8   investigation into the transfer of false government

9   identification documents?

10  A    Yes.

11  Q    Who was the target of your investigation?

12  A    A man by the name of Stan Maynard.

13  Q    How did Stan Maynard come to the attention of the FBI?

14  A    An FBI informant had recorded conversations with Stan

15  Maynard where they discussed obtaining authentic government

16  documents from various agencies and trying to sell them to

17  people who otherwise wouldn't be authorized to have these

18  documents.

19  Q    In listening to those recordings, were you able to

20  determine what types of documents Stan Maynard was trying to

21  sell?

22  A    He was trying to sell birth certificates, social security

23  cards, employment authorization cards and drivers licenses.

24  Q    Where did he claim these documents were coming from?

25  A    He claimed they came from actual government agencies,

SS    OCR    CM    CRR    CSR

Goldberger-direct-Canty                                    39

1   federal and state within the New York City area.

2   Q     During the course of your investigation, in listening to

3   those recordings, did you make a determination as to whether

4   or not the plan Mr. Maynard had changed as to where those

5   documents were going to come from?

6   A     Yes, May 1st of 2010, he mentioned the plan was now to

7   get the drivers licenses from California because in the

8   aftermath of the failed Times Square bombing, he said it was

9   too hot in New York, try California for drivers licenses.

10  Q     In listening to the recordings, did you discover whether

11  or not Stan Maynard was working alone in attempting to get

12  these documents for individuals that were not legally entitled

13  to them?

14          MR. RUSSO:    Objection.

15          THE COURT:    You may answer.

16  A     Please ask the question again.

17          MR. CANTY:    May I have it repeated?

18          THE COURT:    Read it back.

19          (Read back.)

20  A     He mentioned that he had a contact, a person he believed

21  to be of Indian decent that he was working with to get the

22  documents.

23  Q     In these recordings, was the name of that individual ever

24  mentioned?

25  A     No, it was not.


              SS      OCR      CM      CRR      CSR

Goldberger-direct-Canty                              40

1   Q      What specific material was Mr. Maynard requesting that

2   you heard on these on the recordings?

3   A      He requested two passport photos, thumb prints,

4   biographical data and information about the person's parents

5   that were trying to get the documents in addition to money

6   that they had to pay for these documents.

7   Q      On these recordings was Mr. Maynard aware he was being

8   recorded by an informant of the FBI?

9   A      He was not.

10  Q      Based on the recording, did you come up with a plan to

11  arrest Stan Maynard?

12  A      Yes.

13  Q      What was the plan?

14  A      The plan was that we would provide him with these things

15  that he was requesting, the documents to include photographs,

16  biographical information and thumb prints and parental

17  information.

18  Q      When that information was provided by the informant to

19  Mr. Maynard, was any action taken on the production of those

20  documents?

21  A      It was not.

22  Q      Why not?

23  A      Because we didn't provide any money.

24  Q      Did there come a time when you made a decision to provide

25  the informant with money to give to Mr. Maynard V MARND?

Goldberger-direct-Canty                                    41

1   A     Yes.

2   Q     Describe to the jury how that plan worked out.

3   A     On May 11th, 2010, we gave the informant the items

4   Mr. Maynard was requesting; the photographs, the biographical

5   information of the client, the parental information and the

6   thumb prints along with $10,000 cash and we put it in a Girl

7   Scout cookie box to give to Mr. Maynard.

8   Q     Did the informant in fact give that material to

9   Mr. Maynard?

10  A     He did.

11  Q     What happened after Mr. Maynard took possession of those

12  documents and that money?

13  A     He was arrested immediately.

14  Q     Could you please describe the gender of the biographical

15  information you gave him at that point?

16  A     That was for a female.

17  Q     Was that a fictitious individual?

18  A     The person was fictitious; the photograph was of a real

19  person.

20  Q     Mr. Maynard believed it was a real person?

21  A     Yes, he did.

22  Q     After he was arrested, what did you do?

23  A     After we arrested him, we read him hiss Miranda rights,

24  asked him if he would cooperate with the FBI to help against

25  the person who was his contact.

Goldberger-direct-Canty                                   42

1   Q    After he was advised of his Miranda rights, did he agree

2   to speak with the FBI?

3   A    He did.

4   Q    In speaking with the FBI, did he give you a name of the

5   individual that had the contact within those government

6   offices to make these documents?

7   A    Yes, he said the person's name was Rumi.

8   Q    What did you request after he gave you that name?

9   A    We asked him to make a phone call.

10  Q    Did he in fact make a phone call?

11  A    Yes, he did.

12  Q    Were you present when that phone call was made?

13  A    Yes.

14  Q    What was discussed during the substance of that phone

15  call?

16  A    During the substance of the phone call, they discussed

17  Mr. Maynard had money, wanted to meet with Rumi.

18  Q    Was anything arranged with respect to a meeting on that

19  phone call between Mr. Maynard and this individual named Rumi?

20  A    Just it would be later on that day.

21            MR. CANTY:   May I approach the witness?

22            THE COURT:   Yes, you may.

23  Q    Agent, I would like you to take a look at what's marked

24  as Government Exhibit number 1.  Do you recognize that?

25  A    Yes, I do.

Goldberger-direct-Canty                                    43

1   Q    What do you recognize that to be?

2   A    This is the $10,000 that we provided to Mr. Maynard.

3   Q    How do you recognize that to be the $10,000 that you

4   provided to Mr. Maynard on May 11th, 2010?

5   A    It's sealed in the FBI evidence tape, signed by myself

6   and Special Agent Stinson.

7   Q    Did you have the opportunity to compare the serial

8   numbers on that money to the money you prepared prior to

9   giving the package to the FBI informant?

10  A    Yes.

11  Q    Were they the same serial numbers?

12  A    Yes.

13            MR. CANTY:   I ask what's marked as Government

14  Exhibit number 1 to be moved into evidence.

15            MR. RUSSO:   No objection.

16            THE COURT:   Government Exhibit 1 received in

17  evidence.

18            (So marked.)

19            MR. CANTY:   May I approach the witness?

20            THE COURT:   Yes.

21  Q    I would like to you take a look at Government Exhibit

22  number 2.  Do you recognize that?

23  A    Yes.

24  Q    What do you recognize that to be?

25  A    This appears to be the Girl Scout cookie box we put the

                  SS     OCR     CM     CRR     CSR

A-53

1   money in and the information that Rumi was requesting.

2   Q    The box, you put the $10,000 in and the other

3   biographical information on May 11th, 2010?

4   A    And the photographs as well.

5          MR. CANTY:   Asked what's marked as Government

6   Exhibit 2 for identification be moved into evidence.

7          THE COURT:   Any objection?

8          MR. RUSSO:   If we could just see the cookie box?

9          THE COURT:   Sure.  Show it to counsel.

10         MR. RUSSO:   Might I have a moment with the

11  government?

12         (Pause.)

13         MR. RUSSO:   As presently exhibited, we have no

14  objection.

15         THE COURT:   Government Exhibit 2 received in

16  evidence.  You may proceed.

17         (So marked.)

18  Q    Agent, I would like you to take a look at Government

19  Exhibit 3 and 3-A.

20         MR. CANTY:   Upon agreement of the parties, these

21  are fair and accurate copies of the original photographs I've

22  shown to defense counsel.

23         THE WITNESS:  Yes, they are.

24  Q    Do you recognize those photos?

25  A    Yes -- I'm sorry -- I do.

SS      OCR      CM      CRR      CSR

Goldberger-direct-Canty                              45

1   Q     What do you recognize those photos to be?

2   A     These are copies of the passport photo we provided as our

3   female client.

4   Q     Provided to the informant to give to Mr. Maynard on

5   May 11th, 2010?

6   A     Yes.

7             MR. CANTY:   Ask what's marked as Government

8   Exhibit 3 and 3A be introduced into evidence.

9             THE COURT:   Shown to the defense?

10            MR. CANTY:   Yes.

11            MR. RUSSO:   No objection.

12            THE COURT:   Government Exhibit 3 and 3A received in

13  evidence.

14            (So marked.)

15            MR. CANTY:   May I approach the witness?

16            THE COURT:   You may.

17  Q     I would like to you take a look another Government

18  Exhibit 3B.  Do you recognize that document?

19  A     I do.

20  Q     What do you recognize that document to be?

21  A     This would be the name, biographical information,

22  parental information and thumb prints of the female client.

23  Q     That was the information you provided to your informant

24  to give to Mr. Maynard on May 11th, 2010?

25  A     Yes.


             SS    OCR    CM    CRR    CSR

Goldberger-direct-Canty                                    46

1   Q     Is that a fair and accurate copy of the original you

2   provided that day?

3   A     It is.

4         MR. CANTY:   I ask the exhibit be received into

5   evidence.

6         MR. RUSSO:   No objection.

7         THE COURT:   Government Exhibit 3B received in

8   evidence.

9         Proceed.

10        (So marked.)

11        MR. CANTY:   May I publish these exhibits to the

12  jury?

13        THE COURT:   Yes, you may.

14        (Published.)

15  Q     Agent Goldberger, in Government Exhibit 1, it appears the

16  money that fills this bag, how was it organized when it was

17  put within that cookie box?

18  A     It was just stacked one on top of the other.

19  Q     How did you record the conversation of that phone call

20  that Mr. Maynard placed to this individual named Rumi?

21  A     We just used a recording device, taped the microphone

22  leads to his mouthpiece and earpiece.

23  Q     I would like to you look at Government Exhibit 6 for

24  identification.

25        MR. CANTY:   May I approach the witness, your Honor?

SS     OCR     CM     CRR     CSR

A-56

Goldberger-direct-Canty                                        47

1          THE COURT:   Yes, you may.

2   Q    Agent, you recognize what's been marked as Government

3   Exhibit 6 for identification?

4   A    Yes, I do.

5   Q    What do you recognize that to be?

6   A    This is a CD with a copy of the recording of the phone

7   call from Mr. Maynard to Rumi.

8   Q    That was placed on May 11th, 2010?

9   A    Yes.

10  Q    How do you know that CD contained the recorded phone call

11  between Stan Maynard and an individual named Rumi from

12  May 11, 2010?

13  A    I produced the call.  When I listened to it on this disk,

14  I did initial it and date it.

15  Q    You see your initials and date on that CD?

16  A    Yes.

17          MR. CANTY:   Ask what's marked as Government

18  Exhibit 6 for identification be moved into evidence.

19          MR. RUSSO:   No objection.

20          THE COURT:   Government Exhibit 6 received in

21  evidence.

22          (So marked.)

23          MR. CANTY:   With the court's permission, I would

24  like to play Government Exhibit 6 for the jury.  I've produced

25  transcripts of this telephone call that I provided to defense

A-57

1   counsel.

2          THE COURT:    Is there any objection?

3          MR. RUSSO:    No, Judge.  I'm wondering if he could

4   indicate what exhibit number of the transcripts of the phone

5   call are?

6          MR. HORN:    AA?

7          MR. CANTY:    No, 6-A are the transcripts.  The

8   actual call is Government Exhibit 6.

9          THE COURT:    Any objection?

10         MR. RUSSO:    No.

11         THE COURT:    I'll remind --  inform --  later on

12  remind the jury when you receive the transcripts, the purpose

13  of the transcripts are to assist you in listening to the

14  recordings.  If there's any difference between what you're

15  hearing on the recording and what's on the transcript, the

16  evidence is the recording itself, not the transcript.  These

17  are merely aids to the jury in listening to the recording.

18  I'll remind you about that if and when there are additional

19  recordings offered in evidence in the case.

20         You have --

21         MR. CANTY:    I have copies.

22         THE COURT:    Hand out the transcripts, but how do

23  you plan to play it?

24         MR. CANTY:    I have my computer, play it through the

25  court system.

SS       OCR       CM       CRR       CSR

A-58

Goldberger-direct-Canty                    49

1        THE COURT:   Have you tried it?

2        MR. CANTY:   I tried it last Friday, your Honor.

3        THE COURT:   There's no video here, is there?

4        MR. CANTY:   No, Judge.

5        (Transcripts distributed to the jury.)

6        (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-59

50

1        MR. RUSSO:  Your Honor?

2        THE COURT:  Yes?

3        MR. RUSSO: May we approach for clarification?

4        THE COURT: I just want to make sure that it's

5   working. If it is not working, someone will work on it while

6   we have a point of clarification.

7        MR. RUSSO: It is on.

8        THE COURT:  All right.  Let's take a side-bar.

9

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*side-bar*                                                        51

1          (The following took place at side-bar).

2          MR. RUSSO: Judge, I understand that the evidence and

3    the calls were put into evidence, the phone call between

4    Maynard and defendant. That does not include the FBI

5    self-serving statements at the beginning, and I would like

6    that to edited out and for the jury not to hear that. That's

7    not evidence.

8          MR. CANTY: Certainly, it is evidence.  It is the

9    full recording from start to finish.  If he chooses to

10   question the witness about that, that would be self-serving

11   statements.  He is certainly entitled.  This is a recording

12   from start to finish, completely unedited.

13         MR. RUSSO: We don't need the FBI saying test, test

14   test, and this is -- this is a phone call to discuss with the

15   defendant the payments for fraudulent identity documents. That

16   is an editorial comment about the ultimate issue in this case

17   made by an FBI agent at the beginning of the tape.  I would

18   ask the jury not hear that, and the fact that they be

19   instructed to ignore that on the sheets they have been handed

20   of this transcript.

21         MR. CANTY: Your Honor, that's the purpose of the

22   call, so if defense counsel disagrees with the substance of

23   the call, the purpose of the call is to see if they will go

24   kill my mother and then the call, what are you talking about,

25   your moment's a great lady, certainly the jury can dissect

A-61

52

1    those issues. This is the effect that it had on the Agent.

2    The Agent placed the date, the time and purpose of the

3    recording.  He is not saying because we know this guy is going

4    to get fraudulent documents, etcetera.

5            THE COURT:  All right.  Overruled, but I am going to

6    set the context so that the jury knows that the statement made

7    at the beginning is to introduce the recording, but is not

8    itself evidence of anything specific.

9            MR. RUSSO: It reflects the Agent's opinion.

10           THE COURT:  I am going to say it is not evidence of

11   any of the issues in the case.  Just provides the context for

12   when the record was made.

13           MR. CANTY:  Thank you.

14           (End of side-bar).

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

*Goldberger - direct/ Canty*                                    53

1          (The following took place in open court).

2          THE COURT: Now, members of the jury, we note that

3    the first paragraph is the beginning of the recording.  It

4    sets assist the context for what the recording of the

5    conversation which comes afterwards starting with the name

6    Maynard.  The statement which is made at the beginning by the

7    FBI Agent simply establishes the context as to when it

8    happened and what the purpose of the recording was.  It is not

9    itself evidence of any specific acts or of wrongdoing or any

10   other allegations. It is simply establishing the introduction

11   to the recording.  So you are not to treat the first

12   paragraph, which is the FBI, as specific evidence of any

13   behavior on the part of the participants in the recording.

14          All right. Let's hear the recording.

15          (Tape played); (Tape stopped)

16   DIRECT EXAMINATION (Cont'd)

17   BY MR. CANTY:

18   Q    Agent Goldberger, after you arrested Mr. Maynard, did

19   there come a time when you went and picked up additional prior

20   to going to that IHOP Restaurant?

21   A    Yes.

22   Q    Where did you go?

23   A    We went to Mr. Maynard's apartment.

24   Q    What did you go there to pick up?

25   A    We went and picked up this -- similar type documents to

*Goldberger - direct/ Canty*                           54

1    what we have for the female -- the stuff that he previously

2    had been given which was pictures, passport photos of a male,

3    client biographical information, parental information and

4    thumbprints for that male client.

5    Q    Did he explain to you why the process hadn't been started

6    with respect to the male client?

7    A    Because he hadn't been given any money yet.

8    Q    I'd like to show you Government Exhibit 4 and 4-A -- may

9    I approach the witness, Your Honor?

10         THE COURT:  Yes you may.

11   Q    Agent, do you recognize what's been marked as Government

12   Exhibit 4 and 4-A for identification?

13   A    Yes.

14   Q    What is that?

15   A    These look like copies of passport photos that

16   Mr. Maynard gave to us.

17   Q    Is that fair and accurate copy -- color copy of the

18   images that were given to the FBI informant to turn over to

19   Mr. Maynard prior to Mr. Maynard's arrest on May 11, 2010?

20   A    Yes.

21         MR. CANTY: Your Honor, I ask that what's been marked

22   Government Exhibit  4 and 4-A be marked into evidence.

23         MR. RUSSO: No objection.

24         THE COURT:  Government Exhibits 4 and 4-A received

25   in evidence.

A-64

*Goldberger - direct/ Canty*      55

1      You may proceed.

2      (Government Exhibits 4 and 4-A received and marked

3 into evidence)

4      MR. CANTY: May I approach the witness?

5      THE COURT: Yes, you may.

6      MR. CANTY: Thank you.

7 Q     Special Agent, I'd like you to take a look at what's been

8 marked as Government Exhibit 4-B, do you recognize that

9 (handing)?

10 A     Yes.

11 Q     What do you recognize that to be?

12 A     This would be the biographical information for the male

13 client, along with his parental information and thumbprints

14 that we got from Mr. Maynard's house May 11th.

15 Q     Was that information that was provided to Mr. Maynard

16 prior to May 11th that was given to him by the FBI informant?

17 A     Yes.

18      MR. CANTY: Your Honor, I ask that what's been marked

19 Government Exhibit 4-B for identification be moved into

20 evidence.

21      MR. RUSSO: No objection.

22      THE COURT: Government Exhibit 4-B is received in

23 evidence.

24      (Government Exhibit 4-B received and marked in

25 evidence).

*Goldberger - direct/ Canty*                                    56

1          You may proceed.

2    Q    Special Agent Goldberger, can you describe to the jury

3    what you did with respect to Government Exhibits 3, 3-A, 3-B,

4    4, 4-A, 4-B, and Government Exhibit 2 and Government

5    Exhibit 1?

6    A    Do you mean in regard to the meeting with --

7              THE COURT:  Can you be more specific?

8              MR. CANTY: Yes.  I apologize.

9    Q    Agent, with respect to the meeting that was set up

10   between the defendant and Mr. Maynard?

11   A    We put all this -- all the items that you mentioned

12   together.  We put the biographical information for both

13   people, along with the parental information and thumbprints,

14   the passport photographs, and the $10,000 in cash inside the

15   girl scout cooky box, and then we put it all inside of a CVS

16   shopping bag.

17   Q    I would like you to take look at Government Exhibit 5?

18              MR. CANTY: May I approach the witness, Your Honor?

19              THE COURT:  Yes, you may.

20              (Mr. Canty handing to the witness)

21   Q    Do you recognize Government Exhibit 5?

22   A    Yes.

23   Q    What do you recognize Government Exhibit 5 to be?

24   A    This is an envelope that Mr. Maynard kept the pictures

25   and information for the male client inside, which he had

A-66

*Goldberger - direct/ Canty*     57

1   inside his dresser in his house.

2   Q   Did you keep that envelope and use it with respect to the

3   meeting between Mr. Maynard and the defendant on May 11, 2010?

4   A   I believe -- I believe we kept it -- I -- I don't believe

5   we put it back into the envelope -- I'm sorry -- into the

6   cooky box.

7   Q   Okay. But that was the envelope that you got from

8   Mr. Maynard's house on May 11, 2010?

9   A   Yes.

10         MR. CANTY: Your Honor, I ask it be marked as

11   Government Exhibit 5.

12         THE COURT: Do you want to look at it?

13         MR. RUSSO: No Judge. No objection.

14         THE COURT: All right. Government Exhibit 5

15   received in evidence.

16         (Government Exhibit 5 received and marked in

17   evidence) .

18         MR. CANTY: Your Honor, may I publish Government

19   Exhibit 4, 4-A and 4-B an Government Exhibit 5 to the jury?

20         THE COURT: Yes, you may.

21         MR. CANTY: Thank you.

22         (Mr. Canty handing to the jury)

23         (Pause in the proceeding)

24         THE COURT: In the meantime, can you collect the

25   transcripts, please.

A-67

*Goldberger - direct/ Canty*                                    58

1          MR. CANTY: Yes, Your Honor.

2          THE COURT:  All right.

3          MR. CANTY: May I continue, Your Honor?

4          THE COURT:  Yes.

5    Q    Special Agent Goldberger, did there come a time when you

6    set up a plan for Stan Maynard to meet with this individual

7    Rumi?

8    A    Yes.

9    Q    Could you briefly describe to the jury what that plan

10   was.

11   A    May 11th we -- the plan was to have Mr. Maynard call to

12   Rumi and invited him to IHOP -- IHOP Restaurant on Jamaica, I

13   believe it was on Jamaica Boulevard in Queens, and we provided

14   Mr. Maynard with a recording device to wear for the meeting

15   and we gave him -- for both sets of clients we gave him the

16   passport photos, both male and female, thumbprints,

17   biographical information and parental information, and $10,000

18   cash, and put it in the girl scout cooky box inside a CVS bag,

19   and we instructed Mr. Maynard to call Rumi and invite him to

20   the IHOP, and the plan was when Mr. Maynard gave the -- gave

21   everything inside the bag and the box to Rumi the plan was to

22   arrest Rumi immediately.

23   Q    Now, with respect to the -- just point of clarification,

24   with respect to the passport photos, you saw a picture eight

25   by -- eight and a half by 11 photographs.  What was the size

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

A-68

*Goldberger - direct/ Canty*                                    59

1    of those actual photos?

2    A    The passport photo is two inches by two inches.

3    Q    Is that the approximate size of the images that were

4    placed into that box that day?

5    A    Yes.

6    Q    Who, if anyone else, was with you when you went to the

7    IHOP Restaurant with Stan Maynard?

8    A    Special Agent Stinson.

9              MR. RUSSO: Your Honor --

10             MR. CANTY: I'll ask --

11   Q    Did there come a time where you followed through on this

12   plan and actually went to that IHOP Restaurant?

13   A    Yes.

14   Q    Who did you go with?

15   A    Special Agent Stinson, Special Agent Donald Chu and

16   Special Agent Anthony Bivona.

17   Q    How did you guys set yourselves, how did the agents set

18   themselves up within the IHOP Restaurant?

19             MR. RUSSO:  Objection, Your Honor; foundation.

20             THE COURT:  All right. Sustained.

21   Q    Did there come a time where you set yourselves up for the

22   meeting with -- the potential meeting with this individual

23   named Rumi and Mr. Maynard?

24   A    Yes.

25             MR. RUSSO: Objection, Your Honor; leading.

1        MR. CANTY:  I can rephrase.

2        THE COURT: Sustained.

3   Q    What, if anything, did you do when you got to the IHOP?

4   A    When we got to the IHOP we instructed Mr. Maynard where

5   to sit, and then the four agents, we sat at two different

6   tables close by within eyeshot of Mr. Maynard.

7   Q    During the time that you were at the IHOP did -- well,

8   did there come a time while you are at the IHOP that an

9   individual sat down with Mr. Maynard?

10  A    Yes.

11  Q    Do you see that individual anywhere in the courtroom here

12  today?

13  A    Yes, I do.

14  Q    Can you please point him out and identify him by an

15  article of clothing that he's wearing?

16  A    He is --

17  Q    If you want to stand, please stand if that will help you.

18  A    The gentleman sitting over there with his eyeglasses on

19  and he's wearing an off-white shirt. He's got his hand raised

20  now.

21        THE COURT:  Let the record show that the witness has

22  identified the defendant.

23  Q    Can you please describe for the jury the observation you

24  made while you were sitting at that IHOP?

25  A    The two men sat opposite each other at a table. They

A-70

1    engaged in conversation with one another, and at some point

2    during the meeting the defendant took -- received a telephone

3    call and spoke on the phone for a little while.

4    Q    Did there come a time during that meeting that there was

5    an exchange between Mr. Maynard and the defendant

6    Ghulam Mesbahuddin?

7              MR. RUSSO: Objection, Your Honor; leading.

8              THE COURT: Sustained.

9    Q    What additional observations did you make?

10   A    Towards the end of the meeting between Mr. Maynard and

11   the defendant Mr. Maynard handed the defendant the CVS bag

12   that we had previously provided to him and the defendant

13   accepted it.

14   Q    What happened next?

15   A    The defendant was immediately arrested.

16   Q    Did you have the opportunity to inspect the defendant

17   upon his arrest?

18   A    Yes.

19   Q    What did you find on his person?

20   A    We found all the items that we had provided to

21   Mr. Maynard to give to the defendant.  So within the CVS bag

22   was the girl scout cooky box.  Within the girl scout cooky box

23   back was twos of passport photos, both male and female, and to

24   sets of biographical information, parental information and

25   thumbprints, along with the $10,000 cash.

A-71

*Goldberger - direct/ Canty*                                62

1   Q    What, if anything, did you do to memorialize the meeting

2   between Mr. Maynard and the defendant?

3   A    We recorded the entire meeting with the same recording

4   device that we had previously used earlier in the day.

5             MR. CANTY: I would like to present the witness with

6   Government Exhibit 7 for identification (handing to the

7   witness).

8   Q    Do you recognize that.

9   A    Yes, I do.

10  Q    What do you recognize Government Exhibit 7 for

11  identification to be?

12  A    This is a CD containing a copy of the audio recording of

13  the meeting between Mr. Maynard, and the defendant.  I

14  initiated the recording and shut off deal device at the end of

15  the meeting and I listened to this particular disk and after I

16  initialled it --  after I listened to it I initialled it and

17  dated it.

18             (Continued on next page)

19

20

21

22

23

24

25

A-72

1   CONTINUED DIRECT EXAMINATION

2   BY MR. CANTY:

3   Q    After you listened to that, you were satisfied that was

4   the recording of the interaction between Mr. Maynard and the

5   defendant Ghulam Mesbahuddin on May 11th, 2010, at that IHOP

6   restaurant in Queens, New York?

7   A    Yes.

8            MR. CANTY:   I ask what's marked as Government

9   Exhibit 7 for identification be marked into evidence.

10           MR. RUSSO:   May I inquire?

11           THE COURT:   Surely.

12  VOIR DIRE EXAMINATION

13  BY MR. RUSSO:

14  Q    Agent Goldberger, good afternoon.  On Government

15  Exhibit 7, audio recording which you described as the

16  recording of the meeting between Mr. Mesbahuddin and

17  Mr. Maynard, did you have a speaking role?

18  A    Yes, I did.

19  Q    On this is a portion in which you are doing speaking,

20  which you are speaking?

21  A    Yes.

22  Q    You were not in conversation with either Mr. Mesbahuddin

23  nor Mr. Maynard?

24  A    I believe at some point I may provide instructions

25  directly to Mr. Maynard.

64

1  Q    Is there a portion in there you're just making editorial

2  comment about what's to come on the recording?

3  A    Yes.

4        MR. RUSSO:   Your Honor, with the exception of the

5  agent's editorial comment at the beginning of the recording,

6  we have no objection to that disk being moved into evidence.

7        MR. CANTY:   I have no objection, with the same

8  admonition the court gave before.

9        THE COURT:   The objection is noted.  I'll follow

10  the same procedure I followed earlier.

11        MR. RUSSO:   Thank you.

12        THE COURT:   How long is this recording?

13        MR. CANTY:   Approximately 40 minutes.

14        THE COURT:   Which means we're going to hear it

15  tomorrow morning.

16        Let me say this to the jury.  If the jury is able to

17  stay beyond 5:00 o'clock on any given day, just tell

18  Mr. Jackson because that will shorten the number of days that

19  we're going to be on trial.  The commitment to you is we'll

20  stay until 5:00.  If you can stay until 5:30, depending on

21  what your other commitments are, it would be helpful if we

22  could move the trial along, but I'm not requiring you to do

23  so.  I'm simply asking you whether, as a group, you would be

24  willing to do so.  You can discuss this in the jury room when

25  you get here tomorrow or when you're done today.

SS      OCR     CM      CRR     CSR

1           At this point I'm going to suspend for the balance

2    of the day.  Members of the jury, let me remind you not to

3    discuss the case with anyone, or amongst yourselves.  Once

4    you're taking notes, those of you who are, please do not share

5    your notes with anyone.  At the end of the day, I'll ask you

6    to leave them in the jury room and it will be returned to you

7    for your private use the next day.  Do not listen to, watch,

8    access on the internet or read any accounts of this case.  Do

9    not discuss or communicate anything about this case on line on

10   any social networking medium, on the internet, on AOL, on

11   Gmail or anywhere else.  In other words, don't let your

12   fingers touch a keyboard in connection with this proceeding.

13   I remind you that if for any reason anyone should approach you

14   about the case, please bring that to the attention of my law

15   clerk or my courtroom deputy.

16           I want to thank you for your attention today and

17   we'll see you at 11:00 o'clock tomorrow morning.

18           All rise for the jury.

19           (Jury leaves courtroom.)

20           THE COURT:   You all may be seated.

21           I'm going to excuse the witness for the day with the

22   instruction not to discuss the case with anyone -- your

23   testimony with anyone.

24           THE WITNESS:  Yes, sir.

25           THE COURT:   You're excused.

A-75

1           THE WITNESS:  Thank you.

2           (Witness leaves courtroom.)

3           THE COURT:   Mr. Canty, about how long do you have

4    with this witness?

5           MR. CANTY:   Your Honor, just this recording.

6    Although we're going to have the cooperator testify tomorrow,

7    I may have to play what the cooperator is testifying.  This is

8    it.  I don't have any further questions.

9           To let you know, we have all our witnesses lined up

10   for tomorrow.  I believe a number of our witnesses, three of

11   them, will be very quick.  I'm optimistic we may, depending on

12   how long they are with the cooperator, be able to finish

13   tomorrow or the first thing Wednesday.

14          THE COURT:   I'm trying to move the trial along,

15   obviously.

16          Mr. Russo, this means that you're going to be

17   cross-examining this witness first thing tomorrow morning at

18   11:00 a.m. Then we'll have the cooperator after that.  There

19   are several other witnesses.  I take it the cross of the

20   cooperator will take longer?

21          MR. RUSSO:   Correct, Judge.

22          THE COURT:   About how long do you have the

23   cooperator on direct, do you think, including the 40 minutes?

24          MR. CANTY:   Sorry?

25          THE COURT:   How long do you think the cooperator's

SS      OCR      CM      CRR      CSR

1    direct is?

2              MR. CANTY:    Half hour to 45 minutes.

3              THE COURT:    Including the 40 minutes?

4              MR. CANTY:    Because it's in evidence, yes, I would

5    say 40 minutes.

6              THE COURT:    You have the option of playing the tape

7    with this witness, with the next witness.  That's up to you.

8              MR. CANTY:    Yes, Judge.

9              THE COURT:    It's your presentation.

10             MR. CANTY:    With the court's permission, there are

11   some witnesses, if they're available, I may call before the

12   cooperator, just because they're going to be quick, work for

13   other agencies.  I don't want hold them all day.

14             THE COURT:    Does the defense know who they are?

15             MR. CANTY:    Yes, I've turned over a witness list.

16             THE COURT:    You're all set on that?

17             MR. RUSSO:    Whoever they want to call, we're ready.

18             THE COURT:    I want to make sure you've been told

19   who is going to be here tomorrow.

20             MR. RUSSO:    I have a witness list from the

21   government.

22             THE COURT:    Sounds like the list is tomorrow.

23             MR. RUSSO:    Yes.

24             THE COURT:    Let me ask this.  Assuming we're

25   finished with the government's case tomorrow, if you put on a

A-77

1  case, how long do you think that would be?

2       MR. RUSSO:  Very quick, which I think it is an item

3  I wanted to bring to the court's attention.  On Friday when we

4  were here last, your Honor signed a subpoena for someone, a

5  witness who had testified for the government in front of the

6  grand jury, who is actually the speaker on the other side of

7  the phone call we're about to hear, the recording of it.

8  Mr. Haque was served with the court's subpoena but indicated

9  to the server of the subpoena that he did not want to come

10  back to court, did not want to testify anymore.  With that

11  anticipation, he's subpoenaed for the 31st which is Wednesday

12  which is how we put the subpoena.

13       With the anticipation the witness is not going to

14  comply with the court's subpoena, I'm going to seek some

15  assistance or guidance from the court in that regard.  I

16  thought to keep things moving we should do that sooner rather

17  than later, rather than wait for him not to show up.  Perhaps

18  I suggest to the court either the assistance of the marshal to

19  bring him to court because it is a court subpoena or since he

20  has already testified for the government and I essentially

21  only want him to say what he told the government in the grand

22  jury -- there's no right of confrontation issue.  Perhaps if

23  he refuses to appear, we could read to the jury the transcript

24  of his grand jury testimony that has already been turned over.

25       The government certainly cannot claim a right of

SS     OCR     CM     CRR     CSR

1  confrontation even if they had one to have for this witness.

2  It was their witness.  I want his testimony.

3         THE COURT:  Mr. Canty?

4         MR. CANTY:  I take issue with the reference that he

5  was our witness.  He was a grand jury witness called in,

6  subpoenaed to testify.  He's not being called by the

7  government in our case in chief.  Certainly, counsel has --

8         THE COURT:  Was he granted immunity?

9         MR. CANTY:  No, he was not granted immunity.

10        THE COURT:  He has a lawyer?

11        MR. CANTY:  Has a lawyer.  My suggestion is counsel

12  contact his lawyer, that he was properly served, should show

13  up to testify.

14        MR. RUSSO:  Done that.

15        THE COURT:  Please instruct his lawyer he should

16  show up with his lawyer if he's claiming some sort of Fifth

17  Amendment privilege.  I'm going to want to meet with him and

18  his lawyer why he's asserting the privilege or that he is

19  asserting the privilege and we'll take it from there.

20        MR. RUSSO:  Will do.

21        THE COURT:  What about should he not testify?  It

22  would be the request of the defense the transcript of his

23  testimony at another proceeding be introduced to the jury?

24        MR. CANTY:  Your Honor, at this point I would

25  object, certainly want to review his testimony again.  At this

1    point I would object.  It's certainly not --  the purpose of a

2    grand jury inquest is not to necessarily cross examine a

3    witness.  The dynamics of the grand jury is completely

4    different than an adversarial setting.  There are a number of

5    reasons why individuals are called before the grand jury.  The

6    purpose of cross-examination is so different.  Certainly the

7    claim that we had the right to confront him on certain issues,

8    it is a totally different purpose for which you call a witness

9    to the grand jury and you cross examine a witness.  Again, I

10   would object at this point.  I would like the opportunity to

11   review those minutes.

12          Certainly we should hear from this witness.  I'm,

13   again, not stating anything stated on the record is not

14   factual, but merely saying a witness was subpoenaed, said he

15   doesn't want to come in, we want to move in his grand jury,

16   there's more we should be doing before we get to that point.

17          THE COURT:   He has to be here 9:30 Wednesday

18   morning.  Please advise the witness's attorney the court

19   expects the subpoena to be complied with.  The attorney should

20   come with his client if he's claiming some sort of privilege.

21          Anything else?

22          MR. CANTY:   No, thank you.

23          MR. RUSSO:   No.

24          THE COURT:  This means apart from this individual,

25   that by Wednesday morning the defense case, if there is one,

71

1    will be finished.  Is that a fair statement?

2              MR. RUSSO:  Certainly by the lunch break, your

3    Honor, if Mr. Mesbahuddin doesn't testify and then the

4    cross-examination.  I have two witnesses that appear on the

5    list.

6              THE COURT:  Then we'll have closing arguments and

7    then I'll charge the jury on the law.  They'll deliberate.

8              You have my order today.  I would expect for

9    tomorrow I would have your responses on that as to what we

10   might need to add to the charge.

11             We're going to have a charge conference tomorrow

12   afternoon because we're going to have a charge on Wednesday.

13             Anything else?

14             MR. RUSSO:  Nothing, your Honor.

15             THE COURT:  Anything else, Mr. Canty?

16             MR. CANTY:  No, thank you, your Honor.

17             THE COURT:  Have a nice evening.

18                        * * * * * * * * * *

19

20

21

22

23

24

25

72

1    J E F F R E Y   A.   G O L D B E R G E R          37

2    DIRECT EXAMINATION                                 37

3    1                                                  43

4    2                                                  44

5    3 and 3A                                           45

6    3B                                                 46

7    6                                                  47

8    Government Exhibits 4 and 4-A                      55

9    Government Exhibit 4-B                             55

10   Government Exhibit 5                               57

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SS        OCR        CM        CRR        CSR

A-82

73

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA      :    CR-10-726
4
          -against-                     U.S. Courthouse
5                                   :    Brooklyn, New York
     GHULAM MESBAHUDDIN,
6
              DEFENDANT,            :
7                                       August 30, 2011
     - - - - - - - - - - - - - - X   9:30 o'clock a.m.
8
              TRANSCRIPT OF TRIAL
9             BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
              UNITED STATES DISTRICT JUDGE and a jury.
10

11
     APPEARANCES:
12
     For the Government:      LORETTA LYNCH
13                            United States Attorney
                              271 Cadman Plaza East
14                            Brooklyn, New York  11201
                              BY:  MICHAEL CANTY
15                                 SYLVIA SHWEDER
                              Assistants U.S. Attorney
16

17   For the Defendant:       JOHN RUSSO, ESQ.
                              MICHAEL HORN, ESQ.
18

19

20
     Court Reporter:          SHELDON SILVERMAN
21                            Official Court Reporter
                              225 Cadman Plaza East
22                            Brooklyn, New York 11201
                              (718) 613-2537
23

24

25   Proceedings recorded by mechanical stenography. Transcript
     Produced By Computer Aided Transcription.
```

SS       OCR       CM       CRR       CSR

74

```
1              THE COURT:   Case on trial.
2              (Appearances noted.)
3              THE COURT:   We're waiting for the jury.  I don't
4     know if they're here yet.  My deputy will let us know.
5              Before we get started, have you tried out the sound
6     system?
7              MR. CANTY:   I'm putting the disk in now, your
8     Honor.
9              THE COURT:   Let's try it out so we don't keep the
10    jury waiting.
11             (Pause.)
12             THE COURT:   Mr. Canty, have you decided whether
13    you're going to put this in with this witness or the next
14    witness?
15             MR. CANTY:   I'll play with this witness and then
16    I'll have no further questions for this witness.
17             I would like to hand the court a courtesy copy of
18    the letter I filed ECF with respect to your order from
19    yesterday.
20             THE COURT:   All right.
21             MR. CANTY:   I have a copy for the defendant.
22             THE COURT:   It was filed on ECF.  We're making
23    revisions, haven't gotten anything from the defense, but I'm
24    making revisions to the charge.  Thank you for providing this
25    guidance as to your position.
```

A-84

1          Is the defense going to submit anything separately

2    or wait for the charge conference?

3          MR. RUSSO:    Judge, we're okay with the court's

4    published additional charge that we received yesterday in

5    terms of the bribery elements.

6          THE COURT:    Let us incorporate whatever we can and

7    then in a second draft discuss it.  You can tell me then

8    whether you have any issues with the draft.

9          MR. RUSSO:    Thank you.

10          THE COURT:    After Special Agent Goldberger, are you

11   putting your cooperator on?

12          MR. CANTY:    Yes, your Honor.

13          THE CLERK:    Still waiting for one juror.

14          THE COURT:    Which one?

15          THE CLERK:    Alternate juror number 3.

16          (Pause.)

17          MR. CANTY:    So we could expedite the process, there

18   are issues we need to discuss.

19          THE COURT:    Go ahead.

20          MR. CANTY:    With respect to Government Exhibit 15,

21   we ask this be moved into evidence, been marked for

22   identification.  That's without objection.

23          MR. RUSSO:    No objection.

24          THE COURT:    Government Exhibit 15 is received.

25          (So marked.)

SS      OCR      CM      CRR      CSR

1          MR. RUSSO:   I should say this, Judge.  We have no

2    objection to the photograph because it's an accurate

3    photograph of the evidence that's already been admitted.

4          THE COURT:   Say that again, Mr. Russo.

5          MR. RUSSO:   We have no objection to

6    Government Exhibit 15, simply because it's a montage

7    photograph which accurately depicts evidence that's already

8    been admitted.  So, we have no objection to that.

9          MR. CANTY:   I would also ask what's been marked as

10   Government Exhibit 3C, D, 4C, 4D, 3E and 4E be moved into

11   evidence.  These are just the originals of documents that went

12   into evidence yesterday.  That's without objection.

13         MR. RUSSO:   I thought we did that yesterday, Judge.

14         I'll do it again.

15         THE COURT:   I have a lot of B's but no C's.  3C, D

16   and E and 4C, D and E are received without objection.

17         (So marked.)

18         THE COURT:   Anything else?

19         I would like to bring the jury in, get started here.

20         Is there an objection to something?

21         MR. RUSSO:   The government has indicated it intends

22   to offer these demonstrative exhibits that were prepared by

23   the graphics people at the U.S. Attorney's Office.  I

24   certainly have no objection to them displaying them to the

25   jury in connection with argument that they wish to make at

A-86

1   closing.  My understanding is that the government intends to

2   offer them into evidence.  My objection is they are not

3   evidence.  At best, they're a partial representation of some

4   transcripts that are in evidence.

5           MR. CANTY:   Your Honor, we're seeking to move them

6   into evidence.  They are fair and accurate with respect to

7   what they contain.  Again, we have no objection to the proper

8   limiting instruction the jury is to rely on the recordings

9   themselves and that this is merely an aid to the jury to use

10  during their deliberations.  I think with that proper limiting

11  instruction, it should be appropriately admitted if this

12  witness can fairly and accurately demonstrate that's what

13  occurred in the phone call.

14          THE COURT:   I'll let you use it in argument, not

15  going to the jury.

16          MR. RUSSO:   The transcripts of the phone call

17  that's about to be played, I guess with the witness, Special

18  Agent Goldberger.  I thought we had stipulated the transcript

19  yesterday as Exhibit number 7.

20          THE COURT:   Isn't that the tape?

21          MR. CANTY:   The tape is 6.

22          THE COURT:   The transcript?

23          MR. CANTY:   We would make 7-A.

24          MR. RUSSO:   I would have no objection, Judge, to

25  that.  My understanding is that the court did give a limiting

SS      OCR     CM      CRR     CSR

Goldberger-direct-Canty                                78

1    instruction as to the editorial comment at the beginning of

2    the tape.

3              THE COURT:    Right.

4              MR. RUSSO:    Thank you.

5              THE COURT:    I'll take care of that.

6              Let's bring in the jury.

7              Let's bring in the witness.

8              How much cross do you think you'll have of this

9    witness time-wise?

10             MR. RUSSO:    I would like to say 30 minutes.

11             THE COURT:    I'm not holding you to it.  I want to

12   get a sense.

13             MR. RUSSO:    20 to 30 minutes, more or less,

14   depending.

15             THE COURT:    Can we bring in the witness?

16             MR. CANTY:    Yes, your Honor.

17             THE COURT:    Is Mr. Maynard here?

18             MR. CANTY:    He's here.

19             (Agent Goldberger enters courtroom.)

20             (Jury enters courtroom.)

21             THE COURT:    Everyone may be seated.

22             Good morning, members of the jury.  We'll continue

23   with the examination of the witness.  I remind the witness

24   he's still under oath.  You may continue.

25

SS       OCR      CM      CRR      CSR

A-88

1  CONTINUED DIRECT EXAMINATION

2  BY  MR. CANTY:

3          MR. CANTY:   I have what's marked as

4  Government Exhibit 7 in evidence.  I would like to hand up the

5  transcript which has been stipulated as 7-A to the jury.

6          THE COURT:   You may do so.

7          Members of the jury, as I said, the last

8  transcript -- two things; one, if there's any difference

9  between what's in the transcript and what you hear, it's what

10  you hear that's the evidence.  The transcript is only

11  providing you with some assistance in your ability to listen

12  to the recording.

13          Second, the statement by Special Agent Goldberger at

14  the top of the transcript where he describes certain facts,

15  those facts described by the special agent are not themselves

16  evidence.  The purpose of that initial statement is to set the

17  context for the recording which follows.  It is not itself

18  evidence of any facts that you will have to consider when you

19  retire to consider your verdict.

20          Go ahead.

21  Q    Special Agent Goldberger, with respect to this Exhibit 7,

22  describe to the jury what we're going to be listening to here.

23  A    From Exhibit 7, that was the recording device we gave to

24  Mr. Maynard prior to his meeting to go meet with Rumi.  We

25  provided Mr. Maynard with several items that the jury has

SS      OCR      CM      CRR      CSR

Goldberger-direct-Canty                                    80

1    already seen:  Two sets of passport photographs, both male and

2    female, the biographical information, thumb prints and

3    parental information of both those clients as well as $10,000

4    cash, all placed within the box, the Girl Scout cookie box in

5    the CVS bag, provided those items to Mr. Maynard to go to his

6    meeting with Rumi.  Then we went to the IHOP restaurant in

7    Queens, escorted Mr. Maynard inside and then directed him to

8    call Rumi to come meet.

9               (Audio plays.)

10              (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SS      OCR      CM      CRR      CSR

1          (Tape played); (Tape stopped)

2          MR. RUSSO: Your Honor, if I could ask the government

3    to stop the tape and if we can approach?

4          THE COURT: All right.

5          (Side-bar).

6          MR. RUSSO: We don't think the jury should hear any

7    more --

8          MR. CANTY: It is about fifteen minutes away.

9          MR. RUSSO: There was a lot of dead space on the

10   tape.  I didn't know there was this much dead space.  I would

11   consent to --

12         THE COURT:  Now, we are taking more time.  Okay.

13   Let's go back.

14         MR. CANTY: We are about ten seconds away.

15         THE COURT: Thank you, very much.

16         (The following took place in open court)

17         (Tape continued); (Tape stopped)

18         MR. CANTY: Judge, for the record, we are approaching

19   2340 in the transcript.

20         THE COURT:  All right.

21         (Tape continued); (Tape stopped)

22         MR. CANTY:  Your Honor, I have no further questions.

23         THE COURT:  All right. Do you want to recover the

24   transcripts. Are you going to need the transcript for cross?

25         MR. RUSSO: I am going to refer to it, Judge.

*Goldberger - cross/ Russo*                                          82

1          THE COURT:  Everyone, hold on to your transcripts.

2    CROSS-EXAMINATION

3    BY MR. RUSSO:

4          MR. RUSSO:  Thank you Judge.

5    Q    Good afternoon, Agent Goldberger.

6    A    Good afternoon.

7    Q    Now, just to clarify how this entire investigation and

8    the arrest of Mr. Mesbahuddin developed, Stan Maynard was the

9    person who had approached another government informant by the

10   name of Ghula (ph) about selling fraudulent documents, do I

11   have that correct?

12   A    You don't have the name correct.

13   Q    Who was it that brought Mr. Maynard to the FBI's

14   attention?

15   A    You mean the person we referred to as the informant that

16   made the recording?

17   Q    Yes.

18          MR. CANTY:  Objection, Your Honor.

19          THE COURT:  I'm sorry.  Objection as to?

20          MR. CANTY:  The name of the individual.  He's been

21   referred to as government informant.

22          THE COURT: Sustained.

23   Q    Mr. Maynard who is the informant here, who you used to

24   set up Mr. Mesbahuddin, that's the person that we are hearing

25   on that tape; is that correct?

A-92

*Goldberger - cross/ Russo*                                    83

1   A    Yes, sir.

2   Q    Now, Mr. Maynard, before he set about -- set up

3   Mr. Mesbahuddin, was already under arrest by the FBI; is that

4   correct?

5   A    Yes.

6   Q    He had himself been set up the day before by another

7   cooperating government agent; is that correct?

8   A    Not the day before.

9   Q    How long before?

10  A    The investigation lasted a couple of months.

11  Q    He was arrested on May 10th, Mr. Maynard was?

12  A    No, sir, May 11th.

13  Q    And Mr. Mesbahuddin was arrested on May 12th?

14  A    May 11th.

15  Q    When was Mr. Maynard first arrested?

16  A    May 11th.

17  Q    So he was arrested, immediately said I want to cooperate

18  and immediately set up the meeting with Mr. Mesbahuddin all on

19  the same day?

20  A    Yes.

21  Q    Okay. On May 11th, when Mr. Maynard was first arrested,

22  he was arrested while he was attempting to conduct an illegal

23  transaction with an FBI informant?

24  A    Yes.

25  Q    And that informant, who shall remain nameless for the

*Goldberger - cross/ Russo*                                84

1   moment, was also previously arrested by the FBI?

2   A    He -- he'd previously been arrested.  I think it was the

3   FBI.

4   Q    Okay. So we have an unnamed informant who's arrested by

5   the FBI, facing a federal prison sentence, comes to you or

6   your colleagues, and says I want to set someone else up to get

7   myself more lenient treatment; is that about how it happened?

8            MR. CANTY: Objection.

9            THE COURT: Sustained.

10  Q    Is it not your understanding that the unnamed informant

11  in exchange for what he hoped would be a lesser prison

12  sentence agreed to set up Stan Maynard?

13           MR. CANTY: Objection as to the form set up?

14           THE COURT:  Sustained.

15  Q    To cooperate in an investigation into Stan Maynard?

16           THE COURT:  I'm sorry. Could you give the whole

17  question. Thank you.

18  Q    Did this unnamed informant agree to help in the arrest --

19  withdrawn.

20           Did this unnamed informant agree to help effectuate

21  the arrest of Stan Maynard in the hopes of lessening the

22  prison sentence he was facing?

23  A    Yes.

24  Q    We have an unnamed informant arrested by the FBI looking

25  to get out from under a prison sentence, making a connection

1   with Stan Maynard in some sort of criminal activity; is that

2   correct?

3   A     Yes.

4   Q     Than's how Stan Maynard was brought to your attention?

5   A     Yes.

6   Q     This guy, unnamed informant, told you that he knew a guy

7   named Stan Maynard who he could commit crime with?

8   A     Yes.

9   Q     What did he tell you that -- what was it, without the

10  particular words, what was it about Stan Maynard that he

11  thought he could get some criminal arrests out of?

12  A     Meaning what crimes was Stan Maynard interested in

13  committing?

14  Q     Yes.

15  A     The -- obtaining documents for -- obtaining authentic

16  documents for people who otherwise wouldn't be entitled to

17  them.

18  Q     So the unnamed informant told you that he knew a guy Stan

19  Maynard, in sum and substance, who could get fraudulent

20  documents?

21  A     Fraudulently obtained authentic documents, yes.

22  Q     And so, then it was agreed then by FBI that they would go

23  about working with this unnamed informant to set up Stan

24  Maynard in the commission of a crime?

25              MR. CANTY:  Objection.

A-95

*Goldberger - cross/ Russo*                                        86

1          THE COURT:  Set up?

2          MR. CANTY: Yes.

3    Q    To arrange criminal activity between the unnamed

4    informant and Stan Maynard?

5    A    I'm sorry.  Repeat the whole question.

6    Q    So it was agreed then by the FBI that they would work

7    with this unnamed informant while he attempted to engage in

8    some criminal activity with Mr. Stan Maynard?

9    A    Yes.

10   Q    And I imagine then -- were you involved in that

11   investigation?

12   A    Yes.

13   Q    Was this unnamed informant wired up or equipped with the

14   same type of surreptitious recording devices that Mr. Maynard

15   was equipped with?

16   A    Yes.

17   Q    And the government had him make phone calls for Mr.

18   Maynard?

19   A    Yes.

20   Q    Which were recorded?

21   A    Yes.

22   Q    And on those phone calls were he and Mr. Maynard

23   discussing criminal activity?

24   A    Yes.

25   Q    Did you have an opportunity to, during the course of that

*Goldberger - cross/ Russo*                                    87

1   investigation, to listen to those phone calls?

2   A    Yes.

3   Q    Okay. During any of those phone calls does Mr. Maynard

4   tell your unnamed informant that I got a guy (indicating) by

5   the name Ghulam Mesbahuddin, Rumi, who can get all sorts of

6   fraudulent documents?

7   A    No.

8   Q    Okay. Now right after -- withdrawn.

9         At some point the unnamed informant was able to get

10  Mr. Maynard to a sit-down at which he presented Mr. Maynard

11  with some government issued money?

12  A    Yes.

13  Q    Is that correct?

14  A    Yes.

15  Q    And the money was to be in exchange for fraudulent

16  documents that Mr. Maynard was going to give him?

17  A    Yes.

18  Q    And since, you know, you were the agent handling this

19  unnamed informant in this sting operation with Mr. Maynard,

20  you then are aware of what transaction they were meeting for,

21  were you not?

22  A    Yes.

23  Q    Okay. What was it that your unnamed informant hoped to

24  purchase from Mr. Maynard?

25  A    Trying to buy -- trying to buy documents --authentic

*Goldberger - cross/ Russo*                                        88

1   documents for his client, a female.

2   Q    What type of documents, social security cards?

3   A    Yes.

4   Q    Green cards or resident alien cards?

5   A    No, I don't think that was discussed.

6   Q    Work authorization?

7   A    Employment authorization.

8   Q    Now employment authorization, so the jury understands,

9   this is not a standalone document, is it?

10  A    Yes, it is.

11  Q    And isn't it a document that goes inside someone's

12  passport?

13  A    No, sir. If I may describe?

14  Q    Please, if you know.

15  A    It's just like a card that would fit in a wallet with a

16  biographical information, photograph and thumbprint on it.

17  Q    And from whom -- withdrawn.

18        From which agency, if you know, are these work

19  authorizations obtained?

20  A    I believe it's Department of Homeland Security.

21        (Continued on next page)

22

23

24

25

Goldberger-cross-Russo                    89

1   CONTINUED CROSS-EXAMINATION

2   BY MR. RUSSO:

3   Q    That's a federal agency?

4   A    Yes, sir.

5   Q    They're not, to your knowledge, obtained from the

6   California Department of Motor Vehicles?

7   A    No, they're not.

8   Q    Social security cards, those are obtained from the Social

9   Security Administration?

10  A    Yes.

11  Q    What other documents, specifically, was the unnamed

12  informant negotiating the purchase from Mr. Maynard?

13  A    Drivers licenses.

14  Q    Any particular state's drivers license, if you recall, if

15  you're aware?

16  A    During the course of the investigation, New York drivers

17  licenses were discussed and California state drivers licenses.

18  Q    That's two different states, two different things.  To

19  focus in, the unnamed informant made a deal with Mr. Maynard

20  to purchase documents, correct?

21  A    Yes.

22  Q    The FBI gave this unnamed informant money to go and

23  consummate this illegal deal with Mr. Maynard, correct?

24  A    Yes.

25  Q    The subject, the products, if you will, that the unnamed

Goldberger-cross-Russo                           90

1   informant was going to purchase through Mr. Maynard included

2   work authorization, social security cards and drivers license;

3   is that correct?

4   A    Yes.

5   Q    Was there any other documents?

6   A    I believe discussed were birth certificates.

7   Q    The unnamed informant was going to buy birth

8   certificates, work authorizations, social security cards and

9   drivers licenses from Mr. Maynard?

10  A    Yes.

11  Q    With the understanding that they were going to be genuine

12  documents obtained from the various issuing agency?

13  A    Yes.

14  Q    Your unnamed informant, along with you and your

15  colleagues in the FBI, believed Mr. Maynard was able to

16  produce genuine documents obtained through the Social Security

17  Administration, Department of Homeland Security, a local

18  county birth registry office and a Department of Motor

19  Vehicles?

20           MR. CANTY:    Objection.

21           THE COURT:    Sustained.

22  Q    Was it -- again, if you recall -- in that

23  investigation, was it your understanding that Mr. Maynard was

24  peddling or selling documents which had to be obtained from

25  four separate governmental agencies?


            SS     OCR     CM     CRR     CSR

Goldberger-cross-Russo                    91

1          MR. CANTY:    Objection.

2          THE COURT:    What's the objection?

3          MR. CANTY:    With the understanding of the witness,

4    it is irrelevant.

5          THE COURT:    Sustained.

6    Q    Was the subject of the informant's transaction with

7    Mr. Maynard, the purchase of four documents from four

8    different governmental agencies?

9    A    Yes.

10   Q    The FBI thought that this was real?

11         MR. CANTY:    Objection.

12         THE COURT:    Sustained.  The FBI, real?  Be more

13   specific.

14   Q    You would not have --  withdrawn.

15         Agent, the FBI would not have given this guy, this

16   unnamed informant money to consummate this illegal transaction

17   with Mr. Maynard had they not thought that Mr. Maynard could

18   actually deliver the documents that were promised; is that

19   correct?

20   A    Yes.

21   Q    Logically, it's then fair to conclude that there was some

22   belief among the members investigating this transaction with

23   Mr. Maynard that they were going to get documents which you

24   described as being issued by four different governmental

25   agencies; is that correct?

SS      OCR      CM      CRR      CSR

A-101

1   A    Yes.

2   Q    When you arrested Mr. Maynard, did he reveal to you his

3   contacts in the Department of Homeland Security?

4   A    No.

5   Q    We're not talking now about forged documents or fakes.

6   We're talking about the genuine article, right?

7   A    Yes.

8   Q    Did Mr. Maynard reveal to you his contact in the Social

9   Security Administration?

10  A    No.

11  Q    Is that because there really isn't one?

12  A    It's because his only contact for any of these documents

13  was the defendant.

14  Q    Mr. Mesbahuddin.

15       When you arrested Mr. Maynard, learned from him that he

16  really didn't know how to do any of the things that he

17  promised to do with your informant; is that correct?

18            MR. CANTY:   Objection.

19            THE COURT:   Sustained.

20  Q    When you arrested Mr. Maynard, you found out pretty

21  quickly that he, Mr. Maynard, did not have any access or

22  contacts to get drivers licenses, correct?

23  A    No, that's not correct.

24  Q    What did he have?

25  A    His contact was the defendant.

A-102

Goldberger-cross-Russo                                        93

1   Q    Mr. Mesbahuddin.

2        Did you learn from Mr. Maynard that Mr. Mesbahuddin could

3   get work authorizations?

4   A    Yes.

5   Q    Did you learn from Mr. Maynard that Mr. Mesbahuddin could

6   get social security cards?

7   A    Yes.

8   Q    Did you learn from Mr. Maynard that Mr. Mesbahuddin could

9   get drivers licenses?

10  A    Yes.

11  Q    And birth certificates?

12  A    Yes.

13  Q    And Mr. Maynard gave you specifics about how

14  Mr. Mesbahuddin had all these contacts in all these different

15  agencies?

16  A    No.

17  Q    He gave you no specifics?

18  A    No, no specifics.

19  Q    I'm sure then Mr. Maynard told the FBI about all of the

20  documents that Mr. Mesbahuddin had gotten him previously prior

21  to May of 2010, did he not?

22  A    No.

23  Q    Why is that?

24  A    This appeared to be his first attempt at doing this.

25  Q    Mr. Mesbahuddin never had any documents.

SS      OCR      CM      CRR      CSR

Goldberger-cross-Russo                                    94

1          THE COURT:   Sorry, was that a question or

2     statement?

3          MR. RUSSO:   I believe it's a question.

4          THE COURT:   What's the question?  I want to have

5     that clear and any answer should be also clear.

6          MR. RUSSO:  That Mr. Maynard had no information --

7     I'll ask it as a question.

8     Q    Did Mr. Maynard provide you with any information from

9     which you or the FBI concluded Mr. Mesbahuddin had previously

10    obtained documents?

11    A    No.

12    Q    Did Mr. Maynard provide you after he was arrested with

13    your first informant any information --  withdrawn.

14         Did Mr. Maynard provide you with any specifics --

15    specific facts --  about Mr. Mesbahuddin's alleged contacts in

16    governmental agencies?

17    A    No.

18    Q    Was there a price list Mr. Mesbahuddin charged for for

19    those documents?

20    A    No prices.

21    Q    What about the name of one other person Mr. Mesbahuddin

22    obtained documents for?

23    A    Did you say "documents for"?

24    Q    Yes.

25    A    No.

                SS     OCR     CM     CRR     CSR

Goldberger-cross-Russo                    95

1   Q    Mr. Maynard is under arrest.  He immediately --

2   immediately -- wants to cooperate; is that correct?

3   A    Yes.

4   Q    When we say cooperate, we mean he wants to help you set

5   someone else up?

6            MR. CANTY:   Objection.

7            THE COURT:   Sustained.

8   Q    He wants to help -- when we say cooperate, we're talking

9   about he wants to help the FBI get somebody else?

10  A    Help further the investigation.

11  Q    Willing to do that, in fact, Mr. Maynard told you, in sum

12  and substance, to the effect I'm only a middleman, tried to

13  minimize his involvement when you arrested him, did he not?

14  A    He said he was a middleman.

15  Q    Did Mr. Maynard tell you that he hoped you would go easy

16  on him, so to speak?

17  A    I don't recall that.

18  Q    Do you have any idea why the minute somebody is arrested

19  by the FBI and I think that's what you said previously, agent,

20  he immediately was cooperating --  cooperative --  with the

21  FBI and started to tell you about how he was taking money

22  trying to get documents for people?  Is that about what

23  happened?

24  A    Yes.

25  Q    Do you have any idea why Mr. Maynard the moment, almost

SS      OCR      CM      CRR      CSR

Goldberger-cross-Russo                                    96

1    immediately upon his arrest, he decided he wanted to

2    cooperate?

3              MR. CANTY:   Objection.

4              THE COURT:   Sustained.

5    Q    Did Mr. Maynard tell you why he wanted to cooperate?

6    A    No, I don't think he did tell us why he wanted to.

7    Q    Does it strike you as unusual that immediately upon his

8    arrest Mr. Maynard was looking to cooperate with the FBI?

9    A    No.

10   Q    When we talk about cooperation, there is a benefit that's

11   expected by the cooperator; is that not your experience?

12             MR. CANTY:   Objection.

13             THE COURT:   Sustained.

14   Q    Why does somebody cooperate?

15             MR. CANTY:   Objection.

16             THE COURT:   Sustained.

17   Q    Do you know why Mr. Maynard cooperated?

18             MR. CANTY:   Objection.

19             THE COURT:   Sustained.

20   Q    Do you know anything about the particulars of

21   Mr. Maynard's cooperation with the government?

22   A    No, I don't think I do.

23   Q    Mr. Maynard immediately upon his arrest wants to

24   cooperate, right, becomes cooperative; is that correct?

25   A    Yes.

Goldberger-cross-Russo                                   97

1   Q    You don't know why; is that correct?

2   A    I don't know why he's cooperating with the government?

3   Q    Yes.

4   A    I'm not Mr. Maynard.  I could imagine why.

5   Q    Tell us.

6              MR. CANTY:   Objection.

7              THE COURT:   Sustained.

8   Q    Mr. Maynard decides immediately to cooperate, you can

9   only imagine why.  It's not because he wants to be a good

10  Samaritan, immediately cleanse his soul of sin, is it?

11             MR. CANTY:   Objection.

12             THE COURT:   Sustained.

13  Q    Mr. Maynard immediately begins cooperating, tells you

14  about Mr. Mesbahuddin.  Does he give you his name,

15  Mr. Mesbahuddin's name?

16  A    He gave us his nickname and he gave us a different

17  version of his name.

18  Q    Why don't you tell us the nickname?

19  A    Romi or Rumi.

20  Q    Rumi.  He told you that his contact, the person from whom

21  he obtained all these documents that he was peddling to your

22  unnamed informant was Rumi, Mr. Mesbahuddin?

23  A    Yes.

24  Q    From the sound of what we've heard, agent, Mr. Maynard

25  was wired up and ready to go very quickly after his arrest; is

Goldberger-cross-Russo                    98

1   that correct?

2   A    It was the same day, yes.

3   Q    Mr. Maynard, after he was wired up and I guess engaged

4   with the FBI in this investigation, makes a phone call to

5   Mr. Mesbahuddin?

6   A    Yes.

7   Q    Before he makes a phone call, to be clear, he was unable

8   to provide you with any specifics about anything

9   Mr. Mesbahuddin had done with him in the past in connection

10  with documents; is that correct?

11  A    Yes.

12  Q    Couldn't tell you a thing.

13       Did he give you any information that would

14  corroborate his claim that Mr. Mesbahuddin was peddling

15  government documents?

16  A    No, he didn't.

17  Q    He did not, did he?  Okay.

18       You asked him then to make a phone call to Rumi,

19  this person that he says is the one he gets all these

20  documents from; is that about right?  Is that how it went

21  down?

22  A    Yes.

23  Q    How many, on the phone call -- and I know we just

24  listened to it, the jury has the benefit of the transcript --

25  do you recall at any point the phone calls made by Mr. Maynard

Goldberger-cross-Russo                                    99

1   to Mr. Mesbahuddin, did Mr. Maynard tell Mr. Mesbahuddin "I

2   got some money for those social security cards."?

3   A    No.

4   Q    Ever use the words "social security cards"?

5   A    No.

6   Q    "Social Security Administration"?

7   A    No.

8   Q    Used the words "work authorization"?

9   A    No.

10  Q    Used the term "Department of Homeland Security"?

11  A    No.

12  Q    "Drivers license"?

13  A    I would have to look at the transcript to answer that.

14  Q    You don't recall if he ever said --  these are the phone

15  calls that you heard him make and --  withdrawn.

16          On the transcripts, on that recording we just heard,

17  is your voice heard anywhere?

18  A    Yes.

19  Q    Do you recognize your voice?

20  A    Yes.

21  Q    On the printed transcript it says FBI.  That would be

22  you?

23  A    Not every time.  There are other agents' voices heard.

24  Q    You or Agent Stinson?

25  A    And others as well.

SS     OCR     CM     CRR     CSR

Goldberger-cross-Russo                                    100

1    Q    About how many FBI agents?

2    A    Between the two transcripts, I think I recognize about

3    five voices including myself and Agent Stinson.

4    Q    There's about five federal agents with Mr. Maynard.  He's

5    just been arrested for trying to sell or conspiring to sell

6    social security cards, work authorizations, drivers licenses

7    and birth certificates to your unnamed informant?

8    A    Yes.

9    Q    Cooperates, says I want to cooperate, for reasons that we

10   can speculate, and he tells you about Mr. Mesbahuddin,

11   correct?

12   A    Yes.

13   Q    You take him to this IHOP from the Burger King --

14   withdrawn, I apologize for not being clear.

15         Mr. Maynard was arrested in Burger King; is that

16   true?

17   A    Yes.

18   Q    Arrested, says he want to cooperate and you and four of

19   your colleagues, if I have the math correct, take him to an

20   IHOP?

21   A    Not directly, but --

22   Q    Where did you go between the Burger King and the IHOP?

23   A    Mr. Maynard's apartment.

24   Q    You went to his apartment.  Did you perform a consensual

25   search of his apartment while you were there?

Goldberger-cross-Russo                    101

1  A    Yes.

2  Q    In other words, he permitted you to search his apartment?

3  A    That's correct.

4  Q    Did you find anything related to Mr. Mesbahuddin in this

5  apartment?

6  A    Yes.

7  Q    What did you find?

8  A    An envelope that had written on the outside, I believe it

9  said to Rumi from Abduh Aziz, had some documents enclosed

10 inside.

11 Q    To Rumi from who?

12 A    I believe it says Abduh Aziz.

13 Q    Who is Abduh Aziz?

14 A    A nickname Mr. Maynard goes by.

15 Q    This envelope that said to Rumi from Mr. Abduh Aziz, when

16 was that envelope written?

17 A    I don't know.

18 Q    Is that the envelope that Mr. Maynard put --  was there

19 anything in the envelope?

20 A    Yes.

21 Q    What was in the envelope?

22 A    There's two passport photographs of a male and a piece of

23 paper with biographical information, parental information,

24 thumb prints.

25 Q    Are those the thumb prints and photographs that are in

1   evidence here as Exhibits 3 and 4?

2   A    I don't know about the number.

3   Q    Earlier in your testimony you were shown some photographs

4   and thumb prints and documents?

5   A    Yes.

6   Q    Are those the same ones you're referring to now?

7   A    Yes.

8   Q    Would it be fair for me to say you're referring to

9   Government Exhibits 3, 3A, 3B, 4, 4A, 4B?

10  A    Yes.

11  Q    These are, if I may, documents with thumb prints,

12  photographs.  Can you see that, agent, the photographs?

13  A    Yes.

14  Q    Male and female, all in evidence here, that were provided

15  to Mr. Maynard by who?

16  A    By the informant.

17  Q    By the informant.  You found an envelope Mr. Maynard is

18  addressed to Mr. Mesbahuddin but Mr. Maynard got these

19  photographs and thumb prints from the government informant; is

20  that correct?

21  A    Yes.

22  Q    The unnamed informant?

23  A    Yes.

24  Q    In fact, he had them on him when he was arrested at the

25  Burger King, did he not?

SS      OCR      CM      CRR      CSR

Goldberger-cross-Russo                              103

1          MR. CANTY:   Objection, when you say him, who are

2   you referring to?

3          MR. RUSSO:   Maynard.

4          MR. CANTY:   They, all the pictures, all the

5   photographs?

6          MR. RUSSO:   Yes, the photographs and the documents,

7   the thumb prints --

8          MR. CANTY:   My objection is the word him, who is he

9   referring to and "they," what documents?

10         THE COURT:   Sustained.  Be more specific.

11  Q    Mr. Maynard was provided with the thumb prints, the

12  photographs and the information contained in exhibits,

13  Government Exhibits 3, 3A, 3B, Government Exhibits 4, 4A and

14  4B by the government, was he not?

15  A    Yes.

16  Q    In other words, the FBI gave it to the unnamed informant,

17  said this is the stuff you're going to give Maynard in

18  connection with this investigation of him?

19  A    Correct.

20  Q    Was it given to Mr. Maynard along with the money?

21  A    On May 11, we gave the informant the money to give to

22  Mr. Maynard.

23         (Continued on next page.)

24

25


                  SS    OCR    CM    CRR    CSR

*Goldberger - cross/ Russo*

1    CROSS-EXAMINATION (Cont'd)

2    BY MR. RUSSO:

3    Q    So you gave him money and photographs and other stuff?

4    A    Just for the female.

5    Q    Yes, on May 11th?

6    A    Right.

7    Q    Okay. I am trying to get -- what I am trying to get at,

8    Agent, is the envelope that Maynard -- that you said you found

9    in Mr. Maynard's apartment after the Burger King but before

10   the IHOP, that envelope contained the photographs and

11   documents given to Maynard by the government informant on

12   May 11th?

13   A    No. That was given to him sometime earlier.

14   Q    Okay. And did you see when Mr. Maynard addressed the

15   envelope, or not addressed, but wrote on the envelope?

16   A    No, I did not.

17   Q    So after Mr. Maynard -- you don't know if after

18   Mr. Maynard decided to cooperate with the FBI, he took you to

19   his house he wrote on the envelope in preparation for the

20   meeting with Mr. Mesbahuddin?

21   A    No, we didn't -- he didn't -- he did not write it in my

22   presence or he didn't have a chance to because he was

23   handcuffed.

24   Q    He didn't write it in your presence?

25   A    No.

A-114

*Goldberger - cross/ Russo*                               105

1   Q    Did he bring that envelope with him to the meeting with

2   Mr. Mesbahuddin?

3   A    I don't -- I don't think we gave him the envelope to

4   bring.

5   Q    But you gave him those photographs, you gave him

6   everything that was in that envelope, did you not?

7   A    Yes.

8   Q    Instead, you give him the money in the cooky box -- that

9   little girl scout cooky box we saw yesterday?

10  A    Right.

11            We put it in there and gave it to Mr. Maynard.

12  Q    You put these documents and photographs in the same cooky

13  box?

14  A    Yes.

15  Q    So everything's in the cooky box -- pieces of paper, the

16  thumbprints the photographs -- in the cooky box with the

17  money?

18  A    Yes.

19  Q    In that girl scout cooky box we took a look at yesterday?

20  A    Yes.

21  Q    And you put the girl scout cooky box inside a CVS bag?

22  A    Yes.

23  Q    And let me just jump ahead a little bit. When Mr. Maynard

24  sat with Mr. Mesbahuddin at the IHOP he gave him the CVS bag

25  with the cooky box inside?

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

*Goldberger - cross/ Russo*                                106

1    A    Yes.

2    Q    And Mr. Mesbahuddin opened the bag, opened the box,

3    looked at everything?

4    A    No.

5    Q    Never opened the bag, did he?

6    A    No.

7    Q    Never opened the box, did he?

8    A    No.

9    Q    Never saw any money, any photographs, or any thumbprints

10   or information on paper, did he?

11   A    No.

12   Q    Okay.  And you were there, right, this was an FBI

13   operation?

14   A    Yes.

15   Q    You saw the transaction, did you not?

16   A    Yes.

17   Q    You arrested Mr. Mesbahuddin moments after Mr. Maynard

18   put the CVS bag on the table in front of Mr. Mesbahuddin?

19   A    Yes.

20   Q    Did Mr. Mesbahuddin grab the bag, stick it inside his

21   jacket, what did he do with it?

22        Did he ever touch -- withdrawn.

23        Did that man ever touch the CVS bag?

24   A    Yes.

25   Q    How did he touch it, what did he do with it?

*Goldberger - cross/ Russo*                              107

1  A    I don't recall.

2  Q    So he wasn't arrested while he was still at the table, he

3  was arrested after he got up to leave the table?

4  A    Yes.

5  Q    Yes. Never touched the box, right?

6        Never opened the box, Mr. Mesbahuddin?

7  A    That's correct.

8  Q    Now, during the conversation that Mr. Mesbahuddin and

9  Mr. Maynard had, the one that we listened to earlier, you

10 recall anywhere on there that Mr. Maynard -- well, withdrawn.

11       Let me ask you this. How many phone calls did it

12 take for Mr. Maynard to get Mr. Mesbahuddin to go to this

13 IHOP?

14 A    On the second transcript there's, a, three.  I'm sorry,

15 two.

16 Q    So was it apparent to you that there had been no

17 prearranged plan between Mr. Maynard and Mr. Mesbahuddin to

18 meet on May 11th?

19       MR. CANTY: Objection.

20       THE COURT: Sustained.

21 Q    Do you know if before you arrested Mr. Maynard whether or

22 not he had any plan to meet with Mr. Mesbahuddin on that day?

23       MR. CANTY:  Objection.

24       THE COURT:  You may answer.

25 A    No, I don't know if he had a plan to meet with the

*MARSHA DIAMOND, CSR*
OFFICIAL COURT REPORTER

*Goldberger - cross/ Russo*                                      108

1    defendant that day.

2    Q    So after he agrees to cooperate does he tell you, oh, I

3    was going to take the money from your informant here at the

4    Burger King, and I was going to go and just give it to

5    Mr. Mesbahuddin, does he tell you that?

6    A    Yes, those words.

7    Q    He kind of led you to believe that he had some sort of

8    prearranged meeting with Mr. Mesbahuddin, did he not?

9              MR. CANTY: Objection.

10             THE COURT: Sustained.

11   Q    Did he tell you that he had an already prearranged

12   meeting with Mr. Mesbahuddin that day?

13   A    No.

14   Q    Well, because when you listen to the -- well, withdrawn.

15             How many phone calls did it take before

16   Mr. Mesbahuddin agreed to go to IHOP to meet Mr. Maynard, do

17   you recall?

18   A    Two.

19   Q    Two phone calls.

20             Was it two or three?

21   A    Well, it's -- it's the first one from the other

22   transcript is where they establish they would meet later.

23   They weren't discussing the IHOP.

24             It's on the second transcript -- the second

25   recording where -- so that was the two.

A-118

1    Q    Well, if I could, Agent, if it would help to refresh your

2    recollection just say and we can have you look at the

3    transcript, if that will help?

4    A    Sure.

5    Q    Do you recall how many phone calls Maynard had to make

6    for Mr. Mesbahuddin who told him he was with his family and

7    busy before he came to -- agreed to come IHOP?

8              MR. CANTY: Objection.

9              THE COURT: Sustained.

10   Q    Do you recall how many phone calls it took before

11   Mr. Mesbahuddin agreed to go the IHOP?

12             MR. CANTY: Objection.

13             THE COURT: Sustained.

14   Q    How long were you at the IHOP with Mr. Maynard before

15   Mr. Mesbahuddin came?

16   A    Can I refer to the transcript?

17   Q    Please.

18   A    I'd say about 20 minutes.

19   Q    How long?

20   A    Approximately 20 minutes.

21   Q    Twenty minutes.

22             As long as you have that transcript in your hand,

23   let me revisit something we discussed a few moments ago.

24             You indicated that Mr. Mesbahuddin took the CVS bag

25   with the money, got up, and then he was arrested after he got

*Goldberger - cross/ Russo*                              110

1   up from the table with the bag?

2   A    Yes.

3   Q    Let me ask you, as long as you've got that transcript,

4   take a look at -- and these pages aren't numbered, but about

5   two quarters or three quarters of the way down, one of the

6   last pages, I guess it would be four from the back -- four

7   pages from the last beginning with:

8             FBI:  Rumi, you're under arrest.

9             You see that?

10  A    Fourth page from the end (perusing)?

11  Q    Yes,

12  A    October 5th, I got it.

13  Q    Five pages from the end?

14  A    I see it.

15  Q    It says here:  Rumi, you're under arrest.

16            Now, it was your testimony a moment ago, your

17  recollection that, he, Mr. Mesbahuddin, was up from the table

18  walking out with the bag when he was arrested, right?

19  A    Right.  Walking away from the table.

20  Q    Why don't we turn that page where -- it's the top of the

21  next page FBI "let me see your hands.

22  A    Okay.

23  Q    Mr. Mesbahuddin apparently saying:  What wha (ph).

24            Mr. Maynard saying:  What happened?

25            And then the FBI, it could be you or one of your

*Goldberger - cross/ Russo*

1    four colleagues says:  Stand up, stand up.

2            Why would Mr. Mesbahuddin need to stand up if he was

3    arrested after he'd already stood up from the table?

4    A    That stand up, stand up was directed to Mr. Maynard.

5    Q    Okay. So not to Mr. Mesbahuddin?

6    A    No.

7    Q    Okay. So Mr. Mesbahuddin and Mr. Maynard were not then

8    together when he was arrested?

9    A    They were sitting at a table.

10   Q    Exactly.

11           So he was sitting at a table, he was not standing up

12   off the table because he had been standing up off the table,

13   Agent, the recorder that was on Mr. Maynard would not have

14   picked up the FBI saying, Rumi, you are under arrest?

15   A    No, that's not.

16   Q    Not true?

17   A    They'd been sitting at a table.  Mr. Maynard -- do you

18   want me to describe what the scene was in the restaurant?

19   Q    I am just trying to figure out if Mr. Mesbahuddin was

20   told to stand up or whether he was already up when he was

21   arrested, that's all.

22   A    No, Mr. Maynard was told to stand up.

23   Q    Okay. And Mr. Mesbahuddin -- it is still your

24   recollection, that Mr. Mesbahuddin was on his feet with the

25   bag before he was arrested?

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

*Goldberger - cross/ Russo*                                    112

1    A     Yes, I guess he he'd gotten up first.

2    Q     And he was still, however, despite the fact that he had

3    gotten up and had the bag, he was still within earshot of

4    Maynard's recorder even though Maynard was still seated at the

5    table?

6    A     That's correct.

7    Q     Okay. Tables pretty close together?

8    A     Are you talking about the tables where the agents were

9    sitting.

10   Q     In the IHOP.

11   A     The tables are fairly close together.

12   Q     How come then Mr. Maynard's microphone -- and you can

13   play the recording again, I am not suggesting you do -- how

14   come Mr. Maynard's microphone then didn't pick up passers by

15   the table or people in the next booth?

16   A     Well, the only people sitting close to them were agents

17   and we were being very quiet.

18   Q     And nobody ever walked by the table?

19   A     People -- I think you hear the waitress on there at

20   various times and there's other noise.  I don't recall if

21   anybody went to walk past the table.

22         THE COURT:  Just let him finish his answer then you

23   can as the next question.

24         Did you finish your answer?

25   A     (Cont'd) I don't recall.  I don't recall how many people

*Goldberger - cross/ Russo*                    113

1   walked by the table.

2   Q     All right. It's not just that the microphone that's used

3   in these surveillance operations have a very short range.

4   It's not that, right?  In other words, they are designed to

5   get reception in conversational distance but not beyond?

6   A     Well, that's how they're best used, but I suppose,

7   something farther way that's loud would get picked up by the

8   microphone as well.

9   Q     Is there anyplace on the -- during the surveillance of

10  Mr. Mesbahuddin and Mr. Maynard at the IHOP where Mr. Maynard

11  says something to the effect -- well, where Mr. Maynard tells

12  Rumi what he is here to buy?

13  A     When Mr. Maynard tells --

14  Q     Rumi what he's here to buy.

15  A     I would have to refer back to --

16  Q     You don't recall off the top of your head?

17  A     No.  Is there some page on here you are referring to?

18  Q     No, because there is no page.

19        MR. CANTY: Objection.

20        THE COURT: Sustained.

21        The jury will disregard the statement of counsel.

22  Don't testify ask questions, please.

23        MR. RUSSO: Yes Judge.

24  Q     Let me ask you this. Before you sent Mr. Maynard in your

25  new found cooperator, wired him up, did you give him any

1  instructions as to what he should say to Rumi or what he

2  should try and get Mr. Mesbahuddin to say?

3  A    I'm sure I did. I don't recall the exact words.

4  Q    Well, as best you can recall, what instructions did you

5  give Mr. Maynard as to how to conduct himself as a cooperator

6  during the sting operation of Mr. Mesbahuddin?

7  A    I believe I told him to try to discuss the process.

8  Q    Try and get Defendant Mesbahuddin to say something about

9  this crime that Maynard told you he was going to commit with

10 him, correct?

11 A    Yes.

12 Q    Get Maynard, for example, to say to Mr. Mesbahuddin,

13 Rumi, I'm here to buy this -- the fraudulent work

14 authorizations, right?

15 A    Well, I mean that's a rather simplified way to say it

16 because people don't speak like that in conversation.

17 Q    Okay. I'm here, I've got money here, for some social

18 security cards, did he place -- withdrawn.

19          Anyplace, and forget the transcript, if you have to

20 refer to it please do, Agent, do you recall at any time during

21 Maynard's conversation with Mr. Mesbahuddin that he actually

22 placed an order for documents?

23 A    Well, yes.

24 Q    Okay. Tell us about that. Where is it that -- what do you

25 recall him saying to Mr. Mesbahuddin about what documents he

A-124

*Goldberger - cross/ Russo*                                    115

1   was placing an order for?

2   A    Again, specifically he wasn't speaking about the

3   documents but he was speaking about, in general terms, about

4   starting the process either for one or two people, and that

5   the down payment would be either 5,000 on each or -- or as

6   opposed to 10,000 for one.

7   Q    Right.  They are talking about starting the process?

8   A    Right.

9   Q    I am talking about did he place an order for criminal

10  activity anyplace.  Just as a guy you wired up and gave

11  instructions to, did he tell at any time Mr. Mesbahuddin about

12  I am here to commit a crime with you, in some many words?

13  A    Again not -- not in those words, no.

14  Q    So it is your assumption and your conclusion based upon

15  what Maynard told you he was going to do, that he was placing

16  an order for stolen documents with Mr. Mesbahuddin?

17  A    Yes, that is my assumptions.

18  Q    Because there's no other reason that you could possibly

19  conclude that Mr. Mesbahuddin was engaged in a conversation

20  about illegal activity, is there?

21  A    Right.

22  Q    Only because Maynard, your informant, your cooperator,

23  tells you that's the guy I am going to get the stolen stuff

24  from or the fraudulent stuff from; right?

25  A    Right.

A-125

*Goldberger - cross/ Russo*                                          116

1   Q    Okay. He was unable to detail one time in the past that

2   he's ever gotten any fraudulent documents from

3   Mr. Mesbahuddin?

4   A    Right.

5   Q    Never discusses work authorizations, social security

6   cards birth certificates with Mr. Mesbahuddin?

7   A    Right.

8   Q    He says here's $10,000 to get the process started?

9   A    Right.

10  Q    Okay. And just as easily could mean here's $10,000 which

11  Mr. Mesbahuddin was going to forward to an attorney, or some

12  office that helps people for a fee obtain documents, right?

13              MR. CANTY: Objection.

14              THE COURT: Sustained.

15  Q    Could it just have easily have been a discussion about a

16  legal transaction?

17              MR. CANTY:  Objection.

18              THE COURT:  You may answer.

19  A    I don't think it was.

20  Q    Well, because you arrested somebody for it but --

21              THE COURT:  Sustained.  Next question.

22  Q    We know what the government thinks, but I'm asking you,

23  Agent, on these facts, on this conversation, this could just

24  as easily have been a conversation about a legal transaction

25  as it could have been about an illegal transaction, correct?

1              MR. CANTY:  Objection.

2              THE COURT: Sustained.

3    Q    Now, about how many times during the conversation

4    Mr.  Maynard had with Mr. Mesbahuddin did Mr. Mesbahuddin say

5    to Mr. Maynard let me give you a receipt for this money?

6    A    They discussed a receipt for a little while.  I don't

7    know how many times specifically.

8    Q    Three times fair enough, if I told you it was three

9    times?

10   A    If that's what you counted, I believe that.

11   Q    How many times did Mr. Mesbahuddin tell Mr. Maynard I'm

12   going to deposit this money in my bank account?

13   A    I think it was discussed more than once.

14   Q    How often do conspiring criminals give receipts and

15   deposit money in their bank accounts?

16   A    I don't know.

17             MR. RUSSO:  I'm done Judge.

18             Thank you, very much.

19             Nothing further.

20             THE COURT:  Redirect.

21             MR. CANTY:  Thank you, Your Honor.

22   REDIRECT EXAMINATION.

23   BY MR. CANTY:

24   Q    Agent, do you have a copy of the transcript in front of

25   you?

A-127

*Goldberger - redirect/ Canty*

1   A   The transcript from the meeting?

2   Q   From the meeting.

3   A   Yes.

4   Q   Can you please turn to the second, third, fourth page,

5   please.

6   A   Okay.

7   Q   You were asked questions whether or not the defendant and

8   Mr. Maynard discussed the specifics of the documents, do you

9   remember that question?

10  A   Yes.

11  Q   I'd like you to take a look at that portion of the

12  transcript and see if the specifics of the document, including

13  social security cards, work permits, drivers' licenses were

14  discussed on May 11th between the defendant and Stan Maynard.

15  A   I see he did discuss it, and below where it says 950.

16  Q   And what specific documents did he discuss with the

17  defendant?

18  A   Work permit, driver's license, social security.

19  Q   You were asked the question as to whether or not the

20  defendant talked about if he had any contacts at the DMV.

21          Do you recall listening to the phone conversation

22  between Mr. Maynard and the defendant that was recorded by the

23  FBI on May 11th, 2010?

24  A   Yes, the one we played yesterday?

25  Q   Yes.  Were the specifics of authenticity of those

1   licenses discussed?

2   A    I believe they were but I would like to look at the

3   transcript.

4             MR. CANTY: Sure.

5             THE COURT:  That's 6-A. I've got 6-A here.

6             MR. CANTY: I have a copy as well, Judge. Thank you.

7             THE COURT:  All right.

8             (Mr. Canty handing  to the witness)

9             THE WITNESS: Repeat the question, please.

10  Q    Whether or not the authenticity or the genuineness of the

11  California licenses were talked about between the defendant

12  and Mr. Maynard on May 11th during that phone call?

13  A    Yes, it was.

14  Q    What was the defendant's response when he was asked about

15  whether or not the licenses were going to be genuine and

16  authentic?

17  A    He said, yeah, definitely.

18  Q    Is there anything else he said to the defendant, to

19  Mr. Maynard, at that point in discussing this scheme that they

20  were talking about?

21            MR. RUSSO: Objection.

22            THE COURT: Sustained as to the scheme they are

23  talking about.

24  Q    About the transaction they were talking about?

25            MR. RUSSO: Objection, Your Honor.

*Goldberger - redirect/ Canty*                    120

1       THE COURT:  You may answer.

2  A    The defendant told Mr. Maynard he didn't want to talk on

3  the phone.

4  Q    So now is it your experience when individuals are engaged

5  in criminal conduct they don't speak clearly about the actual

6  operation they are engaging in?

7  A    Yes.

8       MR. RUSSO: Objection, Your Honor.

9       THE COURT:  You opened the door.  You may answer.

10 Q    Is it your experience that individuals engaged in

11 criminal enterprises will deposit money in bank accounts so as

12 to launder the origin of that money?

13      MR. RUSSO:  Objection; leading.

14      THE COURT: Sustained.

15 Q    In your experience have you seen individuals take money

16 that was derived from criminal transactions and deposit into

17 bank accounts?

18 A    Yes.

19 Q    For what purpose?

20 A    As I suppose it could be various purposes but one way to

21 launder money.

22 Q    With respect to the FBI informant, what was your

23 understanding as to how that FBI informant came in contact

24 with Mr. Maynard?

25      Was it Mr. Maynard that approached the FBI informant

*Goldberger - redirect/ Canty*                    121

1    or the anybody FBI informant that approached Mr. Maynard?

2    A    I believe it was Mr. Maynard approached the informant.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Goldberger-redirect-Canty                           122

1   CONTINUED RE-DIRECT EXAMINATION

2   BY MR. CANTY:

3   Q    To be clear, the information that was written on

4   Government Exhibit 5, Mr. Maynard never had the opportunity to

5   write this information while he was in your presence at his

6   apartment, correct?

7   A    That's correct.

8              THE COURT:    Sorry, Government Exhibit 5 is?

9              MR. CANTY:    The envelope.

10  Q    You were asked about the specifics that Mr. Maynard

11  talked about with the FBI informant; do you remember those

12  questions?

13  A    Yes.

14  Q    Was there information that Mr. Maynard conveyed to the

15  FBI informant specifically about the material that was needed

16  to create these documents?

17  A    Yes.

18  Q    What was that information?

19             MR. RUSSO:    Objection.

20             THE COURT:    You may answer.

21  A    The information needed was birth date, parental, mother

22  and father name, fingerprints, photos.

23  Q    That information that Mr. Maynard conveyed to the FBI

24  informant, did he have any knowledge at that point that he was

25  being recorded by the FBI?

Goldberger-recross-Russo                    123

1   A    No.

2   Q    You stated that the original plan --  you were asked

3   questions about where the documents were originally supposed

4   to come from.  Do you remember what you said when you were

5   asked that question?

6   A    Yes, originally thought they were from agencies within

7   the New York tristate area.

8   Q    In listening to the recordings of Mr. Maynard before he

9   knew he was being taped, did he indicate whether or not the

10  plan had changed, the specifics had changed as to where those

11  documents were going to come from?

12          MR. RUSSO:   Objection.

13          THE COURT:   Sustained.

14  Q    Did he indicate --  did you receive information that the

15  documents were going to come from somewhere other than the

16  New York metropolitan area?

17  A    Yes.

18  Q    Where were they going to come from?

19  A    California.

20  Q    Why is that?

21  A    Mr. Maynard had indicated New York was hot as a result of

22  the attempted bombing at Times Square in May of 2010.

23  Q    The information that you provided to your informant --

24  withdrawn.

25          MR. CANTY:   I have no further questions.

SS    OCR    CM    CRR    CSR

A-133

1          THE COURT:    Anything else?

2          MR. RUSSO:    Briefly, your Honor.

3   RE-CROSS EXAMINATION

4   BY MR. RUSSO:

5   Q    Agent, to revisit, for a brief moment, you were just

6   asked if Mr. Maynard had ever discussed with Mr. Mesbahuddin

7   what he wanted to purchase at their meeting; do you recall?

8   A    Yes.

9   Q    Just a moment ago.  Then you were asked to read from a

10  portion of the transcript that begins at 9:50, Maynard calls

11  Rumi.

12  A    Okay.

13  Q    That's a several-sentence transcript of Maynard talking,

14  right?

15  A    Yes.

16  Q    There's no participant to this conversation whose words

17  are transcribed here, they?

18  A    No, one side.

19  Q    Maynard could have been talking to somebody's answering

20  machine, could he not?

21  A    I believe --

22  Q    I didn't ask you what you believe.

23          MR. CANTY:    May the witness answer the question?

24          THE COURT:    I'm sorry, can you answer the question?

25          THE WITNESS:    I think you can hear speaking on the

SS    OCR    CM    CRR    CSR

125

1   other end of the line on the tape.

2   Q    You can, thank you.

3   A    Barely audible.

4   Q    You don't know who he was speaking to.  You don't know if

5   or what any of the responses were, if he was speaking to

6   someone, do you?

7   A    Right, yes.

8   Q    You don't know whether if there was someone on the other

9   end of that phone call at 9:50 when Mr. Maynard said "I told

10  him, I told him about work permit and the driver's license and

11  the social security and he needs a work permit and a social,"

12  you don't know if the other person said "What the heck are you

13  talking about," do you?

14  A    No.

15  Q    You don't know of any response to that.  You don't know

16  if this was all just Maynard blowing smoke up the FBI's

17  dresses, do you?

18  A    No.

19          MR. RUSSO:   Nothing further.

20          THE COURT:   Anything else?

21  REDIRECT EXAMINATION

22  BY MR. CANTY:

23  Q    Agent, one question.  Do you hear the defendant's voice

24  on that phone call between Stan Maynard and the defendant

25  talking about getting drivers licenses?

SS     OCR     CM     CRR     CSR

126

```
 1           MR. RUSSO:    Objection.

 2           THE COURT:    You may answer.

 3   A    Yes.

 4           THE COURT:    Anything else?

 5           MR. RUSSO:    Nothing.

 6           THE COURT:    The witness is excused.  You may stand

 7   down, sir.

 8           Members of the jury, at this time we'll take one

 9   hour for lunch.  Please return by 102:00 and we'll resume the

10   trial.

11           All rise for the jury.

12           (Jury leaves courtroom.)

13           THE COURT:    I should have another draft for you by

14   the end of lunchtime, a draft of the charge as to the law.

15   You can look at it and we'll have a charge conference this

16   afternoon.

17           MR. CANTY:    Yes, your Honor.

18           THE COURT:    Anything else?

19           MR. RUSSO:    I have nothing, your Honor.

20           MR. CANTY:    No, thank you.

21           THE COURT:    See you at 10 after 2:00.

22           (Continued on next page.)

23

24

25
```

SS      OCR      CM      CRR      CSR

Bhattacharjya-direct-Canty                              127

1              (A F T E R N O O N   S E S S I O N.)

2              THE COURT:  My clerk will give you a revised section

3      of the charge that we'll discuss at 5:00 o'clock.

4              MR. CANTY:   For the record, I've spoken with

5      counsel.  Our next witness is going to be the Bengali

6      interpreter, sitting around all day.  He's a professor.  I

7      wanted to get rid of him as soon as possible.

8              THE COURT:  Sure.

9              MR. RUSSO:   Before we start, in connection with the

10     subpoena that the court signed, we did reach out.  With the

11     court's permission, I'll let Mr. Horn address the actions.

12     He's the one that spoke to them.

13             MR. HORN:   We reached out to T.J. Baines, of Ali &

14     Baines or Baines & Ali.  I've spoken to him personally and his

15     representation, your Honor --

16             THE COURT:  One moment.

17             (Jury enters courtroom.)

18             THE COURT:   We'll discuss that at the break.

19             Please be seated.

20             The government may call its next witness.

21             MR. CANTY:  Dr. Bhattacharjya.

22             D W I J E N    B H A T T A C H A R J Y A,

23             having been duly sworn/affirmed, was examined and

24     testified as follows:

25             THE COURT:   Please be seated, sir.  Please state

SS      OCR      CM      CRR      CSR

Bhattacharjya-direct-Canty                128

1   and spell your full name for the record much.

2          THE WITNESS:  Dwijen Bhattacharjya, D W I J E N,

3   B HA T T A C H A R J Y A.

4   DIRECT EXAMINATION

5   BY MR. CANTY:

6   Q    Good afternoon, doctor.  Can you tell the jury where you

7   were born?

8   A    I was born Sylhet, Bangladesh.

9   Q    How long did you live in Bangladesh?

10  A    Until 1980.  I was born in'53.  1980, yes.

11  Q    Do you speak Bengali?

12  A    Yes, I have spoken Bengali since I was born, natively.

13  Q    Do you speak any other languages?

14  A    Well, I speak English.  I make a living by speaking

15  English.  I also speak some French, Spanish, some Arabic, some

16  Sanskrit, some Hindi, some Urdu.

17  Q    How long have you spoken the English language?

18  A    Since the age of 18.  I'm an English major.  That makes

19  it 40 years.

20  Q    Can you briefly describe to the jury your educational

21  background?

22  A    My first degree is in English from Taka University,

23  Bangladesh.  My second degree, MA in linguistics, language

24  teaching from the University of Leeds, England.  I have

25  another masters in teaching English as a second language from

SS     OCR     CM     CRR     CSR

Bhattacharjya-direct-Canty                129

1  Hunter College, CUNY.  Then I did a Ph.D. in linguistics from
2  the City University Graduate Center, 2001.
3  Q    Where do you currently work?
4  A    I work in two places.  First my first job is the New York
5  City public school.  I teach English as a second language.  I
6  also teach as a lecturer at Colombia University, Bengali.
7  Q    What's the class that you teach --
8            THE COURT:   Wait to finish the answer.
9  Q    What department is that in the class you teach at
10 Colombia University?
11 A    That's called Language Research Center.
12 Q    How long have you been a teacher of the Bengali language?
13 A    Since the spring semester of 1995.  That would make it 16
14 years plus.
15 Q    In learning the Bengali language, did you learn different
16 dialects?
17 A    Well, I was born in one dialect.  I studied several
18 dialects because I did some work for my Ph.D. in linguistic
19 Bengali, linguistics, educated in two or three other dialects,
20 regional dialect areas.
21 Q    Have you ever been called upon to translate either the
22 written or spoken word from English to Bengali or from Bengali
23 to English?
24 A    Well, here is what I do.  First, I routinely evaluate
25 people's --  Defense Department's employees' Bengali skill as

SS    OCR    CM    CRR    CSR

1   a tester of Bengali.  I have previously translated for the

2   court many years ago.  Recently, I was called by the New York

3   District Attorney's Office to translate a chunk of

4   conversation which was in Bengali.  I translated that into

5   English.

6   Q    When you said you are evaluated by --

7   A    ACTFL.

8   Q    What is that?

9   A    American counsel of Teaching Foreign Languages.

10  Q    In your job, are you called upon to translate Bengali to

11  English, English to Bengali?

12  A    Both.  I have to do both.  Translation is a part of my

13  job.

14  Q    How often do you do that?

15  A    Well, almost daily.  Whenever I'm on the job, I have to

16  do it because I also teach Bengali students at the public

17  school system.  I am required also, my school requires me to

18  translate a lot, Board of Education does and, of course, the

19  ACTFL translator.

20  Q    Has your work ever been reviewed for its accuracy?

21  A    Yes, I am routinely reviewed, annually reviewed not only

22  biannually reviewed by the ACTFL to keep my license.

23  Q    Have you ever lost your license?

24  A    Yes.

25  Q    When was that?

Bhattacharjya-direct-Canty                131

1    A    When I was evaluated last?

2    Q    No.  Have you ever lost your license?

3    A    Oh, no, I'm sorry, I never lost it, no.

4    Q    How often do you speak the Bengali language?

5    A    I speak it daily.  It's my home language.

6    Q    How often do you speak English?

7    A    Daily.

8          MR. CANTY:   I ask the witness be qualified as an

9    expert in the field of translation and transcription of the

10   Bengali language to English.

11         THE COURT:   Any objection?

12         MR. RUSSO:   None.

13         THE COURT:   Your motion is granted.  The witness is

14   deemed an expert as he's been identified.

15   Q    Doctor, were you asked to transcribe and translate a

16   recording by the United States Attorney's Office with respect

17   to a conversation that was in a foreign language?

18   A    Yes, I did.

19   Q    What role, if any, did you play in actually setting up

20   the actual recording of that conversation?

21   A    I just translated it.

22   Q    Just listened to it?

23   A    I listened to it and translated.

24   Q    Were you able to determine what language was being

25   spoken?

1   A    Yes, it's the Bengali language as you hear it spoken in

2   and around the city of Dhaka.  That's the capital of the

3   country Bangladesh.

4   Q    Did there come a time when you translated and transcribed

5   that recording?

6   A    What I did was this, transcribed not using IPA,

7   International Phonetic Alphabet.  What I did was maintaining

8   the syntax of Bengali, I translated word-for-word, then

9   rendered it into standard American English.

10  Q    When you said you originally transcribed it

11  word-for-word, how is that different from the common English

12  language?  Can you describe the difference between Bengali and

13  English?

14  A    Bengali, unlike English, is an S O V language, meaning

15  English is S V O, which is subject, verb, object.  For

16  example, if I were to say I love you, then I as the subject

17  love is the verb and object is you in English, but in Bengali,

18  I would say I you love which makes it an S O V language.  I

19  maintain that when I translate it in case you were to submit

20  it to some expert other than me.  Then I translated it into

21  plain English as could be understood by a layman.

22  Q    I have what's marked as Government Exhibit 8 for

23  identification.

24          MR. CANTY:  May I approach the witness?

25          THE COURT:  You may.

SS      OCR      CM      CRR      CSR

Bhattacharjya-direct-Canty                    133

1   Q    Doctor, I would like you to take a look at what's marked
2   as Government Exhibit 8.  Do you recognize that?
3   A    Yes, this was the one I translated and signed.
4   Q    How do you recognize it to be a copy of the recording you
5   listened to and transcribed from Bengali into the English
6   language?
7   A    My initials.
8   Q    After you listened, what did you do to the CD?
9   A    Initialed it.
10  Q    Is there a date on there as well?
11  A    Yes.
12       MR. CANTY:    Request Government Exhibit 8 be
13  received into evidence.
14       THE COURT:    Any objection?
15       MR. RUSSO:    No objection, your Honor.
16       THE COURT:    Government Exhibit 8 is received in
17  evidence.
18       (So marked.)
19  Q    Doctor, did there come a time after listening to
20  Government Exhibit 8 that you prepared a Bengali original
21  language document and English translation?
22  A    Yes, I did.
23  Q    I would like you to take a look at Government Exhibit 8.
24  Do you recognize that document?
25  A    Yes, this is my translation.

SS     OCR     CM     CRR     CSR

Bhattacharjya-direct-Canty                    134

1    Q    Is Government Exhibit 8A a fair and accurate translation

2    of the recording that you listened to in Government Exhibit 8

3    from English -- from Bengali into English?

4    A    Yes, I did to the best of my ability.  This is an exact

5    and accurate translation.

6              MR. CANTY:   Ask what's marked as Government Exhibit

7    8A marked for identification be moved into evidence.

8              THE COURT:   Any objection?

9              MR. RUSSO:   No objection.

10             THE COURT:   Government Exhibit 8A is received in

11   evidence.

12             (So marked.)

13             MR. CANTY:   May I provide the jury with a copy of

14   Government Exhibit 8A.

15             THE COURT:   8A is the translation into English?

16             MR. CANTY:   It lists --  I'll approach.  It lists

17   the Bengali language and English translation.

18             THE COURT:  Ladies and gentlemen, I will again tell

19   you you're not going to understand unless you raise your hand,

20   tell me you speak Bengali.  You're not going to understand

21   what's said in Bengali on a tape recording.

22             You're going to play the tape?

23             MR. CANTY:   Yes, your Honor.

24             THE COURT:   So we all understand, Mr. Canty, is the

25   recording that you're going to play part of a recording that

1    we've already heard once?

2         MR. CANTY:  Yes, your Honor.  Government Exhibit 8

3    is the portion of the transcription from the IHOP restaurant

4    that was in a foreign language phone call that's already in

5    evidence.

6    Q    Doctor, other than the name that you see on Government

7    Exhibit 8A, the name Mesbahuddin, all your work is the

8    independent translation from Bengali into English on 8A?

9    A    That's correct.  I didn't know it was Mesbahuddin, but

10   yes.

11   Q    That was the only information that was provided you, the

12   name?

13   A    Yes.

14        THE COURT:  You're going to play Exhibit 8 now; is

15   that correct?

16        MR. CANTY:  Yes, your Honor.

17        THE COURT:  Go ahead.

18        (Audio played.)

19   Q    Doctor, was that the recording that you listened to and

20   translated from Bengali into English?

21   A    Yes, this was the recording; this is what I translated.

22   Q    I would like you to listen to a certain portion of this

23   recording at approximately 50 seconds after the voice says

24   Splenda.  Do you have Splenda?

25        (Audio played)

SS      OCR      CM      CRR      CSR

Bhattacharjya-direct-Canty                    136

1   Q      Do you see the eh, question mark, did you translate that
2   into English?
3   A      On page 3, on the top?
4   Q      Yes?
5   A      What, did you say, what did you say or could you please
6   repeat it?
7   Q      Listen to the next line.
8
9          (Audio played.)
10  Q      Na, DL worker.  Oi-je matha.  DMV-r matha?
11  A      Would you like me to translate it?
12  Q      What does that exactly mean?
13  A      The other person was saying something.  He disagrees,
14  says no, not that, na means no in Bengali.  He says what you
15  said is not the case.  It is DL worker.  He says it is a DL
16  worker, like, you know, like a filler in English, you know,
17  matha, head or high ranking official or a family's head.  In
18  this case then he expounds, goes on to explain what he means
19  by DL worker, adds more information saying DMV-r matha.  DMV
20  is DMV, what we all understand.  I would think this is the
21  Department of Motor Vehicles and, let's call it off, the
22  letter r translates into of.  Matha here means head, meaning a
23  top boss or a very high ranking official of DMV.  In plain
24  English, it's saying very high ranking official or a top boss
25  of the Department of Motor Vehicles.


            SS      OCR     CM      CRR     CSR

Bhattacharjya-direct-Canty                    137

1   Q    When you said to clarify the record, you said the r means
2   of, O-F?  I didn't hear you.  I didn't understand.
3   A    r means of, O-F.
4   Q    Would you listen to that last part of the conversation
5   that was in Bengali, the next line, what does the caller say?
6   You could look at the transcription, page 3.
7   A    This is the next line down?
8   Q    Yes.
9   A    Oi-ta, pai-si amra ek-ta.  Bujchhen? Do you understand
10  me?  We have found one of those.  Oi-ta means that one.
11  Oi-ta, pai-si amra ek-ta.  We have found one of them.  They're
12  referring back to DMV matha, meaning high ranking official of
13  the Department of Motor Vehicles.  It refers back to the
14  antecedent, the high ranking government official.
15  Q    I would now like you to turn to page 4, the fifth line
16  down.  What did you translate that portion of the conversation
17  into English?
18  A    Bhai-jan, oi dui-ta agaitase.
19  Q    Ami je din?
20  A    Ami means he (speaks Bengali) je din submit kormu oi din
21  or bhut company thaika amar bhut company-r nam-e chek lagbo.
22  The day I will submit it I would require a check from his
23  ghost company.  Bhut means ghost to my, payable to my ghost
24  company's name.
25  Q    Doctor, with respect to the translation that you've done

SS     OCR     CM     CRR     CSR

Bhattacharjya-cross-Russo                    138

1    in this case, do you have any idea what this case is about?

2    A    I mean if you ask me to speculate I could but I don't

3    want to.

4    Q    I'm not asking you to speculate?

5              THE COURT:   Just answer the question.

6    A    No, I have no idea what the case is about.

7    Q    What were you asked to do?

8    A    I was asked to translate.  I translated.  I don't know

9    what the case is about.

10             MR. CANTY:   Thank you.  I have no further

11   questions.

12             THE COURT:   Cross-examination?

13   CROSS-EXAMINATION

14   BY MR. RUSSO:

15   Q    Good afternoon, doctor.  How are you?

16   A    Good.

17   Q    Let me ask you real quick.  The phrase in Bengali, tumi

18   atkome (ph), what does that mean?

19   A    You and I if you speak a little loudly.  You said tumi

20   Ami.

21   Q    You and I.

22   A    You and I.

23   Q    Tumi means you and am me --

24   A    I.

25   Q    And r?

SS    OCR    CM    CRR    CSR

Bhattacharjya-cross-Russo                                    139

1  A     And.

2  Q     Five minutes ago, I thought I heard you testify that

3  r means something else in Bengali?

4  A     Are you referring to the other r?

5  Q     Yes.

6  A     This is the possessive marker.  R in this case, this

7  would be spelled a-r and in the other one it's only r.

8  Q     If we could --

9  A     A contracted form of a-r, meaning r, a-r means and.  It's

10 a continuative conjunction, and, but only r is a contracted

11 form of a-r, English letter e and r.  There's the diminutive

12 or contracted form.  One means of which is only r and a-r

13 means and.  In this case this is of, O F.

14 Q     R means and sometimes?

15 A     And, all the time.

16 Q     All the time.  On page 3, the third line where it says in

17 Bengali -- I apologize for my pronunciation, Na, DL worker.

18 Oi-je matha.  DMV-r matha.

19        The r there, that doesn't mean the DMV --

20 A     It only means one thing, of DMV.

21 Q     Why can't it mean the other?

22 A     The spelling is different.

23 Q     But you're reading something?

24 A     No.

25 Q     You were listening to something?

SS     OCR     CM     CRR     CSR

Bhattacharjya-cross-Russo                    140

1   A     This is, if I understand you, your question, if it is the

2   issue between r and only r, r means and, and the other means

3   off.

4   Q     The question, what you heard, for instance, when I spoke

5   earlier and again I apologize for my pronunciation, I said

6   tumi ami.  You said that means you and I, of.  We had that

7   exchange a moment ago?

8   A     Yes.

9   Q     You listened to a tape when presumably Mr. Mesbahuddin

10  was speaking and he says on the tape that you hear DMV-r

11  matha.  Am I pronouncing it correctly?

12  A     I listened to it at least seven or eight times before I

13  translated it.  It says DMV-r matha, no vowel between the two.

14  Q     In this original language translation that you prepared,

15  it says DMV-r matha, right, that you heard?

16  A     What I said, between DMV and the consonant r, there is no

17  vowel, like is in the first vowel of ago, not the slightest

18  sounds of vowel.  I listened carefully.  When I translate,

19  because people come to me only when all the other sources have

20  been exhausted, my final verdict as a translator.  I spend a

21  lot of time doing it.

22  Q     If Mr. Mesbahuddin didn't enunciate his vowels correctly,

23  that might explain why you translated it the way you did,

24  correct?

25  A     I didn't get the question.

SS      OCR      CM      CRR      CSR

Bhattacharjya-cross-Russo                              141

1  Q    You said you listened to it carefully and this is what
2  you heard and you did not hear somebody enunciating the vowel;
3  did I understand you correctly?
4  A    No.
5  Q    You did not hear an enunciated vowel?
6  A    In that case.
7  Q    If the speaker did not have good diction, if the speaker
8  dropped a vowel, would that maybe explain why you didn't hear
9  a vowel?
10 A    Well, he could, but in that case the context stood
11 coming.  For the sentence to be meaningful, this is the only
12 possibility that exists.
13 Q    For the sentence to be meaningful to you, for you to be
14 able to make meaning of the sentence, right?
15 A    Can you repeat, sir?
16 Q    Your translation is the only translation that you could
17 put on here for the sentence to be meaningful.  If I were to
18 translate the sentence and say what this means, DMV-r matha,
19 is DMV and the drivers license, that would be meaning to me?
20 A    Well, it would be meaningless totally because it doesn't
21 make sense and he doesn't say DMV matha, says DMV-r matha.
22 There's no other meaning as possible.  You could ask another
23 translator, another native speaker of Bengali.  That is what I
24 hear.  There's no other possibility.  This is only one meaning
25 as possible.

Bhattacharjya-cross-Russo                    142

1   Q    Let me ask you right above that just moments ago, you
2   were asked about that, page 3, the second line, eh, eh.  I
3   think you told Mr. Canty that that could have a number of
4   meanings, right?  Isn't that what you told us?
5   A    Well, if it is eh, eh, it has a number of meanings, but
6   eh, eh is only one possible meaning, what did you say?  It
7   cannot be anything else.
8   Q    I must not have understood when you said it could have a
9   number of meanings.  You didn't -- I must have misunderstood
10  your testimony.  You say it does mean it could mean nothing
11  else except --
12  A    No.  If you're in a conversation with another person and
13  I say eh, it means what did you say?  What did you say or
14  could you repeat it?
15  Q    It could have no other meaning?
16  A    I never heard of anybody ever using it conveying any
17  other meaning.
18  Q    What are you saying?  That's what it says?  It could have
19  no other meaning but what are you saying?
20  A    To convey what meaning?
21  Q    I'm asking you, you speak Bengali?
22  A    Eh, eh, means what did you say, what did you say in
23  American English.  It would be beg your pardon.
24  Q    What did you say, it could have no other meaning?
25  A    No, I cannot think of.  I never heard of anybody using it

SS      OCR      CM      CRR      CSR

Bhattacharjya-cross-Russo                    143

1   differently.

2   Q    How come you told us in this translation it means please

3   repeat?  Does it mean please repeat or does it mean what did

4   you say?

5   A    Eh, eh means I don't get it.  This could also mean could

6   you please repeat it.

7   Q    So there are a number of meanings it could mean?

8   A    If I ask you do you have the time, it means only one

9   thing, please tell me the time.  You could choose to say I

10  have the time and you walk away not telling me the time.

11  Q    I could --

12            THE COURT:  Please let him finish.

13  A    Here, as a native speaker of Bengali, educated speaker,

14  who studied the language carefully, listened to this tape, I

15  have never heard eh, eh being used to convey any other meaning

16  other than this.

17  Q    Than what you said?

18  A    Than what, what, meaning could you repeat it, meaning,

19  suggesting could you repeat it, I can't get it.

20  Q    Doctor, it's not my intention to argue with you.  A

21  moment ago, I think you told us that it can only have one

22  meaning and that is:  What did you say?  Now you're telling me

23  it means please repeat.  So, does it have two meanings, one

24  meaning, several meanings?

25  A    It is only one meaning, sir.  It means what, what and it

SS     OCR     CM     CRR     CSR

Bhattacharjya-cross-Russo                144

1  suggests could you repeat it in any language.  This is
2  possible.  You say something, I gave an example but the
3  literal meaning is what, what with, suggesting I don't get it,
4  could you repeat it.  In conversational, this is standard
5  speech theory.
6  Q    Let me ask you to turn to page 4 of the translation.  If
7  you go down to the fifth statement, Ami je din, again I
8  apologize for my pronunciation.  Tell me again what that means
9  in English?
10 A    It means the day I will submit it, within that day or
11 good company, his ghost company, from his ghost company.  Good
12 company, in the name of my ghost company.  Chek lagbo, check
13 would be needed or necessary.
14 Q    In the translation that you provided, let me just clarify
15 this.  This was not the first translation you prepared for the
16 government.  This was the second or third, right?
17 A    This is the literal meaning and the one on the left is
18 the translation.
19 Q    Doctor, perhaps you didn't understand my question to you.
20 This exhibit, Government Exhibit 8, you prepared this
21 translation?
22 A    That's correct.
23          (Continued on next page.)
24
25

          SS    OCR    CM    CRR    CSR

145

1    CROSS-EXAMINATION (Cont'd)

2    BY MR. RUSSO:

3    Q    This is your work and was this the first one that you

4    did?

5    A    Yes.

6    Q    You did no others for the government?

7    A    The draft copy.  I have the draft copy myself.

8    Q    So you did others?

9    A    For myself.

10   Q    Okay. Before you prepared this you said you listened to

11   the tape many, many times?

12   A    That's correct.

13   Q    To be careful, to be accurate in the English translation

14   of that phrase that you just read for us you do not tell us

15   that after the word my and before the word company is the word

16   ghost, but when you just a moment ago spoke to us about that

17   translation you seemed to include the word ghost after my, my

18   ghost company.

19           Can you explain the difference between the testimony

20   here today and the translations that you carefully prepared in

21   Exhibit 8-A?

22   A    Are you saying that the word ghost missing in my case, my

23   ghost company?

24   Q    Doctor, I am just trying to clarify which translation is

25   accurate, if either, the one that you told us today when I

A-155

1    just asked you to read this phrase and the one that you gave

2    to the jury, or the one that you wrote on this document that's

3    in front of you because there are two -- there's two different

4    translations?

5              MR. CANTY: Objection.

6    A    Okay.

7              THE COURT:  Overruled. You may answer.

8    A    Okay.  The reason I did not there's a such a thing in

9    language called scope.  I believe the word bhut has scope over

10   the second word.

11             THE COURT:  I'm sorry.  What does that mean?

12             THE WITNESS:  In language scope means you do not

13   have to repeat every word.  For example.  You can use the word

14   for the first part of the sentence cover the second part.  I

15   did not feel that that would be necessary to repeat it, but

16   for some foreign expert, independent expert, he can see the

17   Bengali and ask someone what bhut means.

18   Q    So it would be your view then that the phrase my company

19   in English is no different than the phrase my ghost company in

20   English?

21   A    If there is a word bhut previously exist in the sentence

22   that has a scope over the second.

23   Q    Now, how would I know that, since I don't speak Bengali,

24   how would I know that to include the word my ghost company?

25   A    Okay. Okay. Yeah. Here's an honest admission.  When I

1    translate this I assumed that there would be other Bengali

2    experts who would be looking at this, so that is why I kept

3    the Bengali translation properly in the way because I believe

4    -- I personally believed or I still believe there would be

5    other Bengali experts who would be listening to the tape many

6    times because this is a court case.

7    Q    Okay. On page three, Doctor, the last four entries, the

8    one that you gave, two, four, to or kache ki reach kora jae,

9    you see that?

10   A    Tell me again where is it.

11   Q    Again, I apologize, page three about four lines up from

12   the bottom?

13   A    Phone number?

14   Q    Four lines, it says here to, or kache ki reach kora jae?

15   A    Or kache ki reach kora jae.

16   Q    What does may mean?

17   A    Reach is an English word.  Bengalis use a lot of English

18   word.  We have it in our language.  Fon em so (ph), or kache

19   ki reach kora jae, could reach him.

20   Q    And the next line down, what does that say?

21   A    Kon-na amare ekta call dite, is that what you mean?

22   Q    Yes.

23   A    Yes. Why don't you ask him to give me a call.

24   Q    So your translation is on the money on both of those?

25   A    Yes.  Kon-na amare ekt call dite is why don't you tell me

148

1    after I call, call me.

2    Q    The next one that starts with phone number, is that a

3    Bengali phrase, phone number?

4    A    Yeah, we say phone number in Bengali because we were

5    ruled by the British for 200 years and we ended up borrowing a

6    lot of vocabulary.

7    Q    So what does that say?

8    A    It says phone number chhara ekta loker loge kene kaj kora

9    jae, amare bujahn.  Tell me how we can do business with the

10   person who doesn't have a phone -- telephone.

11   Q    Okay. So those three lines that you just went through:

12   So could I reach him, why don't you ask him to give me a call,

13   tell me how we can do business with a person who doesn't have,

14   do you have an opinion as to whether the speaker of these

15   phrases have a phone number for --

16        MR. CANTY:  Objection.

17        THE COURT: Sustained.

18   A    If I have I don't want to give an opinion.

19        THE COURT:  Stop. When there's an objection I have

20   to rule on it first.

21        THE WITNESS:  Sorry.

22        THE COURT: Sustained.

23   Q    Having gone through the recording that you translated m,

24   being qualified as an expert, do you have an opinion as to the

25   subject matter of this one sided discussion?

A-158

1          MR. CANTY:  Objection.

2          THE COURT: Sustained.

3   A    No, I --

4          THE COURT: Sustained means you don't have to answer.

5   Q    Again, I said one sided discussion, I just want to

6   discuss that with you for a moment, you only heard one person

7   to this conversation speaking, correct?

8   A    That's correct.

9   Q    You have no idea what the other person on other end of

10  the phone was saying?

11  A    I only heard one -- one side of the conversation.

12  Q    You don't know what they were talking about?

13  A    Yes and no.

14  Q    What were they talking about?

15  A    Again, I can speculate if I am asked to.

16         THE COURT:  Don't speculate.

17  A    But I would rather stay with the translation which is

18  here and if you want me to expand on the translation, the

19  Bengali I can do it over and over again, but if the Court asks

20  me to speculate, if I am forced to, only then I would like to

21  do it, but as a rule I would not.

22  Q    Doctor, given your extensive training and education in

23  the field of linguistics and I believe you referred to

24  yourself as the Bengali translator of last resort, the

25  go-to-guy, would it be fair for me to say that the context of

1    a conversation is an essential part of a translation of that

2    conversation?

3    A    Absolutely.  This is exactly what I had said before.

4    Q    So I would be correct, I got something right?

5    A    Yes.

6    Q    Okay. Now, if you don't know the context of a

7    conversation, then the translation of that conversation may

8    suffer, would it not?

9    A    Again, if I don't know the context of that conversation,

10   in language we call it is exponential (ph) context and in this

11   case it is the whole discourse.  For any reasonably educated

12   person it is difficult to understand from the text what is

13   going on.  As a translator I do not want to get into this, but

14   any reasonably educated people should be able to -- there's a

15   whole context here.  An entire discourse is given.  One can

16   even figure out the meaning of what is going on if I have a

17   full sentence, context, but here is much more than that. So it

18   shouldn't be difficult for anyone to know what is going on. I,

19   as the translator, I don't want to get into it.  That's

20   against my --

21   Q    Then you don't mean to suggest there's something illegal

22   going on here, you are not suggesting --

23              MR. CANTY: Objection.

24              THE COURT: Sustained.

25   Q    When you say you don't want to get into is that because

A-160

1    it's something untoward or illegal?

2              MR. CANTY: Objection.

3              THE COURT: Sustained.

4    Q    Did you not, Doctor, indicate that in order to get an

5    understanding of the full context of a conversation between

6    two people you need to hear both sides of the conversation?

7    A    Could you repeat the question, I don't --

8    Q    We agree that proper translation, accurate translation,

9    depends on proper context and understanding of the proper

10   context of the conversation; is that true?

11             THE COURT:  You may answer.

12   A    Is it a yes or no answer?  Can I --

13             THE COURT:  You are an expert.  You can answer as

14   you think it is appropriate.

15   A    Okay.  Here is an example, Attorney.  For example, if you

16   ask me to translate the grass is greener on other side of the

17   fence, in Bengali I translate life is better on the other side

18   of the river. There, that is how it is translated.  Now,

19   contrary knowledge come into play and somebody who knows

20   Bengali knows what is going on here, and I have translated

21   every thing that is in here and there should be no difficulty

22   to understand.

23             Now, if you say grass is greener you don't

24   understand what I am that translating life is better on the

25   other side of the river, if you are an educated person you

A-161

1   should have no difficulty and it doesn't distort the meaning

2   at all.

3   Q    But that is not my question.

4        Doctor, I am trying to -- you've only heard one side

5   of the conversation. That is what this translation is, one

6   side, and I thought we agreed that it is always better for a

7   translator to hear a full conversation so that their

8   translation can be consistent with the context of that

9   conversation.

10  A    Yes.

11       MR. CANTY: Objection to the form of the question,

12  what they agreed on together.

13       THE COURT: Sustained.

14  Q    Would you agree that accurate translation is dependent

15  upon hearing the full conversation?

16  A    Again, yes and no.  It a complete conversation, it's a

17  whole discourse here.  This discourse independently has a

18  meaning that's obvious to anyone.

19  Q    Now, would your testimony be the same if you had heard

20  the other side of this conversation?  Might not it have the

21  changed your translation?

22       MR. CANTY: Objection.

23  A    No.

24       THE COURT: Sustained.

25  Q    So not hearing both sides of the conversation, it really

153

1   would be most speculative of you to suggest what --

2   A    No.

3           MR. CANTY: Objection.

4           THE COURT:  Wait, let him finish the question.

5           I will rule on the objection and we will go from

6   there.

7           Finish your question.

8   Q    I will repeat it.

9           Without hearing both sides of the conversation,

10  isn't it difficult for you to really have a strong opinion as

11  to what the conversation was about?

12  A    Again, yes and no.  There's in speech theory there's a

13  certain conversation which is predictable what the other

14  interlocutory is saying and that the case in here. It's not --

15  there is no room for any ambiguity in my understanding of it.

16  I don't see any room for ambiguity.

17  Q    Now, if I were to tell you that the other party to this

18  conversation will tell you and me that Na , DL worker. Oi-je

19  matha DMV-r matha is a reference to a drivers' licenses, not

20  the head of anything, not the supervisor of anything, would

21  that surprise you?

22          MR. CANTY:  Objection to the form of the question

23  what somebody else would come in and tell us.

24          THE COURT: Sustained.

25  Q    In your opinion as an expert qualified by the government

154

1    Doctor, would you --

2              THE COURT:  Qualified by the Court.

3              MR. RUSSO:  Qualified by the Court.

4              THE COURT:  Not the government.

5    Q    Qualified by Court, if I told you that someone else would

6    suggest that that Na, DL worker Oi-je Matha DMV-r matha is a

7    reference to a driver's license and not to the head of DMV or

8    supervisor at DMV?

9    A    That would render the whole sentence meaningless.  The

10   only possible meaning here is saying Na, the DO worker and

11   then he says  Oi-je matha meaning, you know, the head or the

12   high ranking of the official, DMV is head meaning high ranking

13   official.  I cannot conceive of any other meaning.  If you

14   want to impose another meaning, that would render the entire

15   discourse meaningless.

16   Q    One final question?

17             Doctor, who is the best person to interpret a

18   conversation, the participant in that conversation or an

19   expert translator reading or listening to that conversation?

20   A    If you read Bakhtan dialogic (ph) a linguist should be

21   able to understand speaking the same language what is going

22   on. I agree that two people -- one can try to convey a

23   meaning, the other one tries to understand it, but there could

24   be a third person listening to it would come up with a similar

25   understanding.  So in linguistic theory words that get

A-164

155

1  revoiced and meaning stands somewhere between even the person

2  who conveys the meaning, and the person who is the listener.

3  They don't understand the same thing.  So as the third person

4  listening too, that could happen but that could change only a

5  fraction of a meaning but not the whole meaning. In this case

6  I do not see any room for any ambiguity because this is not a

7  complex sentence.

8          MR. RUSSO: I got to tell you, Doctor, I didn't think

9  my question was all that complicated.

10         MR. CANTY: Objection.

11         THE COURT:  We are done.  You can sit down. Anything

12 else?

13         MR. CANTY: I ask that the last comment from defense

14 counsel be stricken from the record.

15         THE COURT:  The last comment by defense counsel is

16 stricken from the record.  The jury should disregard it.

17         Anything further?

18         MR. CANTY:   Not from government.

19         THE COURT:  The witness is excused.

20         You may stand down, sir.

21         THE WITNESS:  Thank you.

22         THE COURT: Yes.  You are excused, sir.  You may go.

23         (Witness exited courtroom).

24         THE COURT: The government play call its next

25 witness.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

A-165

1          MR. CANTY: The United States calls Stan Maynard.

2    S T A N    M A Y N A R D    , having been first duly

3    sworn/affirmed, testified as follows:

4          THE WITNESS:  I do.

5          THE COURT:  Please be seated. Please state and spell

6    your full name for the record.

7          THE WITNESS:  My name is Stan Maynard S-T-A-N

8    M-A-Y-N-A-R-D.

9          THE COURT:  You may inquire.

10         MR. CANTY: Thank you.

11   DIRECT EXAMINATION

12   BY MR. CANTY:

13   Q    If you would move a little closer to the to the

14   microphone.

15         How old are you?

16   A    Forty-three years old.

17   Q    Where were you born?

18   A    I was born in Guyana.

19   Q    Where did you grow up?

20   A    I grew up in the Bronx.

21   Q    And where do you live now?

22   A    I live in Jamaica Queens.

23   Q    How far did you go in school?

24   A    Went four years of Hofstra University.

25   Q    What types of jobs have you had in your life?

1   A    I held accounting positions and bookkeeping.

2   Q    How else other employment have you made money in your

3   life?

4   A    Through illegal activities such as narcotics.

5   Q    Selling drugs?

6   A    Selling drugs, yes.

7   Q    When was the last time that you were arrested?

8   A    I was arrested on May 11, 2010.

9   Q    What were you arrested for?

10  A    I was arrested for conspiracy to transfer false

11  documents.

12  Q    After you were arrested did you speak with federal

13  agents?

14  A    Immediately upon my arrest I spoke with federal agents.

15  Q    Before making any statements were you advised of your

16  Miranda rights?

17  A    Yes, I was.

18  Q    Are you familiar with that term Miranda Rights?

19  A    Yes.

20  Q    After the agents read you your Miranda Rights did you

21  agree to speak with them?

22  A    Yes, I did.

23  Q    Were you completely truthful with them when you spoke to

24  them?

25  A    Yes, I was.

1  Q    Did there come a time when you decided to cooperate with

2  the agents?

3  A    Immediately upon my arrest I cooperated with the agents.

4  Q    That was the same day you were arrested?

5  A    Yes, it was.

6  Q    Did there come a time you also met with prosecutors?

7  A    Yes, I did.

8  Q    Did you have a lawyer present during those meetings?

9  A    Yes, I did.

10 Q    What happened during those meetings when you met with the

11 prosecutors with your lawyer?

12 A    I was explained the whole truth about the case and about

13 the documents that I was supposed to give -- the defendant was

14 supposed to give to me.

15 Q    Other than talking about your involvement in this case,

16 were you required to give any other information to the

17 prosecutors?

18 A    Yes, I was required to tell them all my illegal

19 activities, those that they know about -- the drug activity

20 that I was involved with previously, as well as those illegal

21 activities that they do not know about.

22 Q    And did you fully explain to the prosecutors in the

23 presence of your attorney about your criminal involvement,

24 including those for which you were arrested and for those

25 which were you never caught?

*Maynard - direct/ Canty*                               159

1   A   Yes, I did.

2   Q   Did there come a time after these meetings that you pled

3   guilty?

4   A   Yes, I did.

5   Q   What crimes did you plead guilty to?

6   A   Plead guilty to conspiracy, to transfer false documents,

7   and conspiracy to commit bank fraud as well.

8   Q   With respect to the conspiracy to transfer false

9   identification documents, who did you conspire with to

10  transfer false identification documents?

11  A   The defendant Rumi Mesbahuddin.

12  Q   Do you see him anywhere in the courtroom here today?

13  A   Yes, I do.

14  Q   Can you point him out by an article of clothing he is

15  wearing?

16  A   He is sitting there in the lime shirt.

17          MR. CANTY: I ask that the record reflect the witness

18  has identified Defendant Ghulam  Mesbahuddin.

19          THE COURT:  Yes, let the record indicate that the

20  witness has identified the defendant.

21          You may proceed.

22  Q   You testified that you pled guilty for the crimes for

23  which you were accused, correct?

24  A   Yes, I did.

25  Q   What is the maximum sentence you face when you are

*Maynard - direct/ Canty*                        160

1   ultimately sentenced?

2   A    I face a maximum of 30 years.

3   Q    What is your maximum fine?

4   A    Maximum fine is approximately 1.5 million.

5   Q    In connection with your guilty plea, did you enter into a

6   cooperation agreement?

7   A    Yes, I did.

8   Q    Was that in writing?

9   A    Yes, it was.

10       MR. CANTY: Your Honor, may I approach the witness?

11       THE COURT:  Yes.

12  Q    Mr. Maynard, I'd like you to take look at what's been

13  marked Government Exhibit 3500 SM-4 (handing).

14       Do you recognize that document?

15  A    Yes, I do.

16  Q    What is it?

17  A    Cooperation agreement.

18  Q    Is your signature on that document?

19  A    Yes, it is.

20  Q    Did you enter that agreement with the United States

21  government after consulting with your attorney at a meeting

22  with prosecutors in this case?

23  A    Yes, I did.

24  Q    Under the cooperation agreement do you have certain

25  obligations or things that you have to do?

1   A    Yes, I do.

2   Q    What are your obligations under that cooperation

3   agreement?

4   A    My obligation is to tell the truth about the case and the

5   whole circumstances about the documents.

6   Q    Now, what is your understanding about what the government

7   has agreed to do for you if you meet those obligation to tell

8   the truth in your testimony?

9   A    The government's obligation is to write a letter on my

10  behalf to the Judge.

11  Q    Now, what is your understanding of what that letter is?

12  A    The letter allows the Judge to go outside of the

13  sentencing guidelines.

14  Q    Is it your understanding that there are certain

15  guidelines that the Court should consider in determining your

16  sentence and this letter would allow a Judge to go outside or

17  below those guidelines?

18  A    Yes, it does.

19  Q    And who, specifically, will that letter be addressed to,

20  if it is written?

21  A    To the Judge.

22  Q    Are you aware of what Judge will be sentencing you?

23  A    Yes, I am.

24  Q    Who is that?

25  A    Judge Weinstein.

*Maynard - direct/ Canty*                                     162

1   Q     Is that letter important to you?

2   A     Yes, it is.

3   Q     Tell the jury why that letter is important to you?

4   A     It is important to me because I -- first of all, I would

5   like the Judge to go outside of the guidelines -- the

6   sentencing guidelines, as well as being able not to get the

7   maximum amount of time.

8   Q     If the government writes the letter to the Judge in your

9   behalf, what is the lowest sentence you could receive?

10  A     Lowest sentence I can receive is time served.

11  Q     Now, what is the maximum sentence you could receive even

12  if the government writes the letter to the Judge that is going

13  to sentence you?

14  A     The maximum number sentence would be 30 years.

15  Q     In that letter has the government agreed to recommend any

16  particular sentence for you?

17  A     None at all.

18  Q     If the government writes the letter to the Judge is the

19  Judge required to give you a lower sentence because of that

20  letter?

21  A     No.

22          MR. RUSSO: Objection, leading, Your Honor.

23          THE COURT: Overruled.

24  Q     Has the government made any promises to you that your

25  sentence will be reduced?

*Maynard - direct/ Canty*                                    163

1   A    No.

2   Q    What happens if you violate any of the provisions of that

3   agreement that you have --

4            MR. RUSSO: Objection, Your Honor.

5            THE COURT:  No.  Sustained.

6   Q    What is your understanding of what will happen if you

7   violate that agreement?

8   A    It will be disregarded.

9   Q    What will happen then?

10  A    Then I'll be facing -- I'll be given the highest sentence

11  of 30 years.

12  Q    The government could recommend to the Judge that you get

13  the maximum sentence?

14  A    Yes.

15           MR. RUSSO: Objection.

16           THE COURT: Sustained.

17  Q    In the event that you violate that, would you be able to

18  take back your guilty plea?

19  A    No.

20           MR. RUSSO:  Objection, Your Honor.

21           THE COURT: Sustained as to form.

22  Q    And what is your understanding with respect to whether or

23  not the Judge that sentences you is required to lower your

24  sentence if that letter is written?

25           MR. RUSSO: Objection, Your Honor.

A-173

1          THE COURT:  The objection is in a word.

2          MR. RUSSO: Form.

3          THE COURT: Sustained.

4   Q    At the end of the day, Mr. Maynard,  who will ultimately

5   decide your sentence?

6   A    The Judge will ultimately decide my sentence.

7   Q    And with respect to the sentence you received does it

8   depend in any way on the outcome of this trial?

9          MR. RUSSO: Objection.

10  A    No, it doesn't.

11         THE COURT: Sustained as to form.

12  Q    During your meetings with the government did you have to

13  tell the government about all crimes you committed?

14  A    Yes.

15         MR. RUSSO: Objection; asked and answered.

16         THE COURT:  Sustained.

17  Q    Mr. Maynard, how many times, approximately, have you

18  spent in jail?

19  A    Approximately 13 years.

20  Q    And what types of crimes have you committed?

21  A    Mostly narcotics possession, narcotics trafficking.

22  Q    Did you ever use drugs in your lifetime?

23  A    Yes, I have.

24  Q    What types drugs have you used?

25  A    Marijuana and heroin.

*Maynard - direct/ Canty*                                          165

1   Q      And I'd like to start with marijuana, how often did you

2   use marijuana in your life?

3   A      Approximately three days a week.

4   Q      How old were when you first started using marijuana?

5   A      Eighteen years old.

6   Q      What about heroin?

7   A      I was about 18 years old as well.

8   Q      How often did you use heroin?

9   A      Almost daily.

10  Q      Now, with respect to the heroin, did there come time when

11  you became addicted to heroin?

12  A      Yes, I was.

13  Q      Did you ever go into rehabilitation as a result of your

14  addiction?

15  A      Yes, I went to rehabilitation twice.

16  Q      As a result of your connection with illegal narcotics,

17  did you ever spend time in jail due to heroin?

18  A      Yes, I did.

19  Q      When was the first time you were placed in jail as it

20  related to your connection with heroin?

21  A      The first time I was placed in prison was in Thailand and

22  Asian, Thailand.

23  Q      What were you arrested for?

24  A      I was arrested for possession, attempt to transport

25  heroin out of the country.

*Maynard - direct/ Canty*                                      166

1   Q    Can you just briefly describe to the jury how you came to

2   be arrested for heroin trafficking in Thailand?

3   A    I was -- I had met a friend in New York City who asked me

4   to go to Thailand to bring him back a package, and from my

5   understanding that package -- he said he was going to pay me

6   about $5,000 to bring back a package.  I travelled to Thailand

7   and stayed three weeks there, and I received a package in a

8   concealed suitcase.  I put my -- at my arrival at the airplane

9   I was arrested with the suitcase which contained heroin.

10  Q    Were you ultimately convicted of that offense?

11  A    I was convicted.

12  Q    What was your sentence?

13  A    My sentence was death.

14  Q    Was that ultimately commuted?

15  A    It was ultimately.

16       MR. RUSSO: Objection, Judge.

17  A    It was ultimately.

18       THE COURT:  Wait, wait.  Objection?

19       MR. RUSSO:  Leading, Judge.  Counsel is testifying

20  for the witness.

21       THE COURT:  Go ahead.

22  Q    Well, certainly, you weren't put to death, what happened

23  to that death sentence?

24  A    Because I had pleaded guilty in that case I was commuted

25  from death to life.

*Maynard - direct/ Canty*                                    167

1   Q    And did there come a time where you were ultimately

2   released from prison?

3   A    I was released after ten years.

4   Q    Why was that?

5   A    Because of the transfer treaty that U.S. government had

6   with Thailand government.

7   Q    Now, as a result of that conviction were you placed on

8   supervised release?

9   A    Yes, I was.

10  Q    Did you ever violate that supervised release?

11  A    Yes, I did.

12  Q    Can you explain to the jury what you did that caused you

13  to have a violation of supervised release filed against you?

14  A    Yes, I was at the time using drugs again and I was

15  arrested for possession of heroin.

16  Q    And what happened with that arrest?

17  A    That arrest was disposed of because of it was a bad

18  arrest.  I was dismissed.

19  Q    Did that still lead to a violation of your supervised

20  release?

21  A    It still led to a violation of my supervised release from

22  the Thailand sentence.

23  Q    And what were you sentenced to?

24  A    I was sentenced to a year and a day.

25  Q    Did there come a time where you were arrested again for

1   your involvement with narcotic?

2   A    Yes, I was.

3   Q    When was that?

4   A    That was 2006.

5   Q    And can you explain to the jury how you came to be

6   arrested 2006 for your connection with illegal narcotics?

7   A    At that time I received a package in the mail with heroin

8   and I was arrested for possession of it.

9   Q    And you were arrested after you picked up that package?

10  A    Yes, I was.

11  Q    How many other packages did you pick up through the mail

12  prior to being arrested?

13  A    Approximately three.

14  Q    As a result of that arrest were you ultimately convicted?

15  A    I spent two years in a prison.

16  Q    And were you given the opportunity to cooperate with the

17  government at that time in pleading guilty?

18  A    I was given the opportunity to cooperate with the

19  government at that time, and I did.

20  Q    Did you ultimately ever have to testify as a /RAERLT of

21  that cooperation agreement?

22  A    I never testified before.

23  Q    What was your ultimate sentence in that case?

24  A    I was given time served.

25  Q    How much time was that?

1  A    That was, approximately, two years.

2  Q    Now, other than the crimes for which you were convicted,

3  did you ever commit any other crimes when you were in college

4  or any other offenses?

5  A    Well, I was in college when I was growing up as a kid I

6  had a lot of fights.

7  Q    Were you ever involved in any assaults in college?

8  A    At college I had a fight in college and I was

9  subsequently suspended for that fight.

10 Q    Other than the fight, did you get into any other trouble

11 while you were at Hofstra University?

12 A    When I was at Hofstra I know we have a club on campus

13 where we all go to drink and I was -- I didn't at that day

14 when I went to the club I didn't wear the wristband that they

15 had a legal age to drink.  I was given a ticket because I

16 didn't have the wristband which meant that I was of legal age

17 to drink.  It was disposed of.

18 Q    Now, other than those crimes for which you were

19 convicted, during your interview with the prosecutors did tell

20 them about any other crimes that you were involved in?

21 A    Yes, I did.

22 Q    What other crimes did you tell them you were involved in?

23 A    I admitted to the prosecutors that I also was involved in

24 attempted bank fraud.

25 Q    Now, with respect to that attempted bank fraud, what did

*Maynard - direct/ Canty*                                170

1   you do that made you guilty of that attempted bank fraud?

2   A    I took a copy of a check -- copy -- photocopy of a check

3   and I had given it to the defendant.

4   Q    You gave it to the defendant for what reason?

5   A    Well, the defendant stated to me that he could take a

6   copy of a blank check and make it into a -- through his

7   computer system make it into an authentic check.

8   Q    Did he tell you what portion of that check would be

9   important to him in order to make a new check?

10              MR. RUSSO:   Objection Your Honor.

11              THE COURT: Sustained.

12  Q    What, if anything, did he tell you he was going to do

13  with that bank check?

14              MR. RUSSO: Objection, Your Honor.

15              THE COURT: I'm sorry.  In a word?

16              MR. RUSSO: No foundation that the defendant ever

17  said.

18              THE COURT: Sustained.

19  Q    Now, with respect to that bank fraud, did the authorities

20  have any idea that you were involved in that bank fraud before

21  you told them about it?

22  A    No, I was under.

23              MR. RUSSO objection.

24              THE COURT: Sustained.

25  A    I was under --

*Maynard - direct/ Canty*                                     171

1          THE COURT:  No, no, sustained means you shouldn't

2    answer.

3          Ask another question.

4    Q    At the time that you told them that you were involved in

5    this bank fraud did you have any indication that you were

6    under investigation for that bank fraud?

7    A    No.

8    Q    Now, you stated that with respect to your conviction for

9    transfer of false identification documents you were

10   involved with the defendant Ghulam Mesbahuddin, do you know

11   him by any other name?

12   A    I know him by the name of Rumi as well.

13   Q    When did you first meet the defendant?

14   A    I met him when I first came out from prison.

15   Q    How did you meet him?

16   A    I met him through his brother.

17   Q    How did you know his brother?

18   A    His brother.  I met his brother in prison.

19   Q    Now, after the you got out of prison can you just

20   describe the relationship you had with the defendant Ghulam

21    Mesbahuddin about?

22   A    We became good friends when I came out of prison.  I

23   first spoke to him, help me find a place to live because I

24   didn't have a place to rest my head, and he told me he had a

25   friend who has a basement apartment who he will be able to

*Maynard - direct/ Canty*                                    172

1    accommodate me, and we became good friends.

2    Q    Now, during your relationship did the defendant ever ask

3    you any questions about how your credit was?

4              MR. RUSSO:  Objection, Your Honor.

5              THE COURT: Sustained.

6              MR. CANTY: May we approach?

7              THE COURT:  All right. Side-bar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*side-bar*                                                    173

1         (Side-bar)

2         MR. CANTY: I would like to get into the area of

3   questioning that was the subject of my motion that I had filed

4   with the Court.  Defense counsel specifically opened the door

5   to both issues.  One, I want to the get into the nature of

6   relationship between the defendant and the witness and that

7   would revolve around the mortgage fraud that they were engaged

8   in together, and the bank fraud, and also, defense counsel

9   opened on the fact this was a legitimate enterprise, that he

10  was working with a lawyer.  That's the two reasons I filed the

11  motion, and it was granted by the Court, so that is where this

12  line of questioning is going -- to demonstrate the

13  relationship, and also, show the absence of some sort of

14  accident or mistake which defense counsel explicitly opened

15  on, that his client was engaged in a legitimate enterprise.

16        MR. RUSSO:   My response, Judge, without intending

17  to trite or sarcastic, is let the witness testify.  Let the

18  witness testify. My objection here is telling the witness

19  leading questions with no foundation what to testify about. He

20  can ask him for a detailed explanation of his relationship and

21  his activities and his interactions with the defendant. I

22  would be hard pressed to make a speaking objection there.

23        THE COURT:  All right.

24        MR. CANTY: If it were a leading objection, then I

25  will rephrase the question.

A-183

*side-bar*                                                    174

1          THE COURT:  Why don't you rephrase it.

2          MR. CANTY:  Thank you, Judge.

3          THE COURT:  Why don't we take a ten minute break.

4          Is that all right with everybody?

5          MR. CANTY: Thank you.

6          MR. RUSSO:  You're the boss.

7          (End of side-bar)

8          (The following took place in open court)

9          THE COURT: So we are going to take a ten minute

10   break.

11         All rise for the jury.

12         (Jury exited)

13         THE COURT:  Andrew, one of the jurors took one of

14   the transcripts in there.  Just retrieve it for us.

15         Thank you.

16         We will take a ten-minute break. You may stand down,

17   sir.  Do not discussion your testimony with anyone during the

18   break. We will start in ten minutes.

19         Thank you.

20         Court recessed).

21         (Continued on next page)

22

23

24

25

Maynard-direct-Canty                    175

1    CONTINUED DIRECT EXAMINATION

2    BY  MR. CANTY:

3              THE COURT:   Let's bring the witness back in.

4              (Witness resumes.)

5              THE COURT:   Bring the jury in, please.

6              MR. CANTY:   For scheduling purposes, I have

7    witnesses lined up.  I didn't know what time the court wants

8    to go until today.

9              THE COURT:   How long will you be with this witness?

10             MR. CANTY:   Another 15 minutes.

11             THE COURT:   Cross-examination?

12             MR. RUSSO:   Could be in excess of 30 minutes,

13   Judge.

14             THE COURT:   We're going until 5:30.  Hold the

15   witness in abeyance.  If you have witnesses, I would like to

16   hear them.

17             (Jury enters courtroom.)

18             THE COURT:   Please be seated.

19             You may continue your examination of the witness,

20   Mr. Canty.  The witness is reminded he's still under oath.

21             THE WITNESS:  Yes.

22             MR. CANTY:   Thank you, your Honor.

23   Q    Mr. Maynard, you stated that you met the defendant

24   sometime in 2008; is that right?

25   A    Yes.

SS      OCR      CM      CRR      CSR

Maynard-direct-Canty                    176

1  Q    What type of things did you and Mr. Mesbahuddin do
2  together?
3  A    Sometimes I would go over to his house, hang out there
4  with him.  I would watch TV, even went shopping with his son
5  together.  Sometimes we went to lunch or dinner.
6  Q    During your relationship, did the defendant ever approach
7  you about an opportunity to make money?
8  A    A number of times.
9  Q    What different opportunities did the defendant speak to
10 you about in ways to make money?
11 A    One of the ways, besides the one he's arrested for, he
12 told me, he asked me if I have excellent credit.  His
13 intention, if I have excellent credit, he would be able to use
14 me to buy a house under my name and use my credit.
15 Q    How would you be able to make money?  Did he explain to
16 you how?
17 A    He explained if I have to go through with that type of
18 procedure, he would be able to get an appraiser to appraise
19 the house at a higher price and then he would be able to sell
20 that house, give me a percentage of the profit he makes.
21 Q    Was there a determination whether or not you had the
22 credit to act as a buyer for the defendant to make money?
23 A    Well, after I checked my credit, my credit was bad.  It
24 was not good enough to purchase a house according to what he
25 wants.

SS    OCR    CM    CRR    CSR

Maynard-direct-Canty                    177

1    Q    What was his response when you told him your credit was

2    that bad?

3             MR. RUSSO:    Objection, Judge.

4    A    His response --

5             THE COURT:    Sustained.

6    Q    What did the defendant tell you when you informed him

7    that your credit score was not good?

8    A    He asked --

9             MR. RUSSO:    Objection.

10            THE COURT:    The objection is overruled.  You may

11   answer.

12   A    He asked me if I could find someone else that had

13   excellent credit so we could use that person to buy a house.

14   Q    Did you try to do that?

15   A    I tried but there wasn't anyone that was willing to do

16   such a thing.

17   Q    What other activities did you engage in with the

18   defendant to try to make money?

19   A    Besides giving him a copy of a check so that he can use

20   his computer system which he asked me to give him a blank

21   check, he said that he could use it to recreate a check to

22   make it authentic by changing the routing number and the

23   account number.  His intention was to use the cash for the

24   check.

25   Q    At the time, did you have access to copies of checks?

SS      OCR      CM      CRR      CSR

A-187

Maynard-direct-Canty                                    178

1    A    Yes, I did.

2    Q    What did you do with one of those checks?

3    A    I copied.  There was a copy, a check on my desk which I

4    gave to the defendant.

5    Q    After you gave that to him, did you follow up with him as

6    to whether or not you made any money off that plan?

7    A    I did.  He said he didn't make any money from it.

8    Q    What did he say happened?

9    A    He told me he tried, he created the check, would give it

10   to one of his friends who tried to cash the check and that

11   person was subsequently arrested.

12   Q    With respect to the first plan with the purchase of the

13   house, did he indicate how he was going to get an appraiser to

14   value the house higher than it actually was?

15   A    He indicated he would have to pay the appraiser to value

16   the house higher.

17   Q    Did the defendant also approach you about the opportunity

18   to get authentic government documents?

19   A    Yes, after these attempts failed, he told me he has

20   another way to make money.  He told me he has a contact where

21   he can be able to obtain drivers licenses, birth certificates

22   as well as social security cards.

23   Q    With respect to those documents, those identification

24   documents, were there separate plans that he discussed with

25   you on how to get those documents, those legitimate documents

Case 12-2605, Document 27, 02/04/2013, 836176, Page191 of 278

1  illegally?

2  A    Yes, initially he said he had, his contact had people in

3  governmental offices in New York City.

4  Q    What was the other plan?

5  A    The other plan, he eventually would shift it to offices

6  in California where he would be able to get those documents

7  from California.

8  Q    Did he tell you why he had to shift the plan originally

9  from New York to California?

10  A    He said New York was hot at that time because of an

11  attempting bombing in Manhattan.  Those people in the

12  governmental offices in Manhattan would not be able to do it.

13  Q    Did he describe how he was going to get these documents,

14  these genuine documents illegally?

15  A    Yes, he said through his contact he has people who work

16  in those governmental areas, departments in California.  They

17  would be able to obtain it.

18  Q    What, if anything, did he tell you, what, if anything he

19  would give those individuals in return for the document?

20  A    He said we would be able to make money on that.

21  Q    Did he tell you what he would give to those contacts

22  within those government offices in order to get those

23  documents?

24  A    He would have to pay them money to get the documents.  It

25  would not be through the legal channel.

Maynard-direct-Canty                              180

1   Q    When he made this proposal to you, was there a proposal
2   before this one where the defendant said there was another way
3   to get these documents that he knew of?
4   A    Well, he said the other way was the person, if someone
5   was able to travel from New York to California, they would be
6   able to meet with a lawyer over there and be able to get the
7   documents through that lawyer and possibly be able, if the
8   person was illegal in the country, he would be able to get
9   political asylum, something like that.
10  Q    Did you inquire, make inquiries whether or not that would
11  be successful if individuals didn't have a legitimate
12  political asylum claim?
13  A    I asked him that.  He said the attorney and his contact,
14  he knows in California has contacts if any person who was
15  illegal alien or illegal in the country, they would be able to
16  pass through that system.
17  Q    Through contacts within those offices, he would be able
18  to bypass any procedure for political asylum?
19  A    Yes.
20        MR. RUSSO:    Objection, your Honor.
21        THE COURT:    Sustained.
22  Q    Let me ask you, what did he tell about the legitimacy of
23  those claims and how they would be successful?
24  A    He said once a person pays the money, that his contact
25  would be able to get him political asylum.

Maynard-direct-Canty                    181

1   Q     With respect to the plan, the political asylum plan to

2   have individuals fly out to California, did you ever follow

3   through with that plan?

4   A     Didn't work.

5   Q     What plan did you follow through?

6   A     The plan that worked, someone, anyone from the New York

7   area, they would not fly out to California at this point.

8   They would be able to get the documents; that means social

9   security card, birth certificate, driver license if they pay

10  the money in New York.  That would be provided to them.

11  Q     Other than birth certificates, social security cards,

12  drivers licenses, were there any other documents?

13  A     Yes, he said there would be in addition to those

14  documents, he would be able to obtain a worker's permit.

15  Q     Did you inquire or question the defendant as to whether

16  or not these were going to be legit or authentic government

17  documents?

18  A     I asked how does he know these documents are not fake.

19  He said these contacts were able to obtain them before, able

20  to use them in the community to make them appear to be legal

21  in the country.

22  Q     Did he give you any assurances whether or not --

23  withdrawn.

24        When the defendant made this proposal, what if any

25  role did he ask you to play in this scheme?

Maynard-direct-Canty                    182

1   A    He told me --

2              MR. RUSSO:   Objection.

3              THE COURT:   I'm sorry?

4              MR. CANTY:   I'll rephrase.

5   Q    What if any role did he say you would play in the plan

6   that he had told you about?

7              MR. RUSSO:   Objection.

8              THE COURT:   Overruled.

9   A    He said I would be the middleman, if I would be able, if

10  I can be able to get people who needed these documents, people

11  from Arab countries, Middle Eastern as well as Chinese people.

12  Those are the types of people who will be able to pay the

13  money for these documents that he has through his contact.

14  Q    What was the defendant's explanation why you should

15  target individuals that were from either the Middle East or

16  China?

17  A    He said those would be the most desperate, would be

18  paying the highest prices, who would want to be legal in the

19  country.  That means they would be able to open a bank

20  account, be able to open even a business.

21  Q    With respect to the individuals he asked you to target,

22  did he specifically ask you to target individuals that did not

23  have legal status in the United States?

24  A    Yes.

25  Q    After the defendant made this proposal, what did you do?

SS    OCR    CM    CRR    CSR

1   A    I immediately asked him about the documents.  He told me

2   he guarantees they would be genuine documents.  I went out to

3   try to get someone to buy the documents.

4   Q    You just explained to the jury what you did in order to

5   get somebody lined up to buy these documents?

6   A    I met someone who said they would be able, that they

7   wanted to buy the documents and they had someone who is

8   willing to pay the amount of money for the documents.

9   Q    Mr. Maynard, speak into the microphone.  I'm having

10  trouble.  Say that again.  I'm sorry?

11  A    I was able to obtain one person who wanted documents, was

12  willing to pay the money for a down payment to get these

13  documents.

14  Q    Did you relay that information to the defendant?

15  A    Yes, I did.

16  Q    Did this individual indicate whether or not the customer

17  was in the United States legally?

18  A    They said the person was here illegally.

19  Q    When you lined up the customer, did you ask for

20  anything --  what if anything did you ask of this customer to

21  provide to you?

22  A    I was told by Rumi he needed four photographs of the

23  individual as well as the biological information about that

24  person and two thumb prints of that person.

25  Q    Did the defendant explain to you why you needed to get

Maynard-direct-Canty                                    184

1   that information from the customer?

2   A    He said he needed to make the document to be legal,

3   needed two thumb prints, photographs, biological information

4   about that person.

5   Q    During your time in discussing this plan with the

6   defendant, did you discuss what to charge individuals you had

7   lined up?

8   A    He told me if the person is from the Middle East area,

9   they would be willing to pay the highest price.  That means

10  maybe 50 to 60,000 or so.

11  Q    Did there come a time when you received information from

12  your contact or your customer?

13  A    Yes, I did.

14  Q    What information did you initially receive?

15  A    I initially received four photographs of a man and of the

16  individual as well as two thumb prints and biological

17  information of that person.

18  Q    What did you do with that information?

19  A    I called Rumi.  He was not home.  I went to his house.  I

20  gave it to his mom in an envelope that stated to Rumi.  I told

21  his mom to hold it for him.

22  Q    Did there come a time when the defendant gave that all

23  back to you?

24  A    He said he would not be able to work on it because he

25  didn't have a down payment.

SS      OCR      CM      CRR      CSR

Maynard-direct-Canty                     185

1   Q     What did you do after the defendant told you he needed a

2   down payment?

3   A     I went back to my contact.  I told the contact the

4   documents cannot be processed without some money as a down

5   payment.

6   Q     Did there come a time where you met with your --  excuse

7   me, you met with your customer to get the down payment?

8   A     Yes, I did.

9   Q     Where did that occur?

10  A     In a Burger King restaurant in Brooklyn.

11  Q     Would you please describe for the jury what happened when

12  you got to that Burger King restaurant?

13  A     When I got to the Burger King restaurant, I met my

14  potential customer.  He stated to me he has a down payment of

15  $10,000 to obtain those documents.

16  Q     What did he give you, how did he give you that $10,000?

17  A     He told me he has it in a cookie box.  He said these are

18  expensive, made a joke, saying these are expensive cookies.  I

19  looked into the box.  It was all hundred dollar bills totaling

20  10,000.

21  Q     What was your reaction when you received the money?

22  A     At that point I was happy because I know I'd be able to

23  make some money.

24  Q     What was your understanding about the legitimacy or

25  legality of this plan that you had entered into with the

Maynard-direct-Canty                    186

1  defendant?

2  A    He assured me it will be -- I know it's an illegal plan.

3  He assured me the documents would be authentic.

4  Q    But there was no doubt in your mind at that point what

5  you were doing was illegal?

6  A    Of course I knew it was illegal.

7  Q    What happened to you after you took possession of that

8  Girl Scout cookie box?

9  A    When I possessed the cookie box, I was about to put it in

10  my pocket, I was surrounded by agents.

11  Q    What happened then?

12  A    I was arrested.

13  Q    What happened after you were arrested?

14  A    When I was arrested, upon -- subsequently upon my arrest,

15  I spoke with the agents about the circumstances how I was able

16  to obtain what the money was for.

17  Q    Did they ask you to do anything at that point?

18  A    They asked me where was the money going to, who was the

19  money going to.

20  Q    Who did you tell them the money was going to?

21  A    I told them it was going to Rumi.

22  Q    I would like you to listen to this exhibit.

23        (Audio played)

24  Q    Mr. Maynard, when you were talking about a partial

25  payment of the documents, what documents were you referring to

SS    OCR    CM    CRR    CSR

A-196

Maynard-direct-Canty                    187

1    on the call?

2    A    I was referring to the drivers license --

3              MR. RUSSO:    Objection.

4              THE COURT:    Overruled.

5    A    I was referring to the drivers license, social security

6    card, birth certificate as well as the worker's permit.

7              (Audio continues play.)

8    Q    With respect to your comment about not saying too much,

9    why did he make that comment?

10   A    I know he doesn't like to talk too much over the phone.

11   He likes to meet me, usually go to his house and talk.

12             (Audio plays.)

13   Q    What was your understanding of what the defendant meant

14   when he have said don't speak on the phone so clearly?

15   A    He didn't want me to elaborate about the documents and

16   that it was where he was getting it from, didn't want me to

17   elaborate.  Maybe there was a third party listening.  He

18   wanted to be cautious.

19   Q    With respect --  I would like to back up.

20             (Audio continues play.)

21   Q    Mr. Maynard, did there come a time you ultimately met up

22   with Ghulam Mesbahuddin later on that evening?

23   A    Yes, within an hour or so I met with him.

24   Q    What did you give him at that meeting?

25   A    When we sat down to eat at the IHOP restaurant, I give

SS      OCR      CM      CRR      CSR

Maynard-direct-Canty                    188

1    him the $10,000, the down payment for the documents.

2    Q    With respect to this plan to get these documents, how

3    long had you and the defendant been discussing this plan?

4    How long had this plan been in effect?

5              MR. RUSSO:   Objection, your Honor.

6              THE COURT:   Sustained.  Lay a foundation.

7    Q    With respect to the first time the defendant made this

8    proposal to you, how much time elapsed between that initial

9    meeting where you discussed this and the meeting on May 11th?

10   A    I would say approximately three to four months.

11   Q    With respect to we talking about your heroin and

12   marijuana use, when was the last time you used heroin or

13   marijuana?

14   A    The last time I used heroin or marijuana was more than

15   was more than five years.

16   Q    Have you used any illegal narcotics or drugs in the last

17   five years?

18   A    No.

19   Q    I would like to show you government Exhibit number 5.

20             THE COURT:   In evidence?

21             MR. CANTY:   Yes, your Honor.

22   Q    Do you recognize that envelope?

23   A    Yes, I do.

24   Q    What do you recognize that from?

25   A    That's what I had given to Rumi that contained

SS    OCR    CM    CRR    CSR

Maynard-cross-Russo                    189

1  photographs of the individual that I had, the customer that I

2  had for him to get the documents for.

3  Q    With respect to the writing on it, can you read what the

4  envelope says?

5  A    It says to Rumi from Abduh Aziz.

6  Q    Is that a nickname you go by?

7  A    Yes.

8  Q    With respect to the writing on this envelope, was that

9  writing placed on this envelope prior to you being arrested on

10 May 11th, 2010?

11 A    Yes, of course.

12 Q    Mr. Maynard, do you have 3500 SM4 in front of you?

13 A    Yes.

14 Q    May I have it?

15 A    Yes.

16        MR. CANTY:  I'm going to ask what's marked as

17 Government Exhibit 3500 SM-4 be moved into evidence.

18        THE COURT:   Any objection?

19        MR. RUSSO:   No objection.

20        THE COURT:   Government Exhibit 3500 SM-4 is

21 received in evidence.

22        (So marked.)

23        MR. CANTY:  May I have one moment?

24        THE COURT:   Yes, you may.

25        (Pause.)

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                            190

1         MR. CANTY:   Your Honor, I have no further

2    questions, thank you.

3         THE COURT:   Those documents that are on the shelf

4    there, they're not yours?

5         MR. CANTY:   The juror's.

6         THE COURT:   Just checking.

7         Cross-examination?

8         MR. RUSSO:   Thank you.

9    CROSS-EXAMINATION

10   BY MR. RUSSO:

11   Q    Is Stan Maynard your real name?

12   A    Stan Gerald Maynard.

13   Q    That's the name you were given at birth?

14   A    Yes.

15   Q    How many different names have you used during the course

16   of your life?

17   A    My nickname also, Muslim name Abduh Aziz.

18   Q    Is that a nickname?

19   A    Muslim name.

20   Q    Which name do you use?

21   A    I use Stan Gerald Maynard.

22   Q    Why then would people know you as Abduh Aziz?

23   A    Because Muslims refer to each other by our Muslim names.

24   Q    You introduced yourself to fellow Muslims as Abduh Aziz?

25   A    Yes.

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                                      191

1   Q     And to non-Muslims as Stan Maynard?

2   A     Sometimes.

3   Q     Sometimes?

4   A     Yes.

5   Q     Sometimes you introduce yourself as what?

6   A     Stan Maynard or Abduh Aziz.

7   Q     You've two different names.  For how many years have you

8   used two different names?

9   A     I've been using Stan Maynard all my life.  When I became

10  a Muslim, I was using also Abduh Aziz.

11  Q     When was it that you became a Muslim?

12        MR. CANTY:    Objection.

13        THE COURT:    Sustained.

14  Q     You said you became a Muslim.  When did you become a

15  Muslim?

16        MR. CANTY:    Objection.

17        THE COURT:    Sustained.

18  Q     When did you begin using the name Abduh Aziz?

19  A     I would say when I first initially was in college, when I

20  met one of my fraternity brothers from Kuwait.  We decided on

21  that name.  I was using the name when I was in town, came back

22  to the U.S., was using the same name.

23  Q     Let's back up.  How about a date, a year?

24  A     I would say since the early '90s.  Sometimes I didn't.

25  Q     Since the early '90s you've been using two different

Maynard-cross-Russo                    192

1   names, Abduh Aziz and Stan Maynard?

2   A    Yes.

3   Q    It's in the early '90s after you began using the name

4   Abduh Aziz that you were arrested for narcotics trafficking in

5   Thailand?

6   A    Yes.

7   Q    What name did you tell the Thai authorities was your

8   name?

9   A    Stan Maynard.

10  Q    Stan Maynard?

11  A    That was what my passport said.

12  Q    You didn't tell them your name was Abduh Aziz?

13  A    No.

14  Q    Then they sentenced you to death for narcotics

15  trafficking?

16  A    Yes.

17  Q    Mr. Maynard, let me ask you, before you came here today,

18  took the witness stand and swore to tell the truth, how many

19  times did you meet with the government prosecutors to prepare

20  for today's events?

21  A    I would say more than ten times.

22  Q    Ten times?

23  A    About.

24  Q    Met with the prosecutors to prepare what you would say to

25  the jury, what questions you would be asked, what answers you

Maynard-cross-Russo                    193

1   would give, things like that?

2   A    Well, I met with them about ten times and they told me to

3   tell the truth, to speak loud and clear.

4   Q    So you needed 10 meetings for them to tell you to tell

5   the truth, speak loudly?

6   A    I've been telling the truth from the beginning upon my

7   arrest.

8   Q    That's not my question, Mr. Maynard.  You said you met in

9   preparation for today's trial for your testimony ten times and

10  the only thing you discussed with the government was that you

11  should tell the truth and speak loudly?

12  A    I discussed with the government all my criminal

13  activities, the ones they know about, the ones they did not

14  know about.

15  Q    How about your testimony, did they discuss with you what

16  you would be testifying to today?

17  A    Yes.

18  Q    They did.  They did say more than just tell the truth and

19  speak loud?  What did they tell you about your testimony, what

20  you should say to the jury?

21  A    They didn't tell me exactly what I should say to the

22  jury.  They said I should tell the jury the truth about the

23  circumstances of the documents in the case.

24  Q    Did you practice being asked questions, giving answers?

25  A    They asked me questions several times.  I gave them the

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                               194

1  answers according to my knowledge of the truth of the answers.

2  Q    That would be like practicing?

3  A    There were questions, and answered questions, just like

4  I'm answering your questions now, I answered their questions.

5  Q    That would be like rehearsal?

6  A    I wouldn't say it was rehearsal, but I said when they

7  would call me in for questioning, I would answer their

8  questions.

9  Q    Would it be fair to say that before you came here today,

10 you knew exactly what questions you were going to be asked and

11 what you were going to say?

12 A    Most of the questions that he had asked me I heard some

13 of them before, yes.  My answers were as truthful to the

14 knowledge of my ability to those questions.

15 Q    You knew what you would be asked, what you would say

16 before you got here, fair to say?

17 A    Yes.

18 Q    You last committed a crime when?

19 A    In 2010, May.

20 Q    May of 2010?

21 A    Yes.

22 Q    Since your arrest on May 11th -- was it May 11th, 2010?

23 A    Approximately, yes.

24 Q    Since your arrest on May 11th, 2010, you haven't

25 committed any other crimes?

SS    OCR    CM    CRR    CSR

A No.
Q Nothing illegal?
A No.
Q How about acts of dishonesty, have you been dishonest since May of 2010?
A What way?
Q Anything that you would consider dishonest.
A I don't recall.
Q Have you lied?
A I don't know telling lies would be called illegal activity.
Q Don't recall telling lies since 2010?
A Not to the government or any other party.
Q You don't recall lying?
A No.
Q You haven't lied since May of 2010, haven't committed any crimes since May of 2010?
A Yes, I haven't committed any crimes since 2010.
Q Prior to May of 2010, the history of your adult life is just complete with acts of criminality, dishonesty, lies, deceit. What happened in May of 2010 that changed you?
A Well, I can say an awakening.
Q Do you have an answer, sir?
A Excuse me?
Q Do you have an answer?

Maynard-cross-Russo                              196

1   A     Yes, in 2010, upon my arrest, I realized it's the time to

2   stop any illegal activities in my life.

3   Q     It's time to be honest, not to lie anymore?

4   A     I tried my best at that time to be honest, tell the

5   truth.

6   Q     Except that at the very moment you were arrested, almost

7   immediately thereafter, you undertook a campaign of deceit and

8   lies to set up Mr. Mesbahuddin to get arrested with you later

9   that day, did you not?

10  A     It was not a deceit.  It was not a lie.  We had conspired

11  together to get those documents under his direction.

12  Q     Prior to you immediately agreeing to cooperate with the

13  government --  let me ask you this:  Your agreement to

14  cooperate with the government, made moments after your arrest,

15  why did you do that?

16  A     Well, I wanted to show them, prove to them I was a

17  middleman, that who the money and documents were coming from.

18  Q     Had nothing to do with saving yourself a 30-year prison

19  sentence?

20  A     Well, of course, I would like to save myself from doing

21  30 years in prison.

22  Q     But that was kind of like a secondary concern; is that

23  what you're trying to convince us of?

24  A     At that point, I didn't know I was facing 30 years but I

25  know I was facing time.

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                                          197

1   Q    The reason that you almost immediately figured that you

2   had to cooperate with the government was to save yourself?

3   A    Of course I want to save myself.

4   Q    It wasn't because you had a sudden epiphany of honesty,

5   right?

6   A    Well --

7   Q    The moment they put the handcuffs on you, you didn't

8   decide "I'm going to change and become an honest person"?

9   A    I wanted to show proof to them who was providing me with

10  the documents.

11  Q    Why did you want to do that now?

12  A    Like you said, to save myself.

13  Q    Let's talk about the conspiracy to traffic in documents.

14  You know now that as early as March of 2010, you were under

15  investigation by the federal government for illegal

16  activities, correct?

17  A    Yes, I know that now.

18  Q    You know that now.

19        You know they had you wired up with an informant

20  that you were dealing with?

21        MR. CANTY:    Objection.

22        THE COURT:    Sustained.

23  Q    They were having your contacts with an informant recorded

24  by a secret recording device that informant was wearing?

25  A    After the fact I know that.  After my arrest I knew that.

SS     OCR     CM     CRR     CSR

1  Q    After your arrest.  You know that now?

2  A    Yes.

3  Q    Do you recall on April 19th, 2010, you told the

4  government informant who set you up or who participated in the

5  case that led to your arrest, that you told that government

6  informant that you are waiting for a contact at DMV to get the

7  drivers license and that you were working on another DMV

8  contact?

9  A    I told him I was working on the contact through Rumi,

10 trying to get someone else for him --

11 Q    That's not what I asked you.

12        MR. CANTY:   Objection.  May the witness finish his

13 answer?

14        THE COURT:   Anything more?

15        THE WITNESS:  No.

16        THE COURT:   Go ahead.

17 Q    You did not tell --  let's not mislead.  If you don't

18 understand my question, please ask.

19        THE COURT:   Let's not discuss what's misleading.

20 That's for the jury to decide, not you.

21 Q    The government informant who was secretly recording you

22 on April 19th, did you not tell that government informant that

23 you were working on another DMV contact to get drivers

24 licenses?

25 A    I'm sure I did if it's on the tape.

Maynard-cross-Russo                    199

1   Q    You're just lying to him or were you telling the truth?

2   A    I was telling the truth.

3   Q    You were also telling him you were working on a check

4   fraud scheme; is that the truth?

5   A    Yes.

6   Q    Do you recall on April 22nd, 2010 that you were in

7   Bayonne, New Jersey and you met with this government

8   informant?

9   A    Yes.

10  Q    Do you recall that meeting?

11  A    Yes.

12  Q    Do you recall that you discussed with the informant that

13  you were working with someone called Armando and talking about

14  getting some stuff from the Dominican Republic?  Does that

15  ring a bell?

16  A    Yes.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

A-209

1   CROSS-EXAMINATION (Cont'd)

2   BY MR. RUSSO:

3   Q    Okay. Now, Mr. Mesbahuddin, he is not from the Dominican

4   Republic?

5   A    No, of course not.

6   Q    So you were talking to this government informant about

7   some sort of criminal activity through the Dominican Republic

8   contacts?

9            MR. CANTY: Objection.

10           THE COURT:  You may answer.

11  A    I was speaking to the informant about -- he was asking me

12  questions about getting some stuff from the Dominican

13  Republic, yes.

14  Q    And Rumi was not involved in the Dominican Republic

15  criminal talk, was he?

16  A    No, he was involved with the illegal documents.

17  Q    So would that be a no, he was not involved in the

18  Dominican Republic?

19  A    No.

20  Q    Okay. And you recall also a few days later in Brooklyn on

21  April 26th, 2010 meeting again with the government informant?

22  A    Yes.

23  Q    Where in Brooklyn did you meet, do you recall?

24  A    In Canarsie area.  I believe it is Canarsie area.

25  Q    In Canarsie.

*Maynard - cross/ Russo*                                        201

1          And you discussed various contacts with document

2    fraud and check fraud at that meeting?

3    A    That I told him the contact that I have for.

4    Q    When you say, "various contacts," do you recall talking

5    about the various contacts?

6    A    I'm not sure if I used the word various, but told him

7    about the contact that I have for the documents.

8    Q    You didn't tell him you had a number of contacts?

9    A    I am not sure if I said that word.

10   Q    You might have?

11   A    Excuse me.

12   Q    You might have led this informant to believe that you

13   have a number of contacts?

14            MR. CANTI: Objection.

15            THE COURT: Sustained.

16   Q    Now, did you also discuss obtain British passports with

17   the government contact?

18   A    Yes, I did.

19   Q    You did, didn't you?  Okay.

20            Now, tell us about how you conspired or proposed to

21   obtain British passports with the government informant in

22   April of 2010.

23   A    Well, the government informant asked me if there's any

24   other way I can get -- besides the documents, is there any

25   other way I can get passports or anything like that, and I

1   told him that I have a friend who said that he had a contact

2   to obtain British passports.

3   Q      You had a friend?

4   A      Yes.

5   Q      You did?

6   A      I told him I have a contact that discussed with me that

7   he can get British passports.

8   Q      Who was that contact?

9   A      His name was want Vaughn.

10  Q      Vaughn. So Vaughn could get you British passports?

11  A      Yes.

12  Q      And you also discussed United States passports as well,

13  did you not, at the April meeting with the government

14  informant in Brooklyn?

15  A      I am not sure but I think British passports when I was

16  discussing.

17  Q      Afgazeez, is that the name you go by?

18  A      Yes.

19  Q      Did you discuss getting British passports and United

20  States passports?

21         MR. CANTY: Objection; asked and answered.

22         THE COURT: Sustained.

23  Q      Did you have a friend Vaughn or contact name Vaughn who

24  could get you British passports?

25  A      Vaughn told me he had a contact that could get British

1  passports.

2  Q    So Vaughn told you that he had a contact who could get

3  British passports?

4  A    Yes, he did.

5  Q    And you told that to the government?

6  A    Yes.

7  Q    Did you do anything to get the British passport?

8  A    No.

9  Q    Why not?

10  A    Because that never materialized and it was just a

11  discussion.

12  Q    In terms of your traffic or conspiring to traffic

13  fraudulent documents, your career in that area has certainly

14  not been limited to anything that you alleged that you did

15  with Mr. Mesbahuddin, right?

16  A    Repeat the question.

17  Q    Well, we certainly know that you spent a number of years

18  on a number of occasions engaged in narcotics trafficking,

19  smuggling, what have you, but your career -- your criminal

20  career in the traffic fraudulent identification documents,

21  that was pretty short, was it not?

22  A    Yes, it is. It was several number of months.

23        MR. CANTY: Objection.

24        THE COURT: Sustained.

25  Q    Did you or did you not conspire with people other than

1   Mr. Mesbahuddin in trafficking of fraudulent identification
2   documents?
3           MR. CANTY: Objection.
4           THE COURT: Sustained.
5   Q    Did you conspire with someone named Vaughn?
6   A    I spoke to Vaughn once.
7           MR. CANTY:  Objection as to the term conspired.
8           THE COURT: Sustained.
9   Q    Did you discuss -- whether it was a conspiracy or not --
10  did you discuss getting fraudulent British passports with
11  someone named Vaughn?
12          MR. CANTY:  Objection; asked and answered.
13          THE COURT:  You may answer.
14  A    That discussion I had not only discussed with Vaughn, I
15  also discussed it with Rumi.
16  Q    About British passports?
17  A    Yes, that someone told me they can get a British passport
18  and he was -- he said also that if this person get British
19  passport he will maybe have somebody who can buy it.
20  Q    Okay. You discussed this with Vaughn?
21  A    I discussed it with Vaughn, I discussed it with the
22  Informant an I also discussed it with Rumi.
23  Q    Now, as late as April 29th, 2010 were you under the
24  impression that Mr. Mesbahuddin was of Indian descent?
25  A    I would say of Indian descent because Bangladesh was part

*Maynard - cross/ Russo*                                205

1   of India.

2   Q    So it was your understanding that Bangladesh was part of

3   India?

4   A    It was part of India several years ago.  I guess in the

5   60s it broke off from India.

6   Q    So since 1962 then if you from Bangladesh it would be

7   accurate to refer to you as Indian?

8   A    Sometimes I may use the term India on Bangladesh, but

9   most people would consider them to be part of the India.

10  Q    Most people?

11  A    Yes.

12  Q    Consider Bangladesh to be part of India?

13  A    Yes.

14  Q    Now, you said that prior to April of 2010 you were

15  friends with Mr. Mesbahuddin, were you not?

16  A    Yes.

17  Q    You stayed with him, he found you a place to live when

18  you got out of prison?

19  A    Yes.

20  Q    He helped you?

21  A    Yes.

22  Q    He befriended you?

23  A    Yes, he befriended me.

24  Q    Okay. And you were close enough to him that you still

25  thought that he was Indian or of Indian descent?

*MARSHA DIAMOND, CSR*
OFFICIAL COURT REPORTER

1   A    He would always be of Indian descent but he is

2   Bangladesh.

3   Q    Well, then when you were referring to the contacts that

4   you had during the month of April in particular, you refer to

5   Vaughn getting your British passports during some of your

6   communications with the government informant; is that correct?

7   A    Yes.

8   Q    You also discussed certain fraudulent documents or

9   criminal activities with Armando (ph) involving the Dominican

10  Republic, did you not?

11  A    Those fraudulent documents were not from the Dominican

12  Republic.  That is coming from California through Rumi.

13  Q    Let me go back. You had some discussions about the

14  Dominican Republic, did you not?

15  A    Yes.

16  Q    What were your discussions?

17  A    They are asking me -- informant said that he had a friend

18  that lived in the Dominican Republic. It was the informant

19  that brought that up.  I had nothing to do with the Dominican

20  Republic.  I have nobody there.

21  Q    And you referred to -- you are saying when you referred

22  to your Indian contact you are referring to Mr. Mesbahuddin

23  who is of Bangladesh?

24  A    Yes, because the people I was speaking to.

25  Q    You didn't know he was not Indian even though he was your

*Maynard - cross/ Russo*                                     207

1   good friend who you had shared meals and who had helped you

2   get a place?

3   A    Like I said, the people who I was speaking to no one

4   knows them as Indian.

5   Q    Now, isn't it true then, Mr. Maynard, that during April

6   and before when you referred to your Indian contact with the

7   government informant, you were not referring to

8   Mr. Mesbahuddin from Bangladesh?

9   A    That's not true.

10  Q    You are referring to somebody else?

11  A    That is not true.  I was referring to Rumi, and the

12  people, like I said, I was talking to knows them as being

13  Indian, and even at one point they -- my contact wanted to

14  meet Rumi but Rumi said he don't want to meet nobody.

15  Q    But they didn't know Rumi, so it didn't matter what you

16  called him right, Indian and Bangladeshian, he could have

17  referred accurately to his country of origin and no one would

18  have been the wiser?

19  A    Like I said, is the person that he was speaking to it is

20  not familiar with Bangladesh.  They are familiar with

21  Bangladesh being part of India.

22  Q    What would the person you were speaking to give a hoot

23  about what country your contact comes from?

24  A    Well, like I just referred to him as being Indian, but I

25  know he is Bangladesh.

*Maynard - cross/ Russo*                                    208

1   Q    Are you sure -- still your testimony that you are

2   referring to Mr. Mesbahuddin when you were talking to the

3   government informant about your Indian contact?

4   A    I was referring to Rumi Mesbahuddin.

5   Q    Now, did you tell your contact that you were waiting to

6   hear back from a guy in California at a meeting for a

7   telephone conversation on April 29th?

8   A    Well, that was on behalf of Rumi.  He said he was waiting

9   to hear from his contact, but during this time, that is when I

10  am waiting to hear from the contact in California.

11  Q    You said I am still waiting for -- I am still waiting to

12  hear back from a guy in California (perusing).  You really

13  meant you were waiting to hear back from Rumi who was waiting

14  to hear back from a guy in California?

15       MR. CANTI: Objection.

16       THE COURT:  What is the objection?

17       MR. CANTI: It appears that the defense is reading

18  from something not in evidence and that is not the testimony

19  of the witness.

20       THE COURT: Sustained.

21  Q    So did you, did you not, say that you were waiting to

22  hear back from someone in California talking to your informant

23  in April of 2010?

24  A    What I meant was that --

25  Q    Mr. Maynard, I apologize, I am not asking what you meant.

*Maynard - cross/ Russo*                                            209

1    I am asking the question.  If you don't understand it, sir,

2    please tell me.

3    A    I understand your question, and I did say that I was

4    waiting to hear back from a contact from someone in

5    California, but I was referring that Rumi was waiting to hear

6    from his contact in California. I have no one in California

7    that I know regarding this.

8    Q    I hear you. That's not my question.

9            You didn't tell this informant while you were being

10   recorded, that you didn't know you were being recorded, that

11   your Indian guy was waiting to hear from someone in

12   California, did you?

13           You did not tell them that, did you?

14   A    I might not have said those specific words, but my

15   meaning was what it was meant to be was that Rumi was waiting

16   to hear from his contact.

17   Q    That's your meaning today, right, as you testify?

18   A    No, that is my meaning at that time.

19           MR. CANTY: Objection.

20           THE COURT:  I'm sorry. Please, no argument between

21   the questioner and the witness. Next question.

22   Q    Sir, I am simply asking, yes or no, did you tell your

23   contact informant who was recording you for the FBI in April

24   of 2010 that you were waiting to hear back from the guy from

25   California?

A-219

Maynard - cross/ Russo

210

1        MR. CANTI: Objection.

2        THE COURT:  Sustained.  Side-bar.

3        (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Side-bar*                                                    211

1          (The following took place at side bar)

2          THE COURT: Well, if you're reading from something

3     you are going to have to share it with us, okay?  If you are

4     going to ask questions, that's fine, but you appear to be

5     reading from something. The jury doesn't know what it is. I

6     don't know what it is. Nobody knows what it is, and that

7     creates a false impression. I am not going to allow you to do

8     that. That is number one.

9          Number two.  He has answered your question in this

10    regard and you are going to have to accept it the way it is

11    because you have asked it several different ways, several

12    different times.  I think you got what you need in terms of

13    what you are looking for.  You have got his answer.  He did

14    not specifically discuss the fact that Rumi was going to get

15    the documents from California, and you can do with that

16    whatever you are going to do with it, but I think that is

17    taken care of, so where are we going from here?

18          MR. RUSSO: I was just going to go through one more

19    question about his representations that he made to the

20    government informant about birth certificates.

21          THE COURT:  Okay.

22          MR. RUSSO: I can put this on my legal pad so it

23    looks like my own notes.

24          THE COURT:  Why don't you stand at the podium and

25    that way it won't appear to be you are reading from a

A-221

*Side-bar* 212

1   transcript, a hearing or telephone conversation.

2        MR. RUSSO:  Fair enough.

3        THE COURT: I just don't want to create a false

4   impression.  You may very well not have been intending to do

5   that but it is the perception that I am talking about.

6        MR. CANTY: Judge, along those lines I need to make a

7   record.  Counsel stood right next to the jury box continuing

8   to flash the document and would look at it, read it, you said

9   X, appearing to be reading from something that the defendant

10  may or may not have endorsed.  It is improper impeachment.  It

11  leaves the jury with the misrepresentation he has now given

12  inconsistent statements from what he gave before.  There are

13  other proper ways to do that.  This is not a document that was

14  created by this witness.  That is not a document that witness

15  has seen and he's created a false impression to this jury that

16  the witness has now given an inconsistent statement on a prior

17  occasion and that is not the case, especially from the

18  document he is reading.

19        THE COURT: All right. You have made your record.

20  Let's finish.

21        How much more time do you need?

22        MR. RUSSO:  Well, I will now get into his history

23  with him.

24        THE COURT:  His history?  I am not sure what you

25  mean.

A-222

*Side-bar*                                                    213

1          MR. RUSSO:   Criminal history.

2          THE COURT:  Let's get on with it.

3          (End of side-bar)

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

1          (The following took place in open court)

2          THE COURT:  Oh, by the way, I mentioned before the

3   government is responsible for the audio visual system, I meant

4   the taxpayers.  I was not holding the government at counsel's

5   table responsible.  I was holding the United States of America

6   and all of us responsible.

7          Okay. You may continue your cross-examination of the

8   witness.

9          MR. RUSSO: Yes, Your Honor.

10  CROSS-EXAMINATION (Cont'd)

11  BY MR. RUSSO:

12  Q    Now, Mr. Maynard, let's go back and talk a little bit

13  about, you said that you first committed a crime in 1993 that

14  the first time you committed a crime?

15  A    Yes.

16  Q    First time?

17  A    Yes.

18         THE COURT:  You have to speak up.

19  A    My recollection, that was the first time I committed such

20  a crime, yes.

21  Q    What is that, sir?

22  A    From my recollection that is the first time I committed a

23  crime.

24  Q    Before 1993 were you using illegal drugs?

25  A    Of course, yes.

A-224

1   Q      Heroin?

2   A      Yes.

3   Q      And in order to use heroin you had to obtain heroin?

4   A      Yes, I had to.

5   Q      And you purchased heroin?

6   A      Yes.

7   Q      How did you get the money to purchase heroin prior to

8   1993?

9   A      I was working part time, I was working, and I had money

10  from my family.  I used it to buy drugs.

11         THE COURT:  Sorry.  Is there something more?

12         THE WITNESS: I just said the money that I had, I

13  used it to buy drugs.

14  Q      And when you bought these drugs you were aware that each

15  time that you purchased an illegal narcotic from a drug dealer

16  you were committing a crime?

17  A      I understand that.

18  Q      You also understood that each time you possessed illegal

19  narcotics you were also committing a crime?

20  A      Yes.

21  Q      So then it would be fair to say that 1993 was not the

22  first time that you committed a crime?

23  A      Well, under those circumstances.

24  Q      Under what circumstances?

25  A      Under what you have explained before, 1993 I have

*Maynard - cross/ Russo*                                        216

1  committed a crime.

2  Q    You weren't aware that the purchasing and possession of

3  illegal narcotics was criminal?

4  A    I was aware but I was addicted to the narcotics at that

5  time.

6  Q    Were you aware that it was a criminal act?

7  A    Yes.

8  Q    Okay. So that when I asked you if you committed a crime

9  before 1993 you were mistaken when you said no?

10  A    Well, I wanted to -- according your explanation, you

11  fully explained what you were saying.

12  Q    So now how far back then?

13          THE COURT:  I'm sorry.  Did you want to say

14  something else?

15          THE WITNESS: I said that his question was clarified

16  to me.

17          THE COURT:  Okay. Go ahead.

18  Q    Now, how many years before 1993 would you say that you

19  committed crimes ?

20  A    I would say regarding using heroin, I would say since I

21  was about 18.

22  Q    I am saying any crime, sir?

23  A    Any crime?

24  Q    Not just possessing narcotics or purchasing narcotics,

25  any crime.  Did you ever steal anything?

*Maynard - cross/ Russo*

1    A    No.

2    Q    About how many times do you think -- about how many

3    crimes do you think you committed before 1993, 100, ten?

4    A    Only possession and using narcotics.

5    Q    Okay. Let's assume that those acts are criminal as

6    defined by the government against the law, each time you did

7    so you were breaking the law, about how many times did you so

8    break the law before 1993?

9    A    Well, because I was using heroin I had to get -- buy the

10   heroin to use.  I was -- I would say, I break the law several

11   times to obtain -- to feed my habit.

12   Q    Several times a day?

13   A    Not per day. Per week.

14   Q    Several times a week?

15   A    Yes.

16   Q    Fifty-two weeks in a year, sir?

17   A    Well, I had to.  Like I said, I was using.

18   Q    Fair to say then you committed hundreds of crimes however

19   small or in inconsequential you may think they were, you

20   committed hundreds of crimes before 1993?

21   A    I wouldn't state it as hundreds of crimes, but I will say

22   that I had to use and I used several times.  I used the drug.

23   Q    Now, in 1993 you went to Thailand to pick up a package

24   for a guy?

25   A    Yes, I did.

A-227

1  Q     Didn't know that you were flying across the world to pick

2  up narcotics, did you?

3  A     Yes, I did.  I knew.

4  Q     You did. Okay.

5         So you were part of a conspiracy to traffic

6  internationally in narcotics?

7  A     I had admitted my guilt on that traffic and I did my time

8  for that.

9  Q     So are you familiar with the tendency of people to

10 minimize their involvement when they get arrested?

11         MR. CANTY: Objection.

12         THE COURT: Sustained.

13 Q     Isn't it true, Mr. Maynard, that when you were asked

14 about your trip to Thailand to traffic in narcotics you

15 minimized your role?

16 A     I was arrested in Thailand and I pleaded guilty.

17 Pleading in guilty means you have to admit everything about

18 the conspiracy to traffic heroin.

19 Q     So you were not just --

20 A     -- if I had --

21 Q     Go going to pick up a package for another guy, right?

22 A     (No response)

23 Q     You were involved in international trafficking of

24 narcotics, heroin?

25 A     I was asked to pick up a package and I was told how much

1  I had be paid to pick up that package, and at that time I

2  agreed to pick up the package for the amount.

3  Q    You say, "package," why don't you call it what it was?

4  A    Okay, heroin.

5  Q    How many kilos of heroin did you fly across the world to

6  pick up?

7  A    I wasn't able to fly across the world with any heroin

8  because it was -- I was caught at the airport in Thailand.

9  Q    How did you get there?

10  A    How did I get to Thailand?

11  Q    Thailand?

12  A    I flew across to Thailand.

13  Q    Right.  You flew there with the intention to pick up how

14  many kilos heroin?

15  A    At that time I didn't know how many kilos. I didn't know

16  how many kilos was in the package but when I was arrested the

17  police over there in Thailand told me there was 11 -- 5 kilos

18  in the suitcase?

19  Q    Five kilos of heroin --

20         THE COURT: No, let him finish his answer.

21  A    (Cont'd):  You couldn't see there was -- it was concealed

22  in the suitcase, and in the walls of the suitcase, so you

23  couldn't see how many kilos was there until they opened.  They

24  measure it.  The way they told me, it was five kilos.

25  Q    Were you surprised to find out that you were going across

A-229

*Maynard - cross/ Russo*    220

1  the world to pick up a suitcase with heroin?

2  A    Well, eventually I knew what I was doing but like I said,

3  I was using a drug, I wanted to go to Thailand, and enjoy

4  myself and --

5  Q    So you didn't think you were flying across the world to

6  pick up a suitcase with a little tiny bag of heroin, did you?

7  A    Of course not.

8  Q    You knew you were bringing back kilo --

9  A    No, I would be bringing back certain amount of heroin.

10 Q    Certain amount?

11 A    I didn't know exactly the amount but --

12 Q    And it was your intention and plan to transport and

13 traffic that heroin back here into the United States of

14 America?

15 A    At that time, yes.

16 Q    For distribution in this country?

17 A    I wouldn't be distributing. My intent was to give to the

18 person who was supposed to go to -- who employed me to do that

19 trip.

20 Q    Just employed you.

21        And in Thailand even though you told them you were

22 just an employee --

23        MR. CANTY: Objection.

24        THE COURT: Sustained.

25 Q    Did you tell the Thai authorities I am just an employee?

**MARSHA DIAMOND, CSR**
**OFFICIAL COURT REPORTER**

1   A    I never used the word employee but I said --

2   Q    Just a guy to pick up the package?

3          THE COURT:  He is trying to answer.

4          MR. RUSSO: I'm sorry.

5          THE COURT: You interrupted his answer.

6   A    I never used the word employee but I was told that -- I

7   was asked by someone I knew in New York to pick up a package

8   from Thailand.

9   Q    And how did the Thai authorities act in response to your

10  explanation?

11  A    Well, initially I was given death.

12  Q    So the reaction to your explanation was we sentence you

13  to death?

14          MR. CANTI: Objection.

15          THE COURT: Sustained.

16  Q    Initially you were sentenced to death?

17  A    Everyone gets that unless you plead guilty and I pled

18  guilty and I was sentenced -- commuted to life.

19  Q    Let me get this.  You were sentenced to death and then

20  pled guilty?

21  A    I pled guilty upon my -- you -- they said you will get

22  death.  I plead guilty, but I was -- after a number of years I

23  was commuted to life because the Thai -- the government there,

24  they don't commute right away.  It takes years.

25  Q    So you pled guilty, you were sentenced to death, and then

A-231

1    that sentence was commuted?

2    A    Yes, yes, after the going through a lot of court dates.

3    Q    So you spent a year in a Thai jail?

4    A    Excuse me?

5    Q    How many years did you spend in jail in Thailand?

6    A    A total of ten.

7    Q    Ten years in Thailand and then you were transferred.

8    After the ten years in prison for narcotics trafficking you

9    were transferred back to the United States?

10   A    Yes.

11   Q    You spent some time in federal prison here in the United

12   States, did you not?

13   A    Yes, I did.

14   Q    How long did you spend?

15   A    When I was initially transferred to the states and

16   federal prison, three months.

17   Q    Where, California, Los Angeles?

18   A    Yes.

19   Q    Federal Correctional Facility in Los Angeles?

20   A    Yes.

21   Q    Then you were released?

22   A    Yes.

23   Q    After how many months?

24   A    After about three months.

25   Q    And what did you do?

A-232

1   A    I came back to New York.

2   Q    In 2003 you came back to New York and what did you do

3   between 2003 and the next time you were arrested for

4   narcotics?

5   A    I was working doing odd jobs work.

6   Q    Using drugs?

7   A    Yes, I was.

8   Q    Buying drugs?

9   A    I was using.

10  Q    Committing hundreds of crimes every time you bought --

11  possessed drugs?

12  A    Like I said, I was using drugs at that time.

13  Q    Did you tell people that you were using drugs?

14  A    Well, I tried to conceal my habit.

15  Q    Did you lie to people?

16  A    I didn't lie that I was not using drugs, but within the

17  people who I knew, my friends knew that I was using.

18  Q    Like many people that are involved with drugs, there came

19  a time that the people you no doubt lied to; is that correct?

20  A    I didn't lie to anybody who asked me if I was using at

21  that time.  I didn't say I was not using drug. They -- most

22  people who look upon me were my friends, they didn't even know

23  that I was using heroin.

24  Q    How about employers, you said you had some jobs?

25  A    Yes.

Maynard - cross/ Russo                                    224

1   Q     Did you have any employers who said you are a drug user,

2   no job here for you?

3   A     No employer simply never asked me that.

4   Q     Now, you managed to not get arrested until 2006?

5   A     Yes, that's correct.

6   Q     And you were released from prison in 2003?

7   A     Yes.

8   Q     And 2006 you got arrested again for possessing heroin?

9   A     Yes.

10  Q     And how much heroin did you possess when you got

11  arrested?

12  A     That arrest, I believe, I was possessing.

13  Q     I'm sorry.  I can't hear you.

14  A     I believe I was possessing bags of heroin.

15  Q     I don't know, sir --

16  A     Bags of heroin, I believe.

17  Q     Bags of heroin?

18  A     Yes.

19  Q     How many bags?

20  A     That was glassine bags, maybe 80 bags or so.

21  Q     Eighty bags of heroin and you weren't selling heroin,

22  right?

23  A     That I was using and I was going to a party to have a

24  good time.

25  Q     So you had 80 bags of heroin and it is your testimony

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

*Maynard - cross/ Russo*                                      225

1    that you weren't selling heroin?

2    A    Right.  I was using, and I was going to a party to do

3    with some friends -- to meet some friends.

4    Q    And you'd use 80 bags of heroin at a party?

5    A    I was going to share it when --

6    Q    Share or sell it?

7    A    We were going to share the drugs at that time.

8    Q    And they were going to pay some of the costs of the

9    heroin using, friends of yours, or were you just giving the

10   heroin for free?

11   A    At that time I needed money.  If they gave me money, of

12   course I will take it.

13   Q    So it was your intention then to sell this heroin to

14   people at this party?

15   A    Well, at the party, of course, if the people wanted to

16   buy heroin I would sell and if some of it -- some people had

17   moved there, I would give some to them.

18   Q    Father enough.  But you never got to the party, you never

19   got a chance to sell the 80 bags of heroin because you got

20   arrested, correct?

21   A    Yes, I was arrested.

22   Q    Okay. And you were a person that had previously been

23   convicted of narcotics trafficking and spent over ten years in

24   prison and that case was dismissed?

25   A    That case was dismissed, yes.

1  Q    And got a year and a day in prison?

2  A    That is because of the violation from the Thailand

3  sentence.

4  Q    Right?

5  A    Yes.

6  Q    You violated your supervised release and they gave you a

7  year and a day for the 80 bags of heroin; is that correct?

8  A    Yes.

9  Q    Case was dismissed because why?

10 A    Because the arrest was a bad arrest.

11 Q    It was a bad arrest. Okay.

12       And then you didn't get arrested again -- well, what

13 was bad about it?

14       MR. CANTY: Objection.

15       THE COURT: Sustained.

16 Q    When you say, "it was a bad arrest, " did you go to trial

17 to have the case dismissed?

18 A    No. The case was dismissed almost immediately before we

19 went to trial, before it went to anywhere.

20 Q    And where did that arrest take place?

21 A    In Harlem.

22 Q    Where?

23 A    In Harlem.

24 Q    And 2008 you got arrested again?

25 A    Yes.

A-236

*Maynard - cross/ Russo* 227

1  Q    For drugs?

2  A    Yes.

3  Q    And how much time did you serve in prison for that?

4  A    I did about two years.

5  Q    You did two years?

6  A    Yes.

7  Q    Again, you were trafficking in large quantities of

8  narcotics, correct?

9  A    I would say, I received a package in the mail.

10  Q    I think you said you received actually three packages in

11  the mail?

12  A    Yes, besides that one that I got caught with I received

13  about three.

14  Q    Anything else that you forgot to mention?

15         MR. CANTY: Objection.

16         THE COURT: Sustained.

17  Q    So you received not just once, not twice, but at least

18  times accepted packages that were being shipped from a foreign

19  country containing heroin?

20  A    Yes.

21  Q    And that wasn't heroin for your personal use, Mr.

22  Maynard, was it?

23  A    I used some personally and I sold some.

24  Q    So you sold, imported and then sold narcotics, and you

25  only did two years?

*Maynard - cross/ Russo*                                   228

1    A    Yes.

2    Q    Because you cooperated, right?

3    A    The narcotics was going to someone and I told the

4    government who the person it was going to.

5    Q    Made a case against somebody else to save yourself, did

6    you not?

7    A    Well, I wouldn't put it in so much words but I would say

8    that I told the government who the heroin was going to.

9    Q    So you told the government who else was involved in this

10   heroin scheme and then you got only two years in prison?

11   A    Yes, I did.

12   Q    Is that how it worked?

13   A    Well, I wouldn't say that's how it worked but I did two

14   years in prison because of that case.

15   Q    Now, what happened to the fellow that you informed on

16   then?

17            MR. CANTY:  Objection.

18            THE COURT: Sustained.

19   Q    Did anyone else get arrested because of your cooperation

20   in 2008?

21            MR. CANTY: Objection.

22            THE COURT: Sustained.

23   Q    You cooperated, you gave names of people that the

24   government didn't know anything about; is that what you did?

25   A    I give a name of the person who the heroin was supposed

*Maynard - cross/ Russo*     229

1  to go to.

2  Q    Who the heroin was supposed to go to?

3  A    Yes.

4  Q    Didn't you just tell us that this heroin that you were

5  picking up these packages you were going to use some and sell

6  the rest?

7  A    Yes.

8  Q    So now you are telling us that you told the government --

9         MR. CANTY:  Objection.

10        THE COURT: Sustained.

11        MR. RUSSO: Okay.

12 Q    Mr. Maynard, isn't it a fact that in order to save

13 yourself from prison in 2008 you made up a name of somebody

14 who was supposed to get drugs that you just told us you were

15 using and selling?

16 A    I never made up any name.  It was supposed to be given

17 the person who wanted to buy it.  I give him that person's

18 name.

19 Q    Well, drugs that you were use -- to sell, when you got

20 caught how long did it take you to cooperate to save yourself?

21 A    I would say, it was number of weeks, or a couple of,

22 like, two months or so.

23 Q    Okay. So you determined that you would provide the

24 government with information.

25        Now, did you give them true information?

*MARSHA DIAMOND, CSR*
OFFICIAL COURT REPORTER

*Maynard - cross/ Russo*                                      230

1   A     Yes, I did.

2   Q     You didn't just make something up?

3   A     No.  I told them the name of person.  I can give you the

4   name of person that was supposed to buy at that time today.

5   Q     I am sure you can give names?

6              MR. CANTI: Objection.

7              THE COURT: Sustained.

8              The jury will disregard the last statement.

9   Q     Aside from the fact that you told the government

10  somebody's name in 2008, is there any other proof whatsoever

11  that the person whose name you gave them to save yourself was

12  involved in narcotics trafficking?

13             MR. CANTY: Objection.

14             THE COURT: Sustained.

15  Q     Do you know of any other proof aside from your word?

16             MR. CANTY:  Objection.

17             THE COURT: Sustained.

18  Q     Did you wear a wire for the government in 2008?

19             MR. CANTY:  Objection.

20             THE COURT:  You may answer.

21  A     No, I didn't.

22  Q     Did you make phone calls for the government in 2008?

23  A     I don't recall but I don't think so. I just give the

24  information and they went to investigate.

25  Q     And you got two years in prison?

A-240

*Maynard - cross/ Russo*                                    231

1  A    Yes.

2  Q    How much were you facing, do you know?

3  A    I believe I was facing five, according to my

4  recollection.

5  Q    What?

6  A    I believe I was facing five years according to my

7  recollection.

8  Q    Five years?

9        How much heroin did you get caught accepting in that

10  package.

11  A    I think it ended up being about 80 grams.

12  Q    Given your past record you were looking at a minimum of

13  five years?

14  A    I believe so.

15  Q    And you saved yourself three years in prison by giving

16  them a name, did you not?

17            MR. CANTI: Objection.

18            THE COURT: Sustained.

19  Q    Now, in 2010 you were conspiring with the government

20  informant to traffic in fraudulent identification documents,

21  were you not?

22  A    Yes.

23  Q    Yes?

24            THE COURT:  He said yes.

25  Q    And while you are in a Burger King on May 10th you

*MARSHA DIAMOND, CSR*
OFFICIAL COURT REPORTER

1    accepted a box with money in it?

2    A    Yes, I did.

3    Q    And you got arrested?

4    A    Subsequently, yes.

5    Q    And you agreed, once again, to cooperate and give names

6    almost immediately?

7              MR. CANTY: Objection.

8    Q    After you were arrested?

9              MR. CANTI: Objection.

10             THE COURT: Sustained.

11   Q    How long after you were arrested did you agree to

12   cooperate with the government?

13   A    Upon my arrest I cooperated with the government.

14   Q    What?

15   A    Upon my arrest I cooperated with the government.

16   Q    Okay. And how long did it take you to create the story

17   about Mr. Mesbahuddin being a person with contacts throughout

18   the government?

19             MR. CANTY:  Objection.

20             THE COURT: Sustained.

21   Q    You told the government that Mr. Mesbahuddin had contacts

22   in government offices in New York City and California; is that

23   true?

24   A    Yes, that's what he told me.

25   Q    Let's go start with New York.

*Maynard - cross/ Russo*                                         233

1          What government offices did Mr. Mesbahuddin

2   allegedly have contacts?

3   A    He told me his contacts have contacts in the DMV, Social

4   Security offices.

5   Q    DMV and Social Security?

6   A    Yes.

7   Q    Now, do you know whether or not the birth certificates

8   from DMV --

9   A    Birth certificates is not from the DMV.

10  Q    Okay. Do you know whether or not the work authorizations

11  from social security?

12  A    No, but he said his contacts has.

13  Q    I'm sorry?

14  A    He told me that his contact have the -- within -- the

15  contact to get that in the government offices.

16  Q    So, let me just keep it straight. Your testimony is that

17  Mr. Mesbahuddin told you he had contacts in New York State

18  Department of Motor Vehicles.

19  A    Yes.

20  Q    And Social Security Administration?

21  A    Yes.

22  Q    Here in New York?

23  A    Yes.

24  Q    And how many social security cards and drivers' licenses

25  did Mr. Mesbahuddin get you?

*Maynard - cross/ Russo*                                    234

1    A    Well, he didn't get me any because I didn't give him the

2    down payment that he was looking for.

3    Q    He didn't get you any?

4    A    At that point until -- he needed a down payment.

5    Q    How about at any point, sir, did he get you any at any

6    point?

7    A    No, he didn't get me any.

8    Q    So when you say he didn't get me any at that point, are

9    you saying that he never got you any?

10   A    He never got me any because he never had a down payment

11   to get them.

12   Q    You also told the feds that -- I'm sorry -- the FBI, the

13   federal agents, that Mr. Mesbahuddin was your contact for work

14   authorizations, right?

15   A    Yes.

16   Q    How many work authorizations did Mr. Mesbahuddin get you?

17   A    Well, he said it comes in a package and he said the

18   person will be paying a package for work authorization, social

19   security, drivers' licenses and birth certificate, that's the

20   package, and if I am able to provide a down payment he would

21   be able to provide that package of the documents.

22   Q    Would your answer be zero, sir, because I asked you how

23   many work authorizations Mr. Mesbahuddin and his mysterious

24   contacts got for you?

25              MR. CANTI: Objection.

1          THE COURT: Sustained.

2    Q    How many work authorizations did Mr. Mesbahuddin get for

3    you?

4    A    He wasn't able to get me any because he didn't have the

5    money.  I didn't give him the money at that point.

6    Q    So the answer is none, zero?

7    A    Right.

8    Q    Okay. Now, do you know anybody anywhere that ever got a

9    work authorization, social security card, driver's license, a

10   passport or a greeting card from Mr. Mesbahuddin?

11         MR. CANTY:  Objection.

12         THE COURT: Sustained.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Maynard-cross-Russo                                  236

1    CONTINUED CROSS-EXAMINATION

2    BY MR. RUSSO:

3    Q    Do you know anybody who ever got a work authorization

4    from Mr. Mesbahuddin?

5    A    I don't know anyone specifically.

6    Q    Do you know anyone --

7              MR. CANTY:   Objection, the witness hasn't

8    completed.

9              THE COURT:   Let him complete the answer.

10   A    I don't know anyone specifically.  He specifically told

11   me within his community, several people were able to get it

12   through his contact.

13   Q    The answer is nothing but you heard stories, right?

14             MR. CANTY:   Objection.

15             THE COURT:   Sustained.

16   A    It's not stories.

17   Q    Again --

18             THE COURT:   The jury will disregard the last

19   question and answer.

20   Q    Do you know or can you identify anyone, anywhere, who

21   ever obtained a single governmental document through

22   Mr. Mesbahuddin?

23   A    I specifically cannot.

24   Q    Thank you.

25   Q    When you met with Mr. Mr. Mesbahuddin on May 10th and

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                          237

1   helped him get arrested --

2            MR. CANTY:   Objection.

3            THE COURT:   Sustained.

4   Q    Well, you met with him on May 10th, you were cooperating

5   with the federal government, were you not?

6            MR. CANTY:   Objection.

7            THE COURT:   I'm sorry?

8            MR. CANTY:   I believe the date is May 11th, 2010.

9            THE COURT:   It's important to have the correct

10  date.  It's May 11th, right?

11           MR. RUSSO:  On May 11th.  I apologize if I keep

12  saying May 10th.

13  Q    On May 11th when you met with Mr. Mesbahuddin, you were

14  helping the government, were you not?

15           MR. CANTY:   Objection.

16           THE COURT:   Sustained.

17  Q    At the time that you telephoned Mr. Mesbahuddin, did you

18  do so at the request of the federal government?

19  A    I wanted to show them who the money was going to.

20  Q    Did you understand my question, sir?

21  A    Could you repeat it, please?

22  Q    On May 11th, 2010, when you telephoned Mr. Mesbahuddin to

23  meet with you, did you make that phone call at the request of

24  the federal government?

25  A    Yes, I did.


            SS      OCR     CM     CRR     CSR

A-247

Maynard-cross-Russo                                   238

1  Q    Was Mr. Mesbahuddin --  withdrawn.

2          Did you tell the government when you were arrested

3  that your contact was waiting to meet with you on May 11th,

4  2010?

5  A    Yes, I told them he was waiting to receive the money.

6  Q    So, logically, it would be fair for us to assume on

7  May 11th, Mr. Mesbahuddin was sitting by the phone waiting for

8  your call which he expected you would be meeting him?

9  A    Well, I wouldn't say he was waiting by the phone but he

10 was anticipating within that week that I would have a down

11 payment for the documents.

12 Q    I asked you, sir, on May 11th did you tell the federal

13 agents who arrested you Mr. Mesbahuddin was waiting for your

14 call?  You said yes.  Did I misunderstand your answer, sir?

15 A    No.

16 Q    Is it now your answer that he wasn't really waiting for

17 your call on May 11th but some time that week?

18 A    Well, it has been a period of two months we've been going

19 back and forth trying to get the down payment for these

20 documents so I was able to get it on that specific day and

21 then I called him to tell him I finally have the money.  I

22 told him we should meet eventually.

23 Q    So, he wasn't expecting that phone call that you made to

24 him?

25 A    Well, I would say he was expecting it but he wasn't

SS     OCR     CM     CRR     CSR

Maynard-cross-Russo                                    239

1   knowing specifically what time I would be calling to say let's

2   meet.

3   Q    He was expecting it so anxiously that it took three phone

4   calls to get him to meet you at the IHOP?

5   A    When I called him, he told me he has a lot of people in

6   his house.  He has a lot of guests.  He said we can meet hours

7   later.  I told him I needed to meet now.

8   Q    He wasn't expecting your call, was he?

9   A    Of course he was expecting my call because I told him

10  several times that I would be able to get a down payment.

11  Sometimes I wasn't able to get the money and Rumi knows I will

12  call him 2:00 o'clock in the morning, any time of the day.

13  Q    Was it a down payment Mr. Mesbahuddin was going to send

14  to a lawyer in California?

15  A    I don't know if he was going to give it to a lawyer, but

16  one day I was at Rumi's house.  As we were leaving his house,

17  I met the person in the driveway of his house who was his

18  direct contact for these documents and the three of us --  the

19  person discussed that he was the one that would be able to get

20  these documents from New York or California and Rumi cut the

21  conversation between myself and that person.  That's because

22  he didn't want me to have any direct conversation with him.

23  Q    How, then, sir, is it you came to know of this lawyer in

24  California?

25  A    Rumi.  One plan Rumi had, he said if the person wanted

1 political asylum, that they have a lawyer in California that

2 would be able to get it through that provides obtaining the

3 political asylum easily but they would have to travel to

4 California for that.

5 Q    You understood that knowing a lawyer who specializes or

6 works in political asylum cases, it was your understanding

7 that that was criminal?

8 A    Well, he said anyone.  Even the person who doesn't know

9 English or the person is from a different foreign country,

10 that lawyer will be able to get them the political asylum by

11 any means.

12 Q    Even people who come from foreign countries can get

13 political asylum?

14 A    According to him, he said --

15 Q    Who else gets political asylum?

16        THE COURT:   Let him finish the answer.  Go ahead.

17 A    Can you repeat the question?

18 Q    Who else gets people who get political asylum except

19 people who come from foreign countries?

20        MR. CANTY:   Objection.

21        THE COURT:   Sustained.

22 Q    So, there was a lawyer who could help people who come

23 from foreign countries.  Speaking foreign languages get

24 political asylum through the legal channels here in the United

25 States?

SS      OCR      CM      CRR      CSR

1           MR. CANTY:    Objection.

2           THE COURT:    Sustained.

3    Q    What was your understanding?

4    A    My understanding was the lawyer would not go through the

5    legal channels because the person would be paying a

6    substantial amount of money and upon that political asylum,

7    the person would appear to be legal in the country through

8    this contact that he has.

9    Q    You really have no idea about what the laws or procedure

10   are to get political asylum, do you sir?

11          MR. CANTY:    Objection.

12          THE COURT:    Sustained.

13   Q    Do you have any idea?

14          THE COURT:    Sustained.

15   Q    Do you have any knowledge of the rules and regulations

16   regarding --

17          THE COURT:    Next question.

18   Q    Isn't it true, Mr. Maynard, what was really at work here

19   in your mind is connecting people in need with people who

20   provide services to them and taking a piece of money as a

21   profit in the middle?

22          MR. CANTY:    Objection.

23   Q    Wasn't that your general activity here?

24          THE COURT:    You may answer.

25   A    Of course, I wanted to make money.

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                              242

1   Q    This was not a charitable endeavor on your behalf, was

2   it?

3   A    Like I said, I want to make money.

4   Q    If a lawyer charged 10,000 and you could get a customer

5   to pay 15, there would be 5,000 in it for you, correct?

6   A    Well, if it's going through the legal means or illegal

7   means, either way I would be able to make some money.

8   Q    Aside from your speculation and your testimony here --

9        THE COURT:   I'm sorry, that's out of bounds.  It's

10  sustained.  Speculation?  We don't discuss speculation and

11  testimony in the same breath.  If you're going to do that, you

12  could sit down.  If you have something else you would like to

13  ask, you can remain at the podium.

14       MR. RUSSO:   Thank you.

15  Q    You don't know of any illegal documents that were

16  obtained, do you?

17  A    No, but we were about to obtain those documents.

18  Q    You were about to obtain documents, Mr. Maynard,

19  according to your testimony, that were genuine documents and

20  they were going to be obtained illegally?

21  A    Yes.

22  Q    How?

23  A    Because he won't have to go through the legal channels of

24  going to the DMV filling out paperwork; that he said his

25  contact would pay money to those people who work in those

Maynard-cross-Russo                     243

1   offices to obtain those.  Plus he asked me for the

2   photographs, the thumb prints and the biological information

3   of those people so that he could give it to his contacts after

4   he paid them the money.

5   Q    We're only talking about the Department of Motor

6   Vehicles, right?

7   A    The Department of Motor Vehicles was one example among

8   all the other documents he told me about, the birth

9   certificate, drivers license, social security card and

10  worker's permit.

11  Q    The conclusion that you arrived at that these documents

12  that were going to be obtained were going to be done through

13  illegal channels, that was a conclusion based upon things that

14  you heard, correct?

15  A    No.

16  Q    Was it based upon anything you saw?

17  A    What do you mean saw?

18  Q    Did you speak to anybody who said "I work Homeland

19  Security.  I could get you a work authorization"?

20  A    Of course not but he wouldn't meet those people.

21  Q    Did you ever meet someone from Homeland Security?

22         THE COURT:   I'm sorry, the witness never finished

23  his answer.  Would you like to finish your answer?

24         THE WITNESS:   I would like to say I never met anyone

25  that worked through Rumi, those people, but that are working

1   in the government office.  I would like to say I'm in his

2   driveway when I was leaving.  I met the person who said with

3   his own words that he has the contacts to those areas.  Then

4   he started to speak the Bangladesh language.  I couldn't

5   understand what else was said.

6   Q    You took contact to mean that he had a corrupt government

7   employee in all these different agencies?

8   A    According to what his contact's own words said, that is

9   so.

10  Q    According to what?  I didn't understand you.

11  A    I told you I met one person in Rumi's driveway.  That

12  person was discussing how he would be able to obtain the

13  documents with Rumi through these offices.  He cut off the

14  conversation, started to speak his language.  I wasn't able to

15  obtain exactly what was said.  From my understanding, he had

16  these people who would obtain these documents.

17  Q    You really don't have a clear understanding then of what

18  these contacts were, how the process work, do you?

19          MR. CANTY:    Objection.

20          THE COURT:    Sustained.

21  Q    You don't speak Bengali?

22  A    No.

23  Q    And contacts don't necessarily have to be some of the

24  workings of governmental agencies, is that true?

25  A    May or may not be.

SS     OCR     CM     CRR     CSR

A-254

1    Q     May or may not be.  Part of the things that you discussed

2    with Rumi, he knew a lawyer?

3    A     Excuse me?

4    Q     Rumi said his friend who was a lawyer in California?

5    A     That's when he talked about getting the political asylum.

6    That never occurred.  What occurred was trying to get the

7    drivers license and the birth certificate from California

8    because if he wanted to obtain the political asylum, the

9    person would have to travel there, stay 45 days to go through

10   the process.

11   Q     When you sat down with Mr. Mesbahuddin at the IHOP on

12   May 11th, you were wearing a recording device provided by the

13   Federal Bureau of Investigation, were you not?

14   A     Yes, I was.

15   Q     Because you were a cooperator at that time, correct?

16   A     Yes.

17   Q     I guess then it would have been to your benefit as

18   someone looking to not go to prison for 30 years, it would

19   have been to your benefit to get Mr. Mesbahuddin to say some

20   incriminating things, would it not?

21              MR. CANTY:   Objection.

22              THE COURT:   Sustained.

23   Q     Did you attempt to get Mr. Mesbahuddin to say some

24   incriminating things?

25   A     I attempted to do so.  Of course he knows what the money

SS     OCR     CM     CRR     CSR

1  was for.

2  Q    You attempted to do so and did you?

3  A    I asked him how long these documents would be authentic.

4  He said it would be, as we spoken before, I asked him --  he

5  said within seven days he would be able to have at least one

6  document.

7  Q    Mr. Maynard, if I could ask you to please answer yes or

8  no if possible.  Did you get Mr. Mesbahuddin to say something

9  incriminating at your May 11th meeting at the IHOP?

10          MR. CANTY:   Objection.

11          THE COURT:   Sustained.

12  Q    Did Mr. Mesbahuddin say anything to you at your May 11th

13  meeting at the IHOP, May 11th, 2010, meeting at the IHOP,

14  about getting you illegal work authorization cards?

15  A    He said he would be able to get all the documents from

16  one person --

17  Q    Sir, if you could answer yes or no?

18          THE COURT:   No, he will answer his way.  If you

19  want me to strike it, you'll let me know.

20  A    He said he would be able to get all the documents because

21  now he has the down payment.  Within seven days he would be

22  able to get at least one of them.

23          MR. RUSSO:   Move to strike as nonresponsive.

24          THE COURT:   Motion denied.

25  Q    Did Mr. Mesbahuddin during this wired-up conversation

1   ever tell you that he understood that your customer who gave

2   you this money wanted illegal documents?

3   A    Of course, but he didn't say those specific words.

4   Q    You say "of course," sir.  That would indicate yes?

5   A    Yes.

6   Q    So, he did say that?

7   A    Not in those specific words.

8   Q    So he didn't say that?

9   A    He understood that the money was for the documents.

10  Q    Sir, it's important that we not play word games.

11        MR. CANTY:   Objection.

12        THE COURT:   Sustained.

13  Q    Did he say he understood this money was for illegal

14  documents, yes or no, sir, please?

15  A    Yes.

16  Q    He did.  What did he say that would in your mind's eye

17  indicate that he knew this money was for illegal documents?

18  A    He said within seven days he would get one of the

19  documents.

20  Q    When he said within seven days he would get one of the

21  documents, that was in your mind's eye an acknowledgement of

22  the illegality of the transaction?

23  A    I would say that was in part --

24  Q    Okay, what's the other part?

25  A    The other part is that he accepted the money.  He knows

Maynard-cross-Russo                                    248

1   the fact that this money is a down payment for the whole

2   package of the documents.

3   Q    By accepting the money, that was also in your mind's eye

4   Mr. Mesbahuddin's acknowledgment that he was engaged in some

5   sort of illegal conspiracy with you?

6   A    Also, yes.

7   Q    How many times -- withdrawn.

8            Did Mr. Mesbahuddin tell you that he didn't want to

9   take this money?

10  A    He never said that.

11  Q    Did he say he wanted to put this money in his bank?

12  A    He said he wanted to gain my confidence, he would put the

13  money in his bank to show he was not just using it.

14  Q    Would you try to answer again, sir, please?

15           MR. CANTY:    Objection.

16           THE COURT:    No.

17           MR. RUSSO:    I didn't hear the answer, Judge.

18           THE COURT:    If you want the answer read, you'll ask

19  to have the answer read.  Try the answer again is not having

20  the answer read.  It's say something else.  It's not proper.

21  You know it.  If you can't ask a question properly, you can

22  end your cross-examination and that will be it.

23           Ask another question.

24  Q    Did Mr. Mesbahuddin offer at least three times to give

25  you a receipt for the money, did he not, sir?

SS      OCR      CM      CRR      CSR

Maynard-cross-Russo                                    249

1  A    He said to gain my confidence he wouldn't misuse the

2  money; that he would give me a bogus receipt.

3         MR. RUSSO:    Move to strike as nonresponsive, your

4  Honor, would ask the court to instruct the witness to answer

5  the question.

6         THE COURT:    Motion denied.   Next.

7  Q    Did Mr. Mesbahuddin offer to give you a receipt for the

8  money?

9  A    Yes, he did.

10 Q    Did he offer to give you a receipt from his company, did

11 he not?

12 A    Yes, he did.

13 Q    Mr. Mesbahuddin told you that this money, in part, needed

14 to go to a lawyer, did he not?

15 A    Not that money, no.

16 Q    That's not what he told you  --

17 A    That money --

18 Q    On May 11th?

19 A    That money is going to pay for the documents.  The lawyer

20 is a separate transaction he told me about, but that never

21 occurred.  This money is going for the documents which is the

22 package of driver's license, social security and birth

23 certificate and worker's permit.

24 Q    You've made a few other allegations against

25 Mr. Mesbahuddin, sir.  One, as I recall, was that

Maynard-cross-Russo                                    250

1    Mr. Mesbahuddin wanted to commit some sort of check fraud with

2    you; is that correct?

3    A    Yes.

4    Q    In furtherance of that, the scheme that you told us

5    about, you gave Mr. Mesbahuddin a blank check?

6    A    I gave him a copy of a check, not a blank check but a

7    copy of a check.

8    Q    What check?

9    A    Probably a business check of some company that I can't

10   recall.

11   Q    What was he going to do with it?

12   A    He said that he did this before.  He said he was using

13   his computer equipment, laser equipment in his basement from

14   his company.  He would recreate the check and using the

15   routing number and changing some check numbers, be able to

16   deposit it to obtain money from a financial institution.

17   Q    How did that work out?

18   A    Well, after a number of days I called him, asked him what

19   happened, was he able to get money for me.  He said he wasn't

20   able to get money from it because the person he gave it to got

21   arrested.

22   Q    The person that he --

23   A    He gave it to cash the check got arrested.  That's what

24   he told me.

25   Q    When was this?

SS      OCR      CM      CRR      CSR

Case 12-2605, Document 27, 02/04/2013, 836176, Page263 of 278

1    A    Excuse me?

2    Q    When was this?

3    A    When?

4    Q    Yes.

5    A    I would say March of that year.

6    Q    March of 2010?

7    A    Yes, around March, March-April.

8    Q    That's all you could tell us about that?

9    A    Yes, that's all that occurred.

10   Q    You gave him a copy of the check, never saw it again?  Do

11   you have the original of the check?

12   A    No, it was only a photocopy.

13   Q    So you only had a photocopy of a check?

14   A    He said that's all he needed to make the check.

15   Q    What did you have?

16   A    The photocopy of the check.

17   Q    You had a photocopy, too?

18   A    I gave him the photocopy of a check.

19   Q    How did you make the photocopy?

20   A    There were photocopies of my check on my job.  I gave him

21   a photocopy of one.

22   Q    You gave him a photocopy of your check from your job?

23   A    Yes.

24   Q    You didn't save a copy for yourself?

25   A    No, I didn't save a copy of the check, no.

A-261

Maynard-cross-Russo                    252

1   Q      Gave it to him?

2   A      Yes.

3   Q      For check fraud?

4   A      Yes.

5   Q      You never saw any check that he made, copied or anything

6   else?

7   A      I never saw any money or any check from that.  Actually,

8   I called him, asked him.  He didn't want to give me anymore

9   how he does it or how he cashes it.  I asked him if he was

10  able to make money from it.  He said that the person he gave

11  it to cash it was arrested.

12          (Continued on next path.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SS      OCR      CM      CRR      CSR

*Maynard - cross/ Russo*                                    253

1    CROSS EXAMINATION (Cont'd)

2    BY MR. RUSSO:

3    Q    And this is a crime that you pled guilty to?

4    A    Yes, this is a crime that I plead guilty to because the

5    government didn't know about it but I told them about it as

6    well.

7    Q    You made up a crime and then pled guilty to it?

8    A    I didn't make up a crime. I didn't make up a crime at

9    all.  Whatever this was, I can't say there was specific

10   evidence.  I just told them exactly all my criminal activities

11   that day they know about, and that they did not know about.

12   Q    You can't really say there's any evidence.

13        How about this house appraisal inflation, that

14   scheme that you said Mr. Mesbahuddin came up with where he

15   thought you might have good credit having spent close to

16   13 years in prison?

17        MR. CANTY:  Objection.

18        THE COURT: Sustained.

19   A    Well, I wouldn't say it was an -- excuse me?

20        THE COURT: I sustained it.

21   Q    Mr. Mesbahuddin asked you if you had good credit?

22   A    Yes, he did.

23   Q    And then he is going to use your good credit if you had

24   it to do what, to buy a house?

25   A    Yes, he told me that he was successful in doing things

1   like that.

2   Q    Not what I asked you, sir.

3        You said Mr. Mesbahuddin somehow proposed this

4   elaborate real estate scam to you.  I am asking you what it

5   was.

6   A    Well, he told me that when we first met he didn't know if

7   I had good credit or bad credit and he didn't know if I had --

8   he didn't know that I had spent 13 years before in prison.  So

9   he assumed that I had excellent credit or very good credit

10  because I don't know, but he assumed that I had excellent

11  credit.

12       MR. CANTY: Objection.  The witness is attempting to

13  answer the question. He asked him to explain the scheme.  He

14  asked to explain the scheme and he is doing that.

15  Q    Fair enough to say you didn't have good credit?

16  A    Well, I told him I didn't have good credit.

17  Q    How was the scam or the crime that was proposed to you

18  allegedly by Mr. Mesbahuddin to work if you had good credit?

19  A    If I had excellent credit he told me that he would be

20  able to use my name and credit to buy a house, and he told me

21  that that house is -- the price of the house would be

22  inflated. When the price of the house is inflated, as he

23  explained to me, he will sell the house and be able to get a

24  profit from that house, that he would be able to give me some

25  money from there.

*Maynard - cross/ Russo*                                          255

1    Q     So if you have good credit you would be able to buy a

2    house. How about down payment, was that ever discussed?  You

3    do know that you need a down payment?

4            MR. CANTY: Objection.

5            THE COURT: Sustained.

6    Q     Did he discuss the down payment?

7    A     He told me all of that will be taken care of.

8    Q     He would take care of the down payment?

9    A     He told me when he -- all of that will be taken care of,

10   he said.

11   Q     And then an appraiser would inflate the value of the

12   house?

13   A     Yes.

14   Q     After you bought it or before?

15   A     Before I buy it the price will be inflated.  I don't know

16   exactly how he will do it, but he said the price of the house

17   will be inflated, and it will be sold at the inflated price.

18   Q     So you would buy a house for more money than it was worth

19   and somehow you would make money by paying too much for the

20   house?

21   A     I would say that I'll buy the house at the price that he

22   stated.  I will buy the house.  After that the price of the

23   house will be inflated and will be sold at a higher price.

24   Q     Mr. Maynard, do you have a clear understanding of the

25   details of this supposed house scheme Mr. Mesbahuddin came to

1  you with?

2  A    Look, I am explaining to him what he proposed to me.

3  Q    Did you have a clear understanding?

4  A    Yes, Umm-Humm.

5  Q    Now, house prices gets inflated.  You pay too much for

6  the house,  how then do you make money off paying too much for

7  the house?

8  A    I didn't say I would pay too much for the house.  I will

9  buy the house.  He said I will purchase the house.  The house

10  will be purchased at the price stated at.  It will be  --

11  appraiser would apprise the house at a higher price.  It will

12  be sold at that price making a profit from it.

13  Q    It would be appraised at a higher price than you paid for

14  it?

15  A    Yes.

16  Q    And you would sell it to who?

17  A    He will get the buyer.  He said all of that will be taken

18  care of. I would not be -- if my credit was excellent I didn't

19  have to do anything.  He would take care of the buyers, and

20  who is going to buy it, who was going to appraise it. I didn't

21  have anything else to do with that.

22  Q    Buy low sell high?

23  A    Yes, something like that. That's how it is.

24  Q    And you would get the money to buy, down payment for you,

25  he was going get a buyer to buy the house after you bought it,

A-266

1    and then you'd split the profits at the end?

2    A    Well, that's what he explained to me that all he needed

3    at that time if I had excellent credit.  He would take care of

4    the buyer, the appraiser, down payment.  I didn't have to do

5    anything else.  He just wanted someone or myself who had

6    excellent credit so that he can make money on the house.

7    Q    Okay. Assuming that this ever happened, exactly what part

8    of this proposition that Mr. Mesbahuddin allegedly gave to you

9    is illegal?

10   A    I will say, all of it.

11   Q    Buying a house and selling it for more than you pay for

12   it is illegal?

13   A    Well, if you are using myself as -- using myself as a

14   buyer who doesn't want -- my intention is not to buy it for my

15   own use and my intention is not to buy it in the legal way.

16   Q    So you are speculating on property to make a profit on

17   it, that is illegal?

18   A    Well, if you are speculator.  I wouldn't say I was

19   speculating.  I will say he asked me if I had excellent credit

20   to purchase a house and he said that he will be able to make

21   money from that purchase, but that was my only -- it never

22   occurred because I didn't have excellent credit. I had bad

23   credit.

24           THE COURT:  We are done with this subject. We've

25   gone over it five times.  We are not going to go over it

A-267

1    again.

2            Do you have anything else for this witness.

3            MR. RUSSO: Judge, thankfully, I do not.

4            THE COURT:  Very well.  Thank you, very much.

5            Redirect.

6            MR. CANTY:  No, thank you.

7            THE COURT:  Very well, the witness is excused.

8            You may stand down, sir.

9            (Witness complied)

10           Members of the jury, this will conclude our

11   proceedings for today.  I'm sorry I kept you a little late.  I

12   appreciate your cooperation, as do all the attorneys and

13   parties to this case.

14           I'm going to remind you not to discuss the case with

15   anyone.  Do not discuss the case among yourselves.  If you are

16   taking notes, leave them in the jury deliberation room.  Do

17   not, read, listen or watch or access on the internet any

18   account of this case.  Do not attempt any independent research

19   about the case.  Do not discuss this case on any social media

20   network, such as Facebook or Twitter and we will see you

21   tomorrow morning at 9:30.

22           We thank you again and see you then 9:30 tomorrow

23   morning.

24           All rise for the jury.

25           MR. CANTY: With respect to the transcript --

259

1      THE COURT:  Just leave everything on the chairs.

2      Thank you.

3      (Whereupon, the jury exited the courtroom)

4      THE COURT: Okay. It's 15 to six, and I think we've

5 given -- you can all sit down.  Thank you.

6      We have given out the revision to the charge and

7 have you had a chance to look at it yet?  If the answer is no,

8 I'll understand that.

9      MR. CANTY: I have not.

10      THE COURT:  Why don't I give you the opportunity to

11 do so. Why don't we come in tomorrow morning at 8:30 and go

12 over the charge at that time because I think that's the only

13 fair way to do it, so that you all can have a chance to look

14 at the charge and reflect on the charge and then we can have a

15 fulsome discussion about the charge.

16      MR. CANTY: Thank you, Your Honor.

17      THE COURT:  Mr. Russo, is that okay with you?

18      MR. RUSSO:  Absolutely.

19      THE COURT: I much prefer to do in it that way in

20 fairness for the parties.

21      MR. CANTY:  And we have three very brief witnesses,

22 one from Homeland Security, one from Social Security, and one

23 from the California Department of Motor Vehicles and at that

24 point the government intends to rest.  I expect the witnesses,

25 their direct, to take about five minutes a piece.  Only about

260

1    ten questions.

2            THE COURT:  And then the defense case, if you have

3    one, will be tomorrow.

4            MR. RUSSO: We have one witness who has been here at

5    the ready, a very brief witness. We have the subpoenaed

6    witness issue.

7            THE COURT:  Yes.

8            MR. RUSSO: We have to talk -- to discuss.  I know

9    that Mr. Horn was explaining to the Court.

10           THE COURT:  Yes, I am sorry, Mr. Horn.  You started

11   and the jury came in, so I thought it might not be a good idea

12   to continual discussing it.

13           Mr. Horn, go ahead.

14           MR. HORN: So I spoke to the attorney for Mr. Hoch

15   (ph) and again, I did that in parenthesis because Mr. Baine

16   explained to me that he never filed any notice of appearance

17   for Mr. Hoch.  Nor did anything other than give a consultation

18   that Mr. Kaminsky who believed Mr. Baine was representing Mr.

19   Hoch for all appearances.

20           Bottom line is that Mr. Baine told me that he would

21   make efforts to try and contact Mr. Hoch, inform him that he

22   needs to be here 9:30  tomorrow morning, Wednesday morning,

23   and do what he can to convince him that he has a legal

24   obligation to be here.

25           I have not heard from Mr. Baine since that

A-270

1  conversation at about 6 o'clock last night.  I will reach out

2  to him again this evening and find out what's transpired and

3  let the Court know tomorrow morning.

4  THE COURT:  Well, yes?

5  MR. CANTY: If I can shed a little light on this.

6  Before I was involved in the case, the witness did testify

7  before the grand jury and I think the comments that were made

8  to defense counsel were a little disingenuous because this

9  attorney showed up with this witness pursuant to a grand jury

10  subpoena and effectively represented him in -- prior to his

11  testimony before the grand jury.  So I just want to let

12  defense counsel know, and the Court know that, if that is what

13  you are being told, that is not an accurate reflection of what

14  our understanding was between the lawyer, and the client and I

15  certainly want the court --

16  Mr. Horn: I will throw one other little caveat in

17  this.  Mr. Baine tells me he is not admitted in federal court

18  and I don't know if that has any ramifications.

19  THE COURT:  I wonder what he was doing before the

20  grand jury. I guess he overlooked it then.

21  MR. HORN: Perhaps.

22  MR. CANTY: Judge, the only other suggestion is if we

23  get a CJA lawyer.

24  THE COURT: We are going to get one for tomorrow

25  morning at 9 o'clock, and are you able to reach out to this

262

1    witness who is under subpoena?

2         Mr. Horn: I am going to try, Judge.

3         MR. RUSSO: We know where the witness resides,

4    Your Honor, and he was hand served a subpoena and that's what

5    he indicated to our process server that he didn't want to

6    testify any more.

7         THE COURT:  Well, he doesn't get to choose.

8         MR. RUSSO: This might be helpful, Your Honor. His

9    grand jury testimony that I am interested in spans 12 lines,

10   total of three questions and two answers.  I don't know how

11   the math works on that, but it is three questions and two

12   answers asked by the government, answered by this witness, who

13   was the other person on the phone call made by Mr. Mesbahuddin

14   at the IHOP Restaurant.

15        If this witness, despite best efforts, is not

16   available, I would ask that we be able to read into the record

17   for the jury these questions and these answers given under

18   oath to the United States Attorney.

19        THE COURT:  What's the government's position.

20        MR. CANTY: Your Honor, with respect to the limited

21   information we turned over to defense counsel, we did that

22   because it was potentially exculpatory material.  This was

23   self-serving material made in the support of the defendant.

24   It's the government's position it is not truth.  We certainly

25   turned it over because that is our obligation and we are not

263

1   endorsing this as the truth, and certainly, for us to now

2   consent to testimony going before the grand jury, going before

3   the jury we don't believe to be true, certainly, I think we

4   have an ethical obligation not to consent to that because it

5   is our position that it is not a truthful statement.

6   Certainly, we wouldn't agree to put what we believe to be is

7   fictitious testimony before the jury.

8          THE COURT:  Well, Mr. Baine.  Mr. Horn, please

9   advise Mr. Baine he is to bring his client in here tomorrow.

10  If he was capable of representing him at the time of his

11  federal grand jury appearances, then he is capable of bringing

12  his client here today. If he is not admitted, I am going to

13  try to have a CJA lawyer here who can advise Mr. Hoch of his

14  rights because -- does he speak English, Mr. Hoch?

15         MR. CANTY:  He did in the grand jury.

16         THE COURT:  Well, that's a start. He needs to be

17  here at 9 o'clock tomorrow morning and you can advise him that

18  if he fails to appear under subpoena he may be subject to

19  contempt and jailed for failure to appear, and so, we will see

20  where we are at 9 o'clock tomorrow morning, but I'd look you

21  all to be here 8:30.  We will try to reach out to the CJA

22  lawyer for tomorrow, so that he or she can be here at

23  9 o'clock in the morning.  So advise Mr. Hoch of his rights.

24         We may have a slight tweak in the charge but we will

25  e-mail that to you.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

1           The other thing is am I being asked to make a 404

2    (b) charge here as to something that was testified to?

3           MR. CANTY: Certainly, pursuant to the Court's order

4    last week, and I believe the initial proposal said it could be

5    considered for both and certainly based on the opening

6    statement, that we think that that charge should be given.

7    They can consider it as direct evidence.  It being the

8    mortgage fraud and the bank fraud, both as direct evidence of

9    the relationship of the conspirator, and also, as it pertains

10   to the absence of the state of lack of intent.  Defense

11   counsel opened on that.  He alluded to that multiple times,

12   that this was a legitimate enterprise.

13          THE COURT:  I will give the jury the charge at the

14   beginning of the day tomorrow.

15          MR. RUSSO: My understanding of the Court's order is

16   once Mr. Maynard was permitted to discuss those things on

17   direct examination and cross, that a limiting charge, I think

18   by operation, would have to be given.

19          THE COURT: Well, you didn't mention it but I am

20   mentioning it to you.  So first thing tomorrow morning when

21   the jury comes in I will give them a limiting instruction.

22          Anything else from you, Mr. Russo, before we recess

23   for the evening?

24          MR. RUSSO: Nothing, Judge.

25          THE COURT:  Anything from the government?

A-274

265

1        MR. CANTY: No, thank you, Your Honor.

2        THE COURT:  Now, are you ready to close?

3        MR. CANTY: Yes.

4        THE COURT:  Because you are going to close tomorrow.

5   I don't know if I'll get to the close but you are definitely

6   going to close.

7        MR. RUSSO: We are prepared.

8        THE COURT:  I think the jury, which indicated that

9   they are willing to stay until 5:30 in an effort to be

10  cooperate and also in an effort to see this matter wind down

11  at some point, I think they would like us to be efficient, so

12  I am going to try to be efficient.

13       MR. CANTY: Yes, Your Honor.

14       MR. RUSSO:   We will be ready.

15       THE COURT:  We'll see you tomorrow.

16

17       (Proceedings adjourned as above set forth)

18

19

20

21

22

23

24

25


              SS     OCR     CM     CRR     CSR

266

1    CROSS-EXAMINATION                          82

2    BY MR. RUSSO

3    REDIRECT EXAMINATION.                       117

4    BY MR. CANTY

5    RE-CROSS EXAMINATION                        124

6    BY MR. RUSSO

7    REDIRECT EXAMINATION                        125

8    BY MR. CANTY

9    D W I J E N    B H A T T A C H A R J Y A    127

10   DIRECT EXAMINATION                          128

11   BY MR. CANTY

12   CROSS-EXAMINATION                           138

13   BY MR. RUSSO

14   S T A N    M A Y N A R D                    156

15   DIRECT EXAMINATION                          156

16   BY MR. CANTY:

17   CROSS-EXAMINATION                           190

18   BY MR. RUSSO

19

20

21   15                                          75

22   3C, D and E and 4C, D and E                 76

23   8                                           133

24   3500 SM-4                                   189

25

SS      OCR      CM      CRR      CSR